JOSEPH MCDONALD
FABA-141-U
P.O. BOX 8457
LANCASTER, CA 93599-8457
CDC# T01657
IN PRO PER BY: M. LINDSEY



FILED

JUL - 7 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE JOSEPH MCDONALD,

PETITIONER

V.

HAAWS, Warden,

RESPONDENT.

CIVIL NO. 08-0652 L (PCL)

(1) Petitioners brief in support of motion to stay, and

(2) Further argument in support of GUARDIAN AD LITEM, and

(3) Declaration of Petitioner and Lindsey.

COMES NOW Petitioner, JOSEPH HILTON MCDONALD,
Re the courts ORDER 05/29/2008 Case 08-0652-L-PCL,
Petitioner Submits Further Arguments, Points and authorities
concerning the above named matters. The Petitioner
will also submit exibits Supporting Petitioner's request.

## I.            MOTION FOR STAY

Petitioner Realleges and incorporates by reference as
though fully set forth herein Petitioners Previous Arguments,
Points and Authorities as well as exibits submitted concerning
the matter (see Petitioners First Amended Petition, May 19,

(a) Petitioner submits Brief[1]   as the claims Petitioner seeks to exhaust in the Lower court. (b) in addition to the Arguments. Points & Authorities contained theirin, the Petitioner submits that the issues or claims are 'meritorious' because of the several Constitutional violations alleged therein. which if found by this court or the Lower courts to be true. will result in a Reversal and or Modification of Petitioners sentence. and (C) by order of the count of Appeal, Fourth Appellate District. Division One. issued March 13, 2006. the Court denied Petitioners request to relieve Appellate counsel, Ava R. Straila (SBN 140988), from duty for her failure to include in her Briefs:

I) Ineffective Assistance of trial counsel;

II) Insufficient evidence as to whether the Jury's findings re Priors constituted serious or Violent felonies;

III) Trial court erred in Permitting Presudicial and irrelevant character evidence;

IV) Prosecutorial Misconduct;

V) Judicial error re refusal to Permit defense to view Late discovery documents;

VI) Abuse of discretion re Lasher . . . .

The Petitioner Filed a Habeas which was denied Nov. 29, 2006 . and another request which was denied July 10, 2006. all (3) request and denials are attached hereto as exibit (A)...

---

[1] This Brief was submitted to the CALIFORNIA SUPREME COURT. And Petitioner is currently awaiting decision. (NO. S162214)

Petitioner has made diligent attempts to resolve or pursue state remedies concerning said claims at earlier stages of post-conviction appeal...
Petitioner prays the court will grant stay.

Additional information Re:

## MOTION FOR GUARDIAN AD LITEM

As Petitioner alleged in his previous motion for GUARDIAN AD LITEM. Petitioner maintains he is unable to litigate his habeas corpus petition due to Petitioners mental incapacity. Petitioner is no longer in the E.O.P program (Enhanced Outpatient Program), nor is Petitioner taking several Psychotropic medications. All medication has been stopped. However, Petitioner currently takes sleeping medication due to depression which causes Petitioner to stay up late at night unable to sleep. And Petitioner is involved in the C.C.C.M.S Program here at Lancaster state Program under the care of a Psychiatrist. As noted in Petitioners prior Exibit (EX "B" Page dated 08-10-06)[2] Petitioners mental incapacity stems from Petitioners ingestion of the drug P.C.P, as well as other drugs (see EX, P. 8-10-06) the effects of said substances. were reflected in a TABE test conducted here at Lancaster (see EX "G" 10-23-07) which reflects that Petitioners reading level is 1.7 that of a first grader. while Petitioners Language mechanics is 1.6. It would be impossible for

---

[2] this exibit was included in the first petition to this court as EX "B" (Civil NO. 08-0652 (PCL)

for the Petitioner to understand and comprehend the complex proceedings of a Habeas Corpus. In addition, Petitioner has not attended school for legal litigation. In conclusion, As shown, the Petitioners mental incapacity may be as a result of his history of narcotics use. while Petitioner is no longer taking Psychotropic medications: Petitioners cognitive impairement due to dangerous and harmful drug use, renders Petitioner mentally incapable of Habeas litigation. And thus warrants Petitioner being Provided a Guardian AD LITEM in the interest of Justice. By "mental incapacity" Petitioners "intellectual ability" is implemented. Further documents in Support, include Petitioners Declaration and Declaration of M. Lindsey. EX "H". Petitioner Prays that the court will grant request for GUARDIAN AD LITEM.

Respectfully Submitted,

JOSEPH MCDONALD

In Pro Per by: M. Lindsey

# DECLARATION OF PETITIONER

I, JOSEPH MCDONALD HERBY DECLARE THE FOLLOWING:

1. I AM THE PETITIONER IN THIS MATTER ASSIGNED AS CASE NO. 08·0652(PCL)

2. I AM A PRISONER OF THE STATE OF CALIFORNIA SERVING A SENTENCE AT LANCASTER STATE PRISON.

3. I AM UNDER THE CARE OF A PSYCHIATRIST.

4. I SUBMIT THIS DECLARATION TO REQUEST 1. THAT I BE GRANTED A STAY OF MY EXHAUSTED CLAIMS WHILE I PURSUE EXHAUSTION OF MY UNEXHAUSTED CLAIMS IN LOWER COURT and. 2. THAT I BE GRANTED A GUARDIAN AD LITEM.

5. DUE TO MY MENTAL COGNITIVE FUNCTIONING, I AM UNABLE TO LITIGATE MY CAUSE ALONE.

6. I CAN ONLY READ BASIC FIRST GRADE LEVEL WORDS AND DO NOT UNDERSTAND COMPLEX LEGAL PROCEDURE AND RULES THAT GOVERN HABEAS LITIGATION.

7. I SUFFER SUCH A CONDITION DO TO MY INDULGENCE IN DRUG USE SUCH AS: COCAINE, PCP, MARIJUANA, AND PAINT SNIFFING.

8. WITHOUT A GUARDIAN AD LITEM. I WILL BE INCAPABLE OF APPRECIATING MY LEGAL OPTIONS OR CONTINUING MY POST-CONVICTION APPEAL.

///
///

9. I _____ NOT OBSERVED AND IF I AM HEARD ON MY ARGUMENTS I CAN PROVE SO.

10. FOR THE FOREGOING REASONS, I REQUEST THIS COURT GRANT MY MOTION FOR STAY AND GUARDIAN AD LITEM.

11. I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. EXECUTED THIS 30th DAY OF JUNE 2008, AT LANCASTER - CALIFORNIA.

JOSEPH HILTON MCDONALD
DECLARANT

I, M. LINDSEY, HERBY DECLARE THE FOLLOWING:

1. I AM A PRISONER OF THE STATE OF CALIFORNIA, SERVING A SENTENCE AT CSP-LAC.

2. I SUBMIT THIS SECOND DECLARATION IN SUPPORT OF MR. MCDONALD'S REQUEST FOR STAY AND GUARDIAN AD LITEM.

3. I PERSONALLY KNOW MR. MCDONALD, WITHIN THE COMMUNITY ON THE "A" YARD, AND I PERSONALLY KNOW THAT BECAUSE OF HIS MENTAL CONDITION, AND LACK OF UNFAMILIARITY OF THE HABEAS PROCESS, MCDONALD WILL BE UNABLE TO PROCEED WITHOUT THE PROPER ASSISTANCE.

4. I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER THE PENALTY OF PERJURY, EXECUTED THIS 30th OF JUNE 2008, AT LANCASTER, CALIFORNIA.

M. LINDSEY
DECLARANT

1. The issue of I.A.C. may be raised on direct appeal. However, if the record

2. does not provide an explanation for the attorney's conduct of the case

3. counsel wishing to raise the issue of inadequate assistance of counsel,

4. trial counsel should join with the appeal a verified petition for a writ

5. of HABEAS CORPUS, /1.    On appeal, the burden of proving a claim of

6. inadequate trial assistance is on the appellant. Once the appellant has

7. shown that trial counsel acted or failed to act in the manner expected

8. of a reasonably competent defense attorney, and that counsel's acts or

9. admissions resulted in the withdrawal of a potentially meritorious defense

10. the appellant court must look to see if the record on it's face contains

11. any explanation for the challenged aspect of representation./2.  If it

12. does, the court must inquire as to whether the explanation demonstrates

13. that counsel was reasonably competent and acting as a conscientious,

14. diligent advocate. California courts have reversed convictions when the

15. record showed that counsel had failed to research the law or investigate

16. the facts in the manner of a diligent and conscientous advocate. The

17. standard for measuring the effectiveness of counsel applies equally to

18. both appointed and retained counsel./3.   In addition to showing deficient

19. performance, the defendant generally must show prejudice to obtain relief

20. in an I.A.C. claim./4/

-------------------------------------------------------------------

21. /1. people v. pope (1979) 23 cal. 3d 412, 426-427 n.17, 152 cal. Rptr. 732

22. 590 P.2d 859; people v. Adkins (2002) 103 Cal. App. 4th 942, 127 cal. Rptr
    2d 236 (when the record does not show counsel's deficiency, must be raised
    in a HABEAS petition.)

23.
    /2.

24. People v. Diggs (1986) 177 cal. App. 3d 958, 969-970, 223 cal. Rptr.361(

25. Ineffective assistance of counsel apparent on face of record when there
    is no plausible tactical explanation for counsel's closing aregument

26. effectively withdrawing crucial defense and admitting client's guilt
    without client's consent.)

27. /3.  People v. Frierson (1979) 25 cal. 3d 142, 158, 161, 158 cal. Rptr.
    281, 299 p. 2d 587, people v. pope (1979) 23 cal. 3d 412, 426 n. 16, 152

28. cal. Rptr. 732, 590 p. 2d 859.

/4. Bell v. Cone (2002) 535 U.S 685, 122 S.ct. 1843, 152 L.Ed. 2d 914;
Strickland v. Washington (1984) 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed
2d 674.

Strickland V. Washington (1984) Supra. explained that, "[t]he defendant must show that there is a reasonable probability that, but for counsel; unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

When the record on appeal does not show the basis for the challenged acts or omissions of trial counsel, a claim of I. A. C may be made only through a petition for Habeas Corpus. A petition for Habeas Corpus on the grounds of I. A. C. may be filed in either state or Federal court. See Hill V. Lockhart (1985) 474 U. S. 52, 54-55, 106 S. ct. 366, 88 L. ED. 203; People V. Pope (1979) 23 Cal. 3d 412, 426, 152 Cal. Rptr. 732, 590, P. 2d 859.

In Re Robbins, the California Supreme Court stated that the Dixon 3> and Waltreus 4> bars do not apply to claims of I. A. C. even if the Habeas Corpus claims is based solely on the appellate record (In Re Robbins (1998) 18 Cal. 4th 770, 77 Cal. Rptr. 2d 153, 959 P. 2d 311. Compare the Federal rule of Massaro V. United States (2003) 538 U. S. -, 123 S. ct.-, 155 L. ED. 2d 714, that in a Federal Prosecution there is no procedural bar to raising ineffective assistance of counsel claim for the First time on a Federal Habeas Corpus, even if based solely on matters on the record.

With few exceptions, a defendant will be afforded only one opportunity to bring a state Habeas Corpus Petition; See In Re Clark (1993) 5 Cal. 4th 750, 774-782. 21 Cal. Rptr. 2d 509, 855 P. 2d 729.

**Case Law:**

1.) Strickland V. Washington (1984) 466 U. S. 668, 693-694, 691, 104 S. ct. 2052 , 80 L. ED. 2d 674.

2.) People V. Pope (1979) 23 Cal. 3d 412, 426 n. 16, 152 Cal. Rptr. 732, 590 P. 2d 859; People V. Adkins (2002) 103 Cal. App. 4th 942, 127 Cal. Rptr. 2d 236; People V. Haynes (1980) 104 Cal. App. 3d. 118, 123, 125, 164 Cal. Rptr. 552. (Appeal was improper method of raising issue of ineffective counsel, when record was silent, as to counsel's reasons for challenged conduct.)

3.) In Re Dixon (1953) 41 Cal. 2d 756, 264, P. 2d 513

4.) In Re Waltreus (1965) 62 Cal. 2d 818, 42 Cal. Rptr. 9, 397 P. 2d 527.

Thus, if counsel is contemplating bringing a petition, any other claims need to be included. The California Supreme Court still urges counsel to file I. A. C. habeas petitions in conjunction with the direct appeal. 1>

In the instant case this petitioner appealed to the courts on three seperate occasions. See Exibit ___A___, to remove Appellate counsel Ava R. Stralla, for her failure to raise claims Petitioner feels are meritorious and would require reversal. Petitioner also requested in the alternative, to allow Petitioner to file a Pro Se Brief to include these omitted issues, to Prevail on his direct appeal. The request's were denied on all occassions and therefor this petitioner brings the Current Opening Brief & Habeas Corpus based on Inadequate assistance of counsel and other issues not included in appellate counsels first direct Appeal Briefs. Review by this court is proper. See page 4.

**Case Law:**

**1.)** In Re Harris (1993) 5 Cal. 4th 813, 828 n.7 Cal. Rptr. 2d 373, 855 P. 2d 391.

**Note:** Unlike state practices, Ninth Circuit law prohibits consideration of a Federal habeas petition for I. A. C. as long as an appeal from the conviction is pending. See United States Verses Deeb (9th Cir. 1991) 944. F. 2d 545, 548; Feldman Verses Henman (9th Cir. 1987) 815 F. 2d 1318, 1320-1321.

This Brief and Habeas Corpus will be based on the memorandum of points and author-
ities and the declaration of Appellant served and filed herewith, and on all papers
and records on file or outside the record as mandated by People V. Pope (1979) 23
C3d 412, 428, 152 CR 732, 741 (Ineffective Assistance of Counsel), and petitioner
requests this court to review any sealed records for abuse of descretion. People
Verses Mooc (2001) 26 Cal. 4th 1216.

Petitioner declares that he is suffering from actual or costructive custody or other
restraint of Liberty as is a requirement, P. C. 1473(a).

In that said Petitioner Joseph Mc Donald, is incarcerated at Lancaster State Prison
, with an aggregate term of 22years and 4months for crimes of Burglary (459).

_____

Joseph Mc Donald,
    In Pro Per

## Introduction

Appellant does not challenge his convictions for the following counts:

Count #3/4. The Meza/Morgan Burglary and attempt Burglary in violation of (P. C. 459, 460) and (459,460. 664)

Count #5. Petty theft with a prior (P. C. 484)

Count #6. Recieving Stolen Property in violation of (496 subd. (a).)

Count #7. Ex-felon in possesion of a firearm. (12021 subd. (a) (1).)

Appellant concedes that there was sufficient evidence to convict appellant of the above crimes and does not advance any of the arguments below to challenge those crimes.

All below arguments, Points and Authorities concern counts #1 and Count #2, the HAVERN and BORRECO Burglaries, with the exceptions of P. C. 654 challenges to the MORGAN, attempt-burglary and Ex-felon in possesion of a firearm charge in relation to the MEZA BURGLARY.

The People Of The State Of California, Respondent,

                          V.

Joseph Hilton Mc Donald. Petitioner/Appellant

D046881

NO.  SCE234930

**Application For Leave To
File Oversize Brief.**

**(CRC, Rule 14(C) (5).)**

To the Honorable Justices and Associate Justices of the   United States Dist. Court
~~CALIFORNIA SUPREME COURT~~.

Appellant Joseph Hilton Mc Donald, acting pro se, now moves for leave to file an
Appellant's Opening Brief and Habeas, in excess of the maximum words provided in
California Rules of Court, Rule 14. The attached brief may exceed the amount
permitted under Rule 14, Subdivision (C) (1) by an unknown amount.  This motion
will be based on the memorandom of points and authorities and the declaration of
petitioners served and filed herewith, and on all papers and records on file in
this action.

Dated:  3·24-08

Respectfully Submitted,

Joseph Hilton Mc Donald,
       Acting Pro Se

DECLARATION OF JOSEPH Mc DONALD
IN SUPPORT OF REQUEST FOR LEAVE
TO FILE AN OVERSIZE BRIEF.

I, Joseph Hilton Mc Donald, declare under penalty of perjury, I am acting in Pro
Per, on appeal following my conviction of (3) counts of residential burglary
penal code section 459, (1)count attempt burglary. p.c. (459) and recieving
stolen property p.c. (496), and petty theft with a prior, p.c. (484), and ex-
felon in possesion of a firearm, p.c. (12021, subd. (a).

I have reviewed the entire record on appeal, consisting of the clerks transcripts
(pg. 1-2011), and the repoters transcripts (vol. 1 & 2), and have prepared the
attached Appellants Opening Brief/Habeas. My research led me to the conclusion
that several errors of constitutional magnitude were made at the trial of the
matter. Because these issues, in particular due process error, and I.A.C as well
as other pertinent matters, require an extensive discussion of the factual basis
of defendants contentions, as well as the legal basis for each point, the Brief/
Habeas is necessarily quite lengthy.

I have prepared the brief with the intent that it will be of assistance in reso-
lving the issues on appeal. I have made every effort to comply with Rule 14,
insofar as was possible. And lastly here at Lancaster State Prison, we do not
have word count.

Executed on  3 - 23 -            -, 2008

Joseph Hilton Mc Donald

7

## Points and Authorities in Support of Motion, for leave to file oversize Brief.

California Rules of court, Rule 14, subdivision (c) (1), provides that "[a] brief produced by a computer must not exceed 14, 000 words..." California Rules of court, Rule 14, subdivision (c) (5), provides that "[o]n application, the presiding justice may permit a longer brief for good cause."

Accordingly, appellant request that this application for leave to file "Oversize Brief" be granted, and that this court issue an order that the brief be filed and the Attorney General and appellant be given a reasonable amount of time to respond and reply. I declare under penalty of perjury, under the laws of the State Of California, that the foregoing is true and correct. This declaration was executed on _____ 2007, at Lancaster State Prison, Lancaster California.

Respectfully Submitted,

_____

Joseph Mc Donald/Appellant
In Pro Se.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

~~FOURTH APPELLATE DISTRICT, DIVISION ONE~~

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff and Respondent,<br><br>v.<br><br>**JOSEPH HILTON MCDONALD,**<br><br>Defendant and Appellant. | D046881 |

## STATEMENT OF THE CASE

By way of an amended information filed on September 27, 2004, the District Attorney of San Diego County charged appellant with three counts of burglary (counts 1-3; Pen. Code, § 459[1]); attempted burglary (count 4; §§ 664 and 459); petty theft with a prior (count 5; § 484); receiving stolen property (count 6; § 496, subd. (a)); and possession of a firearm by a felon (count 7, § 12021, subd. (a)(1)). (II CT 300-301.) The information also alleged that appellant suffered one prison prior conviction (§§ 667.5, subd. (b) and 668); a serious felony prior conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)); and a strike prior conviction (§§ 667, subds. (b) - (i); 1170.12; 668.) (II CT 302-303.)

Jury trial commenced on September 27, 2004. (II CT 445.) Appellant was found guilty as charged and the allegations were found to be true. (II CT 388-397, 462-472.) On July 7, 2005, the trial court sentenced appellant to a total of twenty-two years and four months in state prison which consisted of the midterm of four years, doubled, for count 1, one year and four months, doubled,

---

1.   Any subsequent statutory reference is to the Penal Code unless otherwise indicated.

she had left for school, her jewelry boxes had been closed and the jewelry were inside the boxes. (V RT 557.) Jolene went into the kitchen to look for her cat, and her mom came home. (V RT 558, 581.) Jolene told her mom, Janet Havern, about the jewelry boxes, and Janet went upstairs to check her room. (V RT 558.) Janet's room had been ransacked; all the drawers were open, and there was clothing all over the room. (V RT 558.)

Janet called the police, and they waited on the lawn because they did not know if someone was still inside the house. (V RT 559, 583-584.) Janet noticed that a big jug with about $400 worth of change was missing. (V RT 585.) Items such as a gold necklace, cubic zirconia diamond studs, and a topaz ring were taken from her jewelry box. (V RT 586.) Other items that were taken were a black London Fog suitcase, a JVC video camera[3] in a cooler bag. (V RT 587, 592-593.)

Jolene's cat did run away from the house, but it was eventually found. (V RT 559.)

**Borrego Burglary (count 2)**

Jeff Hannigan lives at 3344 Central Avenue. (II RT 88.) His neighbor to the south is Adrian Berrego, who lives at 3336 Central Avenue. (II RT 89; III RT 321.) On October 15, 2003, Hannigan was building a set of stairs in the slope in his backyard. (II RT 90.) From his backyard, Hannigan was able to see into Borrego's backyard. (II RT 90.)

At around 11:00 or noon, Hannigan saw a young Black man, who was about five feet eight or nine inches tall and had tightly braided hair with a lot of colored beads, on the side of Borrego's house. (II RT 91, 101.) The man

---

3. The Havern's videocamera was recently used to take still digital photographs and video footage of a wedding. (V RT 560, 596.) The memory stick was inside the camera.

**Meza Burglary (count 3)**

Peter Meza, a Sergeant on the San Diego County Sheriff's Department, lives in a duplex at 3375 Central Avenue in Spring Valley. (II RT 51.) Kathy and Dennis Morgan rent, from the Mezas, the downstairs unit below Meza. (II RT 52-53; III RT 335.)

On October 23, 2003, at 12:45 p.m., Meza and his wife, Michele, left their house to go to their family's mail store, about two miles from their house. (II RT 60.) Meza's children were in school. (II RT 55.) The backdoor was unlocked. (II RT 56.) Meza's duty gun, a .40 caliber Glock semi-automatic pistol, was in the living room, in an attache case which he carries to work. (II RT 56-57.) His other gun, an A.M.T. .380 caliber gun, was in a gun cabinet in Meza's bedroom. (II RT 56, 59.)

In the meantime, at around 1:00 p.m., Terina Noa, Meza's neighbor, was sitting on her porch talking to her mother on the telephone. (III RT 149, 152.) Terina noticed that two Black males, a tall male who Terina identified as appellant, and a short male, were coming out of the driveway from her neighbor's house across the street. (III RT 152, 154.) The males walked across the street, Terina made eye contact with them, and appellant came towards Terina and asked her for a glass of water. (III RT 154.) Appellant was about 14 feet away from Terina, and she was able to get a good look at him. (III RT 155.) The other person continued to walk towards the Meza's home. (III RT 156.) Terina asked appellant to wait, and she called out to her husband, Elias Noa, who was inside in the bedroom, that a gentleman was out here who wanted some water. (III RT 156.) Terina had her back turned to appellant while she called her husband. When she turned back around, appellant was on her porch, which frightened her. (III RT 157.) At this point, appellant was about four or five feet, or within arm's reach, from Terina. (III RT 157.) Appellant again asked for a cup of water. (III RT 158.) Terina asked him to wait because

been ransacked. (II RT 60, 62, 70.) Meza found that his son's X-Box video game system and video games, cash from his daughter's room, a lot of his wife's jewelry, palm pilot and a video camera were all missing. (II RT 62-63, 72, 77-78.) Meza also noticed that his guns were missing, and the gun cabinet had been pried open. Specifically, the locking mechanism was bent out and part of the wood was broken out. (II RT 59-60, 62, 71.)

Michele Meza also noticed that the back latch to the back door was unhooked. (II RT 75.) The back door had a screen door, and Michele noticed that the screen was ripped so a person would have been able to unhook the latch. However, she was not sure whether the screen was ripped before they left the house before the burglary. (II RT 75.) Michele also noticed that on the back balcony on the house, plants had been smashed down in the corner of the balcony, and she saw finger marks in the dust where someone had climbed up onto the balcony. (II RT 76.)

Appellant did not have permission to enter Meza's home that day. (II RT 63.) The palm pilot and video camera were eventually returned to the Mezas. (II RT 73.)

When police officers first contacted Terina on the day of the burglary, she gave them a description of the tall male she saw at Meza's house. (III RT 199.) He was a Black male, age 20 to 25, approximately six feet two inches, approximately 205 pounds with a muscular build. (III RT 200.) Terina described appellant as being a dark skinned male. (III RT 181.) Terina identified appellant at a photo lineup and at trial. (III RT 154.)

When police first came to investigate, Elias described this person as a six foot two inch Black male, with braided hair, muscular build, wearing pants. (III RT 216.) Elias did not describe appellant as being a "dark skinned black male." (III RT 225.) Elias identified appellant, both at the photo lineup and at trial, as the person who asked for water. (III RT 209, 214-215; IV RT

7

identified as appellant opened the back door of the office.  Appellant saw Porras and her co-worker eating lunch, and he asked them where the front entrance was. (III RT 249.) Porras did not know who appellant was, but since there were other businesses upstairs and around the corner, she directed him to the front entrance. (III RT 249.) Appellant was wearing a really big, puffy black jacket, he had about a dozen, chin length braids in his hair. The person also had dark skin. (III RT 259-261.) Porras made a phone call and then went back to finish her lunch.

Nicholas Brecht, a physical therapy assistant, was walking down a hallway to the front of the therapy office to get some supplies. (IV RT 416.) Brecht saw a Black male going through the cabinets underneath the sink in the same room where the female employees normally kept their purses. (IV RT 413, 416.) The lights were off in the room, but Brecht was able to see the man's profile. (IV RT 418.) Brecht went to the front office and asked if someone was supposed to be fixing the sink in the back. The other employees told Brecht that no one was supposed to be back there. (IV RT 419.) Brecht waited for the man to come out because he did not want to confront the person if the man was not doing anything wrong. (IV RT 420.)

The man, who Brecht identified in court as appellant, came down the hall, and asked Brecht if he knew where the bathroom was. (IV RT 420-421.) Appellant was wearing a big, loose-fitting black denim jacket, so Brecht was unable to see if he had anything in it. (IV RT 420.) Appellant was also wearing baggy pants in a similar dark denim material. (IV RT 428.) Appellant's hair was fixed in really tight corn rows and braids. (IV RT 429.) Brecht was able to get a good look of the person at this time because the man was right in front of him. (IV RT 427.) Brecht directed appellant to the bathroom. (IV RT 421.) Brecht did not ask appellant what he was doing in the office. (IV RT 422.) Brecht then told his co-workers to go back there to check

9.

### Police Investigations

Jim Burgert was appellant's parole agent with the California Youth Authority ("CYA"). (II RT 104.) Appellant was to report his residence to Bergert. (II RT 104.) In the early part of October 2003, appellant was supposed to be living at a sober living home, One Day at a Time, at 4120 16th Street in San Diego. (II RT 106.) On October 17, 2003, Burgert made a random home visit to the facility. (II RT 106.) Burgert found only two pants in his closet, no linens on the bed, no other articles of clothing, no toiletries or anything else that would indicate that appellant was living there on a regular basis.[4] (II RT 106-107.) The owner of One Day at a Time, Tyce Bonjomo, told Burgert that they had not seen appellant around. (II RT 112, 128.)

Burgert then tried to track appellant down. Burgert returned to One Day at a Time about two times, but he did not find appellant here. (II RT 139.) On November 4, 2003, at approximately 6:00 p.m., appellant came to the CYA parole office with Regina Burton, who appellant identified as his cousin. (II RT 108.) Burgert told appellant that he was concerned about appellant's placement. Appellant told Burgert that he was changing his placement and wanted to live with Burton at 8614 ½ Troy Street in Spring Valley. (II RT 108.) After checking with his supervisor, Burgert tentatively approved the change in placement. (II RT 108, 122.) Burgert also told appellant that he would have to speak with his adult parole officer. (II RT 124.)

On November 5, 2003, Burgert received a phone call from Detective Hartman indicating that appellant may be a suspect in a crime. (II RT 131.) Detective Hartman told Burgert not to go to the Troy Street address to check on appellant's placement request yet because they were still investigating the

---

4. Burgert was aware of the pants, shirts and linens appellant had because CYA purchased two pants, two shirts, and linens for appellant when he was released on parole. (II RT 116.)

11

MORENA DAMIAN IS A CLERK AT LA MORENA PRODUCE, A SMALL PRODUCE MARKET ON THE CORNER OF SWEETWATER AND TROY ST. (IIIRT 353-356.) REGINA BURTON AND HER FIVE CHILDREN LIVED IN AN APARTMENT ACROSS FROM THE MARKET (IIIRT 358) TWO WEEKS BEFORE POLICE EXECUTED A SEARCH WARRANT ON THE APPELLANTS APARTMENT , THE APPELL/ AND ANOTHER BLACK MALE MOVED INTO THE APARTMENT.(IIIRT 358-359) DAMIAN SAW APPELLANT COMING AND GOING FROM THE APARTMENT (IIIRT 366, 370) APPELLANT HAD TWO BIKES THERE. THE BIKES WERE NOT      THE APARTMENT PRIOR TO THAT DATE.(III RTY 369) APPELLANT AND ANOTHER PERSON ENTERED THE PRODUCE STORE WHEN DAMIAN WAS WORKING (IIIRT 361) AND ANOTHER CUSTOMER WAS INSIDE THE STORE (IIIRT 362) APPELLANT APPROACHED DAMIAN AND THE CUSTOMER AND ASKED IF THEY WERE MARRIED APPELLANT THEN PULLED OUT A SANDWHICH BAG   THAT WAS HALF-FULL OF JEWELRY THAT WAS NICE LOOKING(IIIRT 362-363) APPELLANT THEN TOLD THEM HE WOULD GIVE THEM A NICE PRICE FOR THE JEWELRY (IIIRT 364.) BOTH DAMIAN AND THE STORE CUSTOMER DECLINED, AND APPELLANT AND HIS FRIEND LEFT THE STORE (IIIRT 365) ON NOV.4,2003 DETECTIVE HARTMAN SPOKE WITH APPELLANT'S PAROLE OFFICER JIM BURGERT WHO INFORMED DET. HARTMAN THAT APPELLANT WAS LIVING AT 86141/2 TROY ST. IN SPRING VALLEY.(IVRT 451, 516) DET. HARTMAN ALONG WITH OTHER DETECTIVES, CONDUCTED A SURVEILLANCE OF THE TROY ST. RESIDENCE NOV.5, 2003. (IVRT 452) DETECTIVE HARTMAN SAW APPELLANT AND TONY WASHINGTON COMING IN AND OUT OF THE FRONT DOOR OF THE TROY ST. RESIDENCE OVER A SPAN OF 20minutes BEFORE APPELLANT AND WASHINGTON GOT INTO A TAN OLDSMOBILE AND   DROVE AWAY WITH WASHINGTON DRIVING, AND APPELLANT AS THE PASSENGER. (IVRT 452) DETECTIVE HARTMAN OBTAINED A SEARCH WARRANT FOR THE TROY ST. RESIDENCE, THE TAN OLDSMOBILE THAT WAS IDENTIFIED IN THE BORREGO BURGLARY, AND

(CONTINUED ON P. 13)

appellant. (IV RT 453-454, 456.) The Glock .40 caliber handgun stolen from the Meza residence was recovered from the drop ceiling in the south bedroom of the Troy Street apartment. (IV RT 459.) Another gun was located beneath a dresser. (IV RT 461.) Officers also found a purse, a camcorder which had a memory stick depicting images of Jolene Havern, and a palm pilot which belonged to Michele Meza. (IV RT 463-464, 469.) The videocassette in the camcorder also contained 49 minutes of footage, including footage of the wedding the Haverns attended. Some of the footage also included appellant and Tony Washington. (IV RT 469.) It showed the interior of the Troy Street apartment, a barbeque on November 5, 2003, and a rap performed by appellant. (IV RT 471.) In the rap, appellant mentioned a "Glock 40" which was the type of gun recovered from the Troy Street apartment and was stolen from the Meza's home. (V RT 550.) Appellant also talked about a "Tre-80" gun which is slang for a .380 caliber handgun, also a gun found in appellant's apartment and was taken from Meza's gun cabinet. (V RT 550.) In the tan vehicle that appellant was arrested in, officers recovered a Nordstrom credit card, a Bally fitness card, and a Movie Watcher card, in the name of Michelle Porras. (IV RT 480.) A London Fog suitcase and a tripod which belonged to the Haverns was located in the trunk of the car. (IV RT 484, 486.) An owner's manual for the Havern's JVC camcorder found inside the Troy Street apartment was located in the glove compartment of the car. (IV RT 481.) Also recovered from the glove compartment was a vehicle title transfer document in appellant's name, and a service invoice dated October 30, 2003, with appellant listed as the owner of the car. (IV RT 482.)

During appellant's arrest and booking, Detective Hartman asked appellant where he lived, and he said 8614 ½ Troy Street. (IV RT 487.) Appellant also told Detective Hartman that he purchased the car on October 4, 2003. (IV RT 483.)

13

to his curfew. (VI RT 918, 922, 925, 927.) According to Burton, Washington would bring people over to her apartment, including six Black males with dark complexions and braided hair. (VI RT 944-945.)

Appellant also testified at trial. (VII RT 1510.) He let Washington use his car many times. (VII RT 1526.) Appellant claimed that he talked about guns in the rap video because Washington had told him about the guns. Appellant never saw the guns in the apartment. (VII RT 1534, 1545.) Appellant specifically told Washington that if Washington brought guns into Burton's home, he and appellant would have problems. (VII RT 1545.) He did not know anything was in his trunk and did not know that Porras's credit cards were under the passenger seat of his car. (VII RT 1550.)

### Rebuttal

Detective Hartman testified that Washington implicated himself and appellant in the Borrego burglary after the detective told him someone saw them at the side of the house. (VIII RT 1605.) Washington also told Detective Hartman that he and appellant would drive around looking for houses where there were no cars. They would then ring the doorbell to see if anyone was home. If not, they would try to find a way into the house. (VIII RT 1606.)

Washington also described how, during the Meza burglary, appellant climbed up onto the rear balcony and let him in through the front door. (VIII RT 1606-1607.) Washington never mentioned a person named C.K. during the interview. (VIII RT 1607.) Washington told the detective that he was just trying to help appellant, but burglaries were not his thing or his idea. (VIII RT 1607-1608.)

Appellant admitted to Detective Hartman that he had seen and held the guns. VIII RT 1612.) Appellant claimed the London Fog suitcase found in the car was his. (VIII RT 1613.)

15

ARGUMENT

I

>     Appellant argues there was insufficient evidence
>     to convict appellant as to count one the Havern
>     Burglary...

A.  Proceedings Below.

   (See statement of the case and statement of the facts.)

   (And see the police investigation.)

The Appellant's trial counsel filed an 1118.1 motion for dismisal of the appellants charge for burglary of the Havern residence, after the people had rested there case in chief (RTV5 P. 611-613.)  In which the following colloquy between appellants trial counsel Pamela Lacher and the Judge and Government Prosecutor took place:

**Ms. Lacher:**  Last one would be count one of the Havern residence there was no evidence that any witness saw the events in question so.

**THE COURT:**  Is that a requirement?

**Ms. Lacher:**  So, what we have is the video camera and some of the items were found in both the house and the car related to Mr. Mc Donald.  At least the evidence supports possesion of stolen property, rather than entering into that particular house, especially since the only evidence of entry, or at least was Mr. Washingtons prints, but there was no evidence that Mr. Mc Donald was in the house, there were two males inside the house, or was near the house, or that he ever entered the house or was near the house, so I would... at best, it constitutes possesion of stolen property.

**THE COURT:** Mr. Bowman.

**Mr. Bowman:**  yes, your Honor there is no doubt that he was certainly in possesion of the stolen property within a month of the burglary.  But what we have to do is look at the similarities in the Meza burglaries, which are helpful in determining

who did the burglary of the Havern residenceand the Meza residence. It was obvious
they had dumped all the items on the bed and gone through all the items in the bed,
much like they did on the Havern residence, so the method of entry, Although, well,
through an unlocked backdoor you recall that the Meza's left the backdoor open.
The Haverns leftbackdoor open. That is how we presume they got in, they dumped
the items on the bed in the Haverns house, much as they did in the Mezas residence.
Dumping on the bed, they stole the guns from the Meza house and it was apparent
they were perhaps looking for guns in the bedroom because they were looking through
all the mail stuff and all the things by the bed where perhaps someone would keep
a gun. So, there is sufficient circumstantial evidence to tie Mr. Washington-- I
am sorry-- Mr. Mc Donald into that particular burglary. And the cumulative effect
of all that circumstantial evidence is certainly enough to get past atleast an
1118 motion on that burglary, so he actually entered the house.

**THE COURT:** I don't know about the gun thing, that seemed a little farfetched to
me that they are looking through guy stuff in a closet. But I think Mr. Mc Donald's
association with Mr. Washington, who clearly is in that particular home, certainly
allows an argument that he had an aider and abettor, and the aider and abettor is
the guy who is possessing the property one month later. Jury doesn't have to buy
it. But I think they can, If that is what they want, so the 1118 is denied there
as well. (RT Volume 5 P. 611, 22-28, P. 612. 1-28, P. 613, 1-16.)

## ARGUMENT

### I

Appellants Due Process Rights under the U.S.C.A. Fourteenth Amendment, were violated since the Evidence (at 1118 hearing) was insufficient to support the courts denial of appellants request to acquit appellant of the Havern Burglary of count #1. In violation of Penal Code Section 459.

Appellant was charged in an information with First degree residential Burglary (Penal code 459) in count 1. Regarding the burglary, the information alleged the Appellant and Co-defendant Tony Washington did unlawfully enter a building occupied by with intent to commit theft- in violation of P.C. Section 459. And further it was alleged that said burglary was an burglary of an inhabited dwelling house-trailer couch- inhabited portion of a building- within the meaning of P.C. Section 460. (C. T. 0002)

The Jury found appellant guilty of the First degree burglary (Penal code Section 459/460) in Count 1. The appellant contends, the Jury's finding on Count 1 was erroneous as there was Insufficient evidence to establish that appellant "TOOK" any of the Property from the Havern residence or entered the Havern residence within the meaning of P.C. section 459.

**The Federal Standard For Sufficiency Of Evidence is set out in Jackson V. Virginia (1979) 443 U.S. 307-319.**

> [T]he relevant Question is whether- after viewing the evidence in
> the Light most Favorable to the Prosecution, any rational trier of
> Fact could have found the essential elements of the crime beyond a
> reasonable doubt. This Familiar Standard gives full play to the
> responsibility of the trier of fact, fairly to resolve conflicts in
> the testimony- to weigh the evidence, and to draw reasonable infere-
> nces fom basic facts to ultimate facts. Once a defendant has been
> found guilty of the crime charged, the facts finders role as weigher
> of the evidence is preserved through a legal conclusion that upon
> Judical review all of the evidence is to be considered in the light
> most Favorable to the Prosecution.

The standard set out in <u>Jackson</u> is applicable to California Cases. (People V. Johnson (1980) 25 Cal. 3d 557,558.)  In Johnson, the California Supreme court refined the standard:

"In determining a reasonable trier of fact could have found defendant Guilty beyond a reasonable doubt, the appellant court 'must view the evidence in a. light most Favorable to respondent and Presume in support of the Judgement the existance of every fact the trier of fact could reasonably deduce from the evidence.' [citations.] The court does not, however, limit its review to the evidence Favorable to the respondent. As People V. Basset (1968) 69 Cal. 2d 122, explained, 'Our task ... is twofold. First, we must resolve the issue in the light of the whole record -- i.e., the entire picture of the defendant put before the Jury-- and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must Judge whether the evidence of each of the essential elements. . . is substantial;; it is not enough for the respondent simply to point to 'some' evidence supporting the finding. For 'Not every surface conflict of evidence remains substantial in the light of other facts.'" (Id., at PP. 576-577.)

A conviction based on proof that does not rise to this level of certainty cannot stand, in the face of the defendant's due Process right to have the prosecution Prove every element of the offence charged beyond a reasonable doubt. (In re Winship (1970) 397 U.S. 358,364.)

The People's theory on the burglary was that:[1] "The Havern burglary was 'similiar' to the Meza burglary in Count #2."[2] Appellant was in possession of stolen property within a month of the Havern, burglary, thus there was sufficient circumstantial evidence to tie appellant into the Havern burglary. . . (RT vol. 5 . P. 611-613.) The Prosecutor stated, "The cumulative effect of all that circumstantial evidence is certainly enough to get past at least an 1118 motion on that burglary, so he actually entered the house." (RT. P. 613.)

B. The trial court should have Granted appellants 1118 motion as is the requirement when there is insufficient evidence of every necessary element to convict appellant of burglary at the close of Prosecutions case-in-chief...

**Burglary Defined:**

"Every person who enters any building with the specific intent to steal, take or carry away the personal property of another of any value and with the further intent to deprive the owner permanently of that property is Guilty of Burglary in violation of Penal code section 459."

In a court trial counsel can move for motion of Prosecutions case-in-chief, or the close of all evidence before the case is submitted. (See P.C. 1118.1.)

Moving for a Judgement of acquital at the close of Prosecutions case-in-chief preserves the defendant's right to appeal to have a reviewing court consider the sufficiency of the evidence as it stood at that time, i.e. before the defendant put on evidence. (See People V. Trevino (1985) 39 C3d 667, 695. 217 CR 652. dissapproved on other Grounds in People V. Johnson (1989) 47 C3d 1194, 1219. 255 CR 569.)

No Particular form is required for the motion and the defendant is not required to state the Grounds or direct the court's attention to particular counts. (People V. Cole (2004) 33 C4th 1158, 1213. 17 CR3d 532;  People V. Belton (1979) 23 C3d 516, 521, 153 CR 195 (defense counsels statement that he didn't think there was sufficient evidence to convict defendant held to be sufficient articulation of motion of Judgement of acquital.)  Thus, a non-specific motion for acquital requires the trial court to consider all possible claims of insufficiency of the evidence.

In either a court trial or a Jury trial, the court must consider whether the evidence presented is sufficient to sustain a conviction on appeal.  P.C. 1118, 1118.1 ;  People V. Ainsworth (1988) 45 C3d 984, 1022, 248 CR 568 (Test to be applied in deciding P.C. 1118.1 motion is "whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offence charged.")

The function of this court in reviewing the trial court's denial of appellant's motion for acquital, is the same as the standard of review on a claim that the evidence is insufficient to support the verdict...

The court must determine whether there is any substantial evidence of the exist-
ence of each element of the offence charged. People V. Trevino (1985) 39 C3d
667, 695, 217 CR 652, overruled on other Grounds in People V. Johnson (1989) C3d
1194, 1221, 255 CR 569.

The substantial evidence rule is an aspect of due Process. Jackson V. Virginia
(1979) 443 U.S. 307, 61 L Ed 2d 560, 99 S Ct 2781.

As outlined above, the trial court's duty was to decide whether there was "Subst-
antial" i.e. solidly built-strong- evidence of each 'element' of the offence
charged. People V. Ainsworth (1988) supra.

Thus, the appellant argues the trial court erred when it denied appellant's motion
for acquital with only the following evidence 'up until the 1118 motion' which
consisted of: (1) Appellant was in the Presence of co-defendant TONY WASHINGTON
who's FingerPrints were found inside the HAVERN residence, thereby
tying WASHINGTON to that crime. (R.T. 452-456, 498);
(2). Stolen property from the Havern residence being found in appellant's
vehicle and residence. (RT Vol. IV P. 463-64, 484-486.)

The elements necessary to convict on a charge of burglary consist of:
1. That a person entered a building. At the 1118 motion the prosecution put
forth no substantial evidence that appellant ever entered Havern residence; 2.
The person entered with the specific intent to steal, take or carry away the
personal property of another. At the 1118, again there was not any evidence
albeit, substantial evidence to    suggest that the appellant had any of the
required intent to steal or take the Havern Property, or 3. with the further
'intent' to permanently deprive the Haverns of their property.

Thus, the appellant argues the trial court did not adhere to the 'substantial
evidence' rule mandated by 1118.1 when it based its denial of appellant's motion
for acquital on speculation and less than substantial evidence. The trial court
reasoned that appellant and co-defendant Tony Washingtons association/1 with each
other (RT Vol. 5 P. 613) and evidence against Washington that established
Washingtons presence inside the Haverns, "certainly allows an argument that he
(WASHINGTON) had an aider and abettor, and the aider and abettor is the guy who
is possessing the property one month later." (RT Vol. 5 P. 613) was Erroneous.

/1 mere association with the perpetrator of a crime is not sufficient to prove
a criminal conspiracy. (People V. Massey (1957) 151 Cal. App. 2d 623, 312 P. 2d
365.

It has long been the rule in California that evidence of recently stolen property
is not, standing alone, sufficient evidence to sustain a conviction. In other
words, possession of recently stolen property must be corroborated. (People V.
Citrino. 46 Cal. 2d, 284-288 [294 P. 2d 32]. and [58 Cal. 2d 785] case cited.)

The trial courts ruling that appellant's possession of stolen property and Co-Def-
endants proven presence inside the Haverns, allowed for an aiding and abetting was
insufficient to deny appellants 1118 motion.

**The appellant urges the court to look at a case similiar to appellant's:**

People V. Johnson (1988) 200 Cal. App. 3d 1553. In that case, "the defense offered
evidence of another person detained in the vicinity of a Burglary who was the
height described, had the cash in the amount and denominations missing, and who
was seen walking away from the burglariezed house. The trial court barred the
evidence because that persons finger prints did not match Latent Prints left at
the point of entry." Upholding that ruling, the court held "even the strongest
Circumstantial evidence case of third party Culpability does not raise a reason-
able doubt about a defendant's Guilt when finger prints found at the scene of the
crime could not have been those of the third party." Id. at P1564)

Here, the appellant indeed was found in possession of stolen property. However,
the finger prints found at the scene of the crime, did not match appellant's, and
furthermore, there was no eyewitnesses to place appellant at the scene, or place
appellant in a place of opportunity. Thus, to speculate as to appellant possibly
being an aider and abettor was based on "suspicion" which is not evidence with
which the court could deny appellants 1118 motion as a trier of facts." Suspicion
is not evidence, it merely raises a possibility, and this is not sufficient basis
for an inference of fact." (People V. Briggs 1967) 255 A.C.A 593, 596. 63 Cal. RPTR.
111;  People V. Tatge (1963) 219 Cal. App. 2d 430-435, 33 Cal RPTR. 323.)

The facts of Appellants case is;  there was no testimony or prosecution witness to
establish appellants involvement in the Havern Burglary. And only Washingtons
prints were found at the scene. (See People V. Hall (1964) 62 Cal. 2d 104-41 Cal.
RPTR. 284, 396 P. 2d 700, which requires the reviewing court to reject "inferences
sought to be derived from weak and inconclusive sources when they are contrary to"
'otherwise indubitably established facts.' (62 Cal. 2d at P. 110, and see ID. ,
P. 112, 41 Cal. RPTR. 284-396 P. 2d 700-703;  and People V. Singh (1936) 11 Cal.
App. 2d 244-250-254. 53 P. 2d 403.)

The trial courts denial of appellants 1118 motion was predicated upon its belief in what the Jury might be able to infer from the evidence which is that the appellant aided and abetted Washington, and thus leaving it up for the Jury to decide. This was not the courts function at the time of the 1118 motion. The court was to decide on its own, whether the evidence "up until that point" was sufficient to sustain a conviction. (People V. Trevino, supra; People V. Johnson , supra.)

The indisputable fact was, by itself; stolen property is not enough to convict (People V. Citrino, supra.), and Tony Washingtons prints proved he committed the Burglary. The courts ruling that the evidence may allow for aiding and abetting , "and that the Jury may buy it," was clearly a showing of the courts doubt in the evidence before it.

Reese V. Smith, 9 Cal. 2d 324, 328, 70 P. 2d 933, 935: "If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary."(Patterson V. San Fransisco, etc., RY. Co., 147 Cal. 178, 81 P. 531. a Judgement cannot be based on Guesses or Conjectures. Puckhaber V. Southern Pac. Co., 132 Cal. 363-64 P. 480.)

It was not what the evidence "allowed" for, but whether it was enough to convict at the time of the 1118 motion.

As the appellant argued Previously Re People V. Johnson, supra. The court should bar evidence of third party culpability when other evidence proves he could not be the perpetrator.

"Even the strongest circumstantial evidence case of third party culpability does not raise a reasonable doubt about a defendant's Guilt when fingerprints found at the scene of the crime could not have been those of the third party." Id. at P. 1564.

The appellant concludes that, without corroboration of Appellants Guilt in the face of other evidence which excluded appellant as the perpetrator, there remained only the courts "suspicion" of appellants involvement, and suspicion is not enough to convict appellant of all the necessary elements of burglary.

Moreover, suspicion is not evidence;  it merely raises a possibility and that is
not sufficient basis for an inference of fact. (Sanders V. Mac Farlane's Candie's,
119 Cal. App. 2d 497, 500, 259 P. 2d 1010;  Brocato V. Standard oil Co., 164 Cal.
App. 2d 749, 758, 331 P. 2d 111;  Estate of Teed, 112 Cal. App. 2d 638-644, 247 P.
2d 54.)

**The appellant further argues, that the conviction should be reversed because the
trial courts assumption that because appellant associated with co-defendant, Tony
Washington, who's prints were found inside the Havern Residence, this fact allowed
for the argument that appellant was co-defendant Washington's aider and abettor
was erroneous.**

Appellants, co-defendant Tony Washington operated appellants vehicle (RT. Vol. IV
P. 452), and lived at the 8614½ Troy Street residence. (RT Vol. IV P. 452). There-
fore, explaining how the stolen property was found in those places,  Furthermore,
CALJIC 3.01 Aiding and Abetting-- Defined states:  "A person aids and abets the
the commission or attempted commission of a crime when he or she **(1)** with knowledge
of the unlawful purpose of the perpetrator, and **(2)** with the intent or purpose of
committing or encouraging or facilatating the commission of the crime, and **(3)** By
act or advice aids, promotes, encourages or instigates the commission of the crime.

A person who aids and abets the commission or attempted commission of a crime need
not be present at the scene of a crime which does not itself assist the commission
of the crime does not amount to aiding and abetting.  Mere knowledge that a crime
is being committed and the failure to prevent it does not amount to aiding and
abetting."

As clearly, outlined in the above, CALJIC NO. 3.01, in order for the appellant to
be deemed an aider and abetter, appellant had to have the requisite "intent".or
'Knowledge' of the crime. or encouraged or facilitated the crimes commission. . .

Thus, at the 1118 motion, for the trial Judge to deny the appellants 1118 motion
because appellant associated with co-defendant Tony Washington, and was in the
presence of stolen property and speculate that appellant could be an aider and
abetter was error.  In light of the fact that there was absolutely no evidence at
the 1118 motion to establish that appellant met any of the required "elements" as
co-defendants Aider and Abettor, as mandated in CALJIC NO 3.01.  Therefore the

trial courts ruling to deny the 1118, was based entirely on conjecture, suspicion and speculation.  (Sanders V. Mac Farlanes candies, supra.)/2

Appellant respectfully request this court to set aside his conviction for count#1, The Havern Burglary...

/1  mere association with the perpetrator of a crime is not sufficient to prove a criminal conspiract (People V. Massey. supra.)

## ARGUMENT #2

Appellant contends that there was insufficient evidence to
convict him of count (2), The Borrego Burglary...

1.  (See statement of case, Borrego Burglary, Count (2)...)
                (See statement of facts)

## Applicable Law:

On appeal, the evidence is to be viewed in the light most favorable to the party
prevailing in the trial court. It is for the trier of fact to determine the
credibility of the witnesses and the reasonable inferences to be drawn from the
evidence, (People V. Newland (1940) 15 Cal. 2d 678-681, 104 P. 2d 778;  People
V. Gaeta (1960) 178 Cal. App. 2d 830-832, 3 Cal. RPTR. 384.)

Before the Judgement of the trial court can be set aside for insufficiency of the
evidence to support the verdict of the Jury, it must appear that upon no hypothe-
sis whatever is there sufficient substantial evidence to support it, (People V.
Daugherty (1953) 40 Cal. 2d 876-885, 256 P. 2d 911;  People V. Newland, supra;
People V. Reed (1966) 241 Cal. App. 2d 102-105, 50 Cal. RPTR. 300.)

But evidence which merely raises a strong suspicion of the defendant's Guilt is
not sufficient to support a conviction (People V. Briggs (1967) 255 A.C.A. 593-
596, 63 Cal. RPTR. 111; People V. Rascon (1954) 128 Cal. App. 2d 118-122, 274 P.
2d 899.)  Suspicion is not evidence:  it merely raises a possibility, and this is
not a sufficient basis for an inference of fact, (People V. Briggs, supra, at P.
597. 430-435, 33 Cal. RPTR. 323.).

The evidence was Insufficient to support the verdict for Burglary of the Borrego residence count #2 in violation of Penal code section 459.

Appellant was charged in an information with First degree residential burglary (Penal code 459), in count #2, regarding the burglary count, the information alleged on, or about October 15, 2003 appellant and Tony Washington did unlawfully enter a building occupied by, with the intent to commit theft, in violation of Penal code section 459, (c.t. 0002).

The Jury found appellant guilty of First degree residential burglary (Penal code section 459), (c.t. 0389.)  The Jury's findings on count 2 was erroneous as there was insufficient evidence to etablish appellant entered, or abetted the burglary of the Borrego residence, within the meaning of Penal code section 459, and CAJIC 3.01

## A.  Standard of Review

"When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the Judgement to determine whether it contains substantial evidence-- i.e., evidence that is credible and of solid value-- from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  (People V. Green (1980) 27 Cal. 3d 1, 55;  People V. Johnson (1980) 26 Cal. 3d 557-578;  Jackson V. Virginia (1979) 443 U.S. 307-317-320(61 L. ED. 2d 560-573-574, 99 S. ct. 2781-2789-2790.)  Furthermore, "[m]ere conjecture, surmise or suspicion is not the equivalent of reasonable inference and does not constitute Proof.  People V. Bender (1945) 27 Cal. 2d 164, 186 [Parallel citations omitted.]  People V. Anderson (1968) 70 Cal. 2d 15-24.)

"[T]he Governments evidence need not exclude every reasonable hypothesis consistent with innocence.  [citations omitted] in order to support an inference of guilt.  However, the evidence must include sufficient probative facts from which a reasonable fact finder, applying the reasonable doubt standard, could choose the hypothesis that supports a finding of guilt rather than hypothesis that are consistent with innocence."  (United States Verses Bishop (9th cir. (1992) 959 F. 2d 820-830.)

A conviction based on proof that does not rise to this level of certainty

cannot stand, in the face of the defendant's due process right to have the prosecution prove every element of the offense charged beyond a reasonable doubt. (In re-Winship (1970) 397 U.S. 358-364.)

**B. There was Insufficient evidence that Appellant burglarized the Borrego residence.**

The Jury was instructed with CALJIC NO. 14.50 [Burglary Defined], in pertinent part, as follows:

In order to prove this crime, each of the following elements must be proved:

1. A person entered a building; and
2. At the time of the entry, that person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of that property. (c.t. 0361), (R.T. 1704)

During his closing argument, the prosecutor explained to the Jury that the people's theory on the burglary was that "The Borrego residence, only one person probably pushed that window open. Well, what about the other person? Were they involved in the commission of the crime? And Mr. Washington told you that he was the one who pushed the window open, but then you heard from Mr. Hannigan whosaid there was another person standing on the north side of the house. well, that Person who was trying to break in the house or acting as a lookout or doing whatever they were doing is an aider and abettor in the crime and is involved in the commission of the crime, Just as Mr. Washington would be. (R.T. 1698)

The prosecutor summed up his theory as follows:

"These two acted together. These two, as you saw on the video, Hang out together. They smoke together, they drink together, they hang out together, and they commit residential burglaries together. That is what they do." (R.T. 1703)

The evidence was insufficient to permit appellant's conviction for the Borrego residential burglary within the meaning of Penal code section 459, because the requisite elements of aiding and abetting CALJIC 3.01, and Burglary CALJIC 14.50, were not satisfactory.

In Appellants case, co-defendant Tony Washington is said to have provided a
statement to detective Jerry Hartman, in which Mr. Washington allegedly gave a
statement implicating appellant as his partner in the commission of the Borrego
Burglary. (VIII RT 1605)

However, this alleged statement(s) was not recorded. (VRT. 771) and during Tony
Washingtons testimony Mr. Washington denied ever providing such statements impl-
icating appellant. (VRT 771-772) and claimed that Detective Hartman was putting
"words in his (Washingtons) mouth" during the interview. (VRT 772)

Appellant does not seek to advance a lengthy argument concerning the statements
allegedly attributed to Tony Washington during his interview by the detective.
Instead, the test to be applied in regards to these statements of Washington, is
that of Penal code section 1111. (People V. Mac Ewing, 45 Cal. 2d 218-224, 288
P. 2d 257) which states:

"A conviction can not be had upon the testimony of an accomplice, unless it be
corroborated by such other evidence as shall tend to connect the defendant with
the commission of the offense; and the corroboration is not sufficient if it
merely shows the commission of the offense or the circumstances thereof."·

Here, the prosecutor sought to impeach Mr. Washington with his alleged statements
during the interview, in which Washington allegedly implicated appellant as his
accomplice. Assuming arguendo, said statements by Washington implicating appellant
were true; nevertheless, the statements were not enough standing alone, and need
corroboration, Washingtons denial of having made such statements, (VRT 771-772)
And prosecution witness, Jeff Hannigan testimony in which Hannigan testified
the male he saw during the Borrego burglary was Five-Eight or Five-Nine (RT VII
P. 91-101) had colored beads in his hair (II RT P. 92) and second person Hannigan
saw was "shorter" than the first (II RT 92) Jeff Hannigan also testified at appe-
llants Preliminary Hearingin which Hannigan said the male he saw was 5'8, 5'9
and weighted 150 pounds, and second male "shorter" (Prelim. Transc. P. 27)
Hannigan also provided an accurate license plate number of the vehicle he saw
suspects driving. (RT V. II P. 93)

At Appellant's trial, Tony Washington corroborated Jeff Hannigans testimony, by
admitting he was 5'8. (VRT 728-730) That he was present at the crime (VIRT 839)
That he wore **beads**, In his hair (VIRT 840.)

During Appellant's Trial Several Witnesses Provided Accurate descriptions of
Appellant. Prosecution witness Terina Noa described the person she saw at her
home and the Meza drive-way as being a darkskinned Black male aged 20-25, approx-
imately 205 pounds. (III RT 181-200)

Elias Noa described the person as being six foot-two inches tall, Black male, with
Braided hair and a muscular build, (III RT 216). Martinez described the person
she saw as being a Black Male with Braids and Fairly tall and very dark complected
(III RT 291).

Appellant is 6'2, 205 pounds.

In addition, there remains no direct evidence or circumstantial evidence to
corroborate appellants alleged Participation in that crime.

Witnesses, as well as The Investigating Detective Jerry Hartman; Provided test-
imony that Washington Drove appellant's car.

Defense witness Regina Burton testified that she as well as others operated
appellant's car. (VI RT 905-906, 908-912) And that appellant could'nt drive because
of bad vision. (VIRT 925)

Tony Washington testified he drove appellants car with and without appellant.
(VRT 715-736-737-741. VIRT 807). And that Washington drove because appellant had
Broken his Glasses. (VRT 720-721)

And as noted, Detective Hartman observed Washington operating appellants car during
his surveillance, with appellant as the passenger. (RT Vol. IV 452, VIII P. 1622)

**Appellant Turns Towards:** People V. Draper. 69 Cal. App. 2d 781-785-786. 160 P. 2d
80-82, it is appropriately said: '\*\*\* A defendant no matter how untrustworthy
he may be is not required to prove his innocence. The People must prove him
Guilty. With these observations, we must proceed to consider the sufficiency of the
evidence against Draper. "\*\*\* The foregoing evidence points the finger of suspicion
at Draper shows that he had an opporyunity to participate in the commission of
the crimes and proves that he was not a truthfulwitness. This is not sufficient
to sustain the Burden resting on the People of Proving him Guilty beyond a Reason-
able doubt. For it is the rule here that evidence, which merely raises suspicion,

no matter how strong, of the Guilt of a Person charged with a crime is not suffi-
cient to sustain a verdict and a Judgement against him.  [citations.]

In People V. Blackwell (1961) 193 Cal. App. 2d 420, 14 Cal. RPTR. 224, Frey
was seen associating with Blackwell after a Robbery with which both were charged
and to which Blackwell Plead Guilty. The Robbery victim could not identify Frey,
who was convicted by a Jury.  The appellant court reversed upon the stated grounds
that, Failing an Identification, nothing connected Frey with the robbery except
his association with Blackwell and that it was not sufficient, "to meet the Burden
resting on the prosecution to establish Guilt Beyond a Reasonable Doubt." (Id. P
424, 14 Cal. RPTR. P. 227.)

Appellant does not dispute the fact that his car was at the scene of the Borrego
burglary;  Only that the evidence was insufficient, In light of the entire record
to convict appellant of that crimes commission.

**See also:  People V. Briggs, supra.**

In that case the defendant, Briggs was charged with a Burglary. The evidence
against Briggs, consisted of his wallet being found at the scene of the crime.
"Briggs was ultimately found Guilty." Briggs appealed.

In reversing, The court found there was insufficient evidence to convict Briggs,
I.e, No fingerprints or property, and that whatever prints were found "If any"
were not Mr. Briggs. And the court cited among other cases:

People V. Blackwell 193 Cal. App. 2d 420-424-425, 14 Cal. RPTR. 224-227, it is
set fourth: "*** while the fact that an accused has an opportunity to commit
the crime with which he is charged may be a circumstance from which Guilt may be
conjectured, it is nevertheless, an established precept of law that an incriminating
circumstance from which Guilt may be inferred must not Rest on conjecture. And
by the same rule it is not permitted to pile conjecture on conjecture. [citation].
That the circumstances were suspicious may be conceded, but mere surmise and
conjecture are not enough."

As noted, The People's case was that Appellant and Tony Washington committed these
crimes together. However, as shown, there was no corroboration sufficient to

24

establish appellants Guilt beyond a **reasonable** doubt. The prosecutions witness Jeff Hannigan provided testimony which, eliminated appellant as a person involved in that crime. As appellant has succintly shown by Washingtons own admission, and corroborating testimony with Jeff Hannigan as to Washingtons height and "Beads" being in hair during the crime, there was not any sufficient proof of appellants involvement in the Borrego Burglary.

In summation, appellants description cannot match that of the second     Jeff Hannigan saw, in which the     he described "shorter" than the first who was 5'8 , 5'9, leaves no doubt that Appellants car being at the scene, In light of all of the above evidence and arguments, was not enough to convict without sufficient corroboration.

Appellant accordingly ask that his conviction for count #2, be set aside for Insufficiency of the evidence.

ARGUMENT #3

Appellant asserts the consecutive sentence foe his ex-felon in possession of a firearm conviction was error and should have been stayed pursuant to Penal code section 654...

A.  Proceedings Below.

(See statement of the case and statement of the fact's.)

Appellant was convicted of the Meza Burglary in which appellant stole a firearm during the Burglary. (RTV12 P.2008-2009.)

During appellants sentencing, appellant was sentenced to serve a consecutive term of 1 year 4 months, for the ex-felon in possession of a firearm conviction (P.C. section 12021, subd. (a) (1).)  (RTV 12 P. 2008-2009)

The appellant now appeals the consecutive term.

Applicable Law

The sentencing court must consider the Pen. Code section 654 issue before determining whether to impose concurrent or consecutive sentences.  Cal. rules of court 4. 424.  The issue is a question of fact, but for the court, not the Jury.  People V. Porter (1987) 194 CA 3d 34-38, 239 CR 269.

The sentence for all counts must be imposed, then the P.C. 654 barred counts must be stayed.  On service of the unstayed term, the stay becomes permanent. See People V. Beaman (1973) 8 C3d 625-640, 105 CR 681.  A concurrent term is not proper.  (People V. Pearson (1986) 42 C3d 351-358, 228 CR 509.)

On a silent record, a reviewing court will presume that the trial court considered and rejected use of P.C. section 654.  Thus, the lack of a P.C. 654 stay will be upheld  if any substantial evidence supports a finding of seperate intents or seperate transactions. [People V. Coleman (1989) 48 C3d 112-162, 255 CR 813;  People V. Green (1988) 200 CA3d 538-544, 246 CR 164.]

At the sentencing hearing the defense and the prosecution have the right to
present evidence on their own behalf and to rebut statements in the probation
officers report.  Pen. Code section 1204;  People V. Valdiva (1960) 182 CA 2d
145, 5 CR 832.  The rules of evidence do not strickly apply to sentencing
hearings;  the Judge has wide discretion in the sources and types of evidence
he or she uses to determine the kind and extent of punishment to be imposed
within limits fixed by the law.  Williams V. New York (1949) 337 U.S. 241-246
93 L ED. 1337, 69 S Ct. 1079.

The parties are entitled to a hearing that affords Due Process  however, and to
a sentencing decision based on accurate information.  People V. Peterson (1973)
9 C3d 717-726, 108 CR 835.

## Violation

Penal code section 654 states that "[a]n act or omission that is punishable in
in different ways by different provisions of law shall be punished under the
provision that provides for the longest potential term of imprisonment, but in
no case shall the act or omission be punished under more than one provision.
Case law has expanded the meaning of the section to apply not only when there
was only one act, but also when there was a course of conduct that violates
more than one statue but never the less constitutes an indivisble transaction.
If all the offenses were incident to one objective, the defendant may be
punished for any one of such offenses but not for more than one.  People V.
Lattimer (1993) 5 C4th 1203-1211, 23 CR2d 144.  See e.g.;  People V. Lopez (2004)
119 CA4th 132-137, 13 CR3d 921, (when a defendant convicted on possession of
firearm and possession of ammunition which was loaded in firearm.) Sentence for
possession of ammunition stayed under (P.C. section 654):

Multiple punishment is barred, but multiple convictions are allowed under Pen.
code section 954, unless one of the offenses is a necessarily included lesser
offense of the other.  See People V. Ortega (1998) 19 C4th 686-692, 80 CR2d.
489.  A defendant may be convicted of any number of crimes on the basis of
the same act or course of conduct, but all but one of the sentences must be
stayed.

A defendant may be convicted of both burglary (Pen. code section 459 and
concealing the property stolen in the burglary, but may not be punished for

both crimes. People V. Allen (1999) 21 C4th 846, 89 CR2d 279.

*The appellant now asserts, that the trial court erred*

In sentencing Appellant to a consecutive sentence of 1 year and 4 months for
the ex-felon in possession of a firearm conviction (P.C. 12021 (a) (1).) As
succintly shown above; where [a]n act or ommission that is punishable in
different ways by different provisions of law shall be punished under the
provision that provides for the longest potential term of imprisonment, but in
no case shall the act or ommission be punished under more than one provision.
"Penal code section 654,"

In appellant's case, the gun's which constituted the appellant's charge of ex-
felon in possession of a firearm, (P.C. 12021 (a) (1),) were acquired by
appellant, from the Meza burglary. (See Statement Of Facts Meza burglary.)

The resulting arrest of appellant, and charge of burglary (P.C. section 459)
Recieving stolen property (P.C. section 496 subd. (a),) and appellant's charge
of ex-felon in possession of firearm constituted an indivisible course of
action . The guns were in *fact;* stolen property from the commission of the
Meza burglary. Indeed elements of burglary that the People are to prove in
order to convict on a charge of burglary, is that a person "enters any building
with the <u>intent</u> to steal take and carry away the personal property of another,"
and with the further specific intent, *to deprive the owner* "permanently" *of that property*
*it follows that appellant,"permanently"seeking to deprive,*               , would therefore, be in 'possession'
of the property (Gun's) in which he stole from the burglary. Thus, constitut-
ing an indivisible course of action with no seperate intents.

"[It] is well settled that section 654 applies not only where there was but
one act in the ordinary sense, but also where there was a course or conduct
which violated more than one statue but never the less constituted an indivisi-
ble transaction. [citation] whether a course of conduct is indivisible depends
upon the intent and objective of the actor. [citation]." If all the offenses
were incident to one objective, the defendant may be punished for any one of
such offenses but not for more than one. [citation] People V. Perez (1979) 23
Cal. 3d. 545-551 [153 Cal. RPTR. 40, 591 P. 2d 63].)

Courts have avoided prohibited multiple punishment by imposing a sentence on
each of the convictions arising from the same act or indivisible course of

conduct, but staying execution of all but one of the sentences conditioned upon Rules of Court, rule 449.

Appellants status as an ex-felon did not allow for a consecutive sentence on a ex-felon in possession of a firearm (P.C. 12021 subd. (a) (1). charge, when the charge derived from appellants possession of the Guns stolen from a burglary in which Appellant was charged and convicted. And Given a sentence For.

"Section 654 was enacted in 1872 and, insofar here relevant, has never been amended. The purpose of this legislative protection against punishment for more than one violation out of an 'act or omission' is to insure that a defendant's punishment will be commensurate with his culpability. [citation]. (People V. Perez, supra 23 Cal. 3d at PP. 550-551.)

The appellant respectfully request the court to stay the imposition of sentence as to count #7, ex-felon in possession of a firearm and to correct the abstract of Judgement to reflect this stay ., per P.C. 654.

If the respondent argues that appellant has waived the sentencing error for failure to object; the appellant contends he was rendered Ineffective Assistance of trial counsel for failure to object.

## Sentencing defects are waived unless challenged at sentencing.

See People V. Scott (1994) 9 C4th 331, 36 CR2d 627. The Scott court took pains to point out that a defense attorney who does not properly understand and argue at sentencing is subject to a finding of ineffectiveness. 9 C4th at 351.

Thus, the Appellant argues he was rendered Ineffective Assistance of counsel when he failed to object to the imposition of a consecutive sentence pursuant to appellant's conviction of ex-felon in possession of a firearm, in violation of (P.C. 12021 subd. (a)(1)). On the grounds that the possession of the guns, were incident to a burglary to the Meza residence and constituted an invisible course of action. However,
    appellant apparently 'violated' another provision of law, which allowed for conviction of both the burglary and ex-felon in possession of a firearm charge; but consecutive sentencing was barred Re P.C. section 654. And the ex-felon in possession of a firearm sentence of 1 year and 4 months should have been stayed. Failure to object to error which waives review may constitute Ineffective Assistance of councel. (People V. Scott (1994) 9 Cal. 4th 331, 356, Fn. 18; People V. Cooper (1991) 53 Cal. 3d 771-831; People V. Malone (1988) 49 Cal. 3d 1. 33.) Similarly, See in People V. Flowers (1982) 132 Cal. App. 3d 584, the defendant attacked the victim with the intent to rob him. He struck the victim to knock him unconscious so that he could be robbed (Id. at 597-588.) The court of appeal held that he could be seperately convicted of the assault and the robbery, but he could not be punished for both ."[section] 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible course of conduct with a single, objective imposition of sentence for each violates section 654 [citation] (ID. at 588.)

There, as here, the issue was not raised at the time of sentence, "but the absence of any objection does not obviate [the] duty [of the appellate court] to review the [Penal code] section 654 Question. [Citation.]" (Id. at P. 589).

Where as a matter of law, the uncontradicted evidence shows an indivisible course of conduct for which multiple Prison terms were imposed, the Proper Procedure is for the reviewing court to modify the sentence to stay imposition of the lesser term. (Ibid)

ARGUMENT #4

## Judicial Error & Prosecutorial Misconduct

Appellant contends he was unconstitutionally forced to waive one constitutional
right "Right to Due Process." to invoke another, "Right to Present Witnesses."
When the trial court informed appellant's counsel that it would allow the
Prosecutor to Question defense witness concerning his Gang Affiliations. The Gang
evidence violated appellants right to due process, and Evid. Code Section 352 and
Simmons V. United States (1968) 390 U.S. 377 [19 L .Ed. 2d 1247, 88 S.ct. 967.]

**A. Proceedings Below.**

During a pre-trial In Limine motion trial counsel Pamela Lacher requested there
be no gang references (IIRT P. 23)

Gangs were discussed again at (IV RT 700):

**Ms. LACHER:** I am not sure if this will be an issue, but I had a long chance
to speak to Mr. Washington about what he would testify today. And he asked
me what it is the D.A. might ask and they are going to know if it is
Mr. Mc Donald who it was that was with you. And he says "well, Homies I always
hang out with homies." And the next response was well, could you tell me who
the homie was? He said."well. I don't know his name."
And I said."when you said homie, it is basically Gang."

**The Court:** You are opening the whole idea of gang nomenclature. Gang member-
ship. That is up to you.

**Ms. LACHER:** I didn't want to open all that up, but he is going to ask, the
response is going to be I don't know the name, but I know the nick-name.

**Ms. LACHER:** If that is all and we can limit it to that. I don't want to get
into that.

**Mr. Bowman:** I want to be limited in my cross, I want to know who the real
person is if Mr. Mc Donald didn't do it. And I am sure he has a reason for
not saying who did it, but that comes along with the baggage this witness
carries. (VI RT P. 700), (Continued at VI RT5 P. 701)

**The Court:**  It doesn't say anything about whether Mr. Mc Donald is a gang member or not.  There is certainly no reason to protect Mr. Washington.

**Ms. LACHER:**  I don't have any reason to protect Mr. Washington either- and I don't think it matters.

**The Court:**  Aside from the fact that obviously Mr. Washington, Mr. Washington and Mr. Mc Donald's association with another is going to draw an inference that Mr. Washington is a Gangster, so is Mr. Mc Donald.  But that is the risk I think you put putting a Gangster up to vouch for the --- vouch for your client.

**Ms. LACHER:**  I understand.

**Mr. Bowman:**  I am sure she understands the risk, but she is determined that his statement exonerating Mr. Mc Donald are more important than that Potential Prejudice that comes along with it.

**The Court:**  RIGHT.

**Ms. LACHER:**  Yes Basically.

**Mr. Bowman:**  OKAY.

**MS. LACHER:**  So ---

**The Court:**  well, it was clear to me from your opening statement you were talking about homeboy this and homeboy that. You already really introduced the whole idea of Gangs into this case.

**Ms. LACHER:**  RIGHT.

**THE COURT:**  And again, I think Mr. Bowman is correct that that is something you knew what you were doing.  (Continued on P. 702, 1-21.)

When you were making that Opening Statement, and that was going to open the door to it.  And we are not going to be --- there is no gang allegation here, we are not, I don't think, bringing in somebody who is going to be a Gang Expert to

testify to something to prove an allegation of Gang membership or that these crimes were not the comission for the advancement of a Gang. /1

---

/1    The people did call someone to testify about gangs, Detective Hartman.    (
(                P. 1610-1611)

33

<u>Ms. LACHER</u>:  I just --- we are not getting into -- I understand there is an association, but is Mr. Bowman going to be asked whether Mr. Washington knows whether Mr. Mc Donald is a member of a gang?

<u>The Court</u>:  well I imagine so.

<u>Ms. LACHER</u>:  Okay.  I just wanted to know what's coming.

<u>The Court</u>:  One of my homies did it.  Well is Mr. Mc Donald one of your homies, how can he not ask that Question.

<u>Ms. LACHER</u>:  I guess that's true.  Okay, I just wanted to kind of air it out, I Guess.  Thank you.

<u>Mr. Bowman</u>:  Thank's.

The above collquy ends, and the questioning sequed off into other matters. The next relevant questioning continues on (V RT 786), when appellants defense witness Tony Washington was asked by the prosecutor what a "Homeboy" meant.  In which Mr. Washington replied "A friend." (V RT 786)

The prosecutor then resumed questioning of Mr. Washington and at (V RT 796 the following Collquy took place)

(See Attached pages 796, 797, 798. 801·804)

1      EL CAJON, CALIFORNIA - OCTOBER 4TH, 2004 - 9:13 A.M.

2

3                      P-R-O-C-E-E-D-I-N-G-S

4

5          **THE COURT:**  WE ARE OUTSIDE THE PRESENCE OF THE JURY.

6      THE DEFENDANT IS PRESENT WITH COUNSEL; THE DISTRICT ATTORNEY

7      IS PRESENT.

8          MR. BOWMAN, YOU WANTED TO TAKE UP SOMETHING?

9          **MR. BOWMAN:**  YES, YOUR HONOR.

10         JUST WITH RESPECT TO THE TESTIMONY FROM MR. WASHINGTON,

11     AND WE DISCUSSED THIS BRIEFLY OUT IN THE HALLWAY BEFORE HIS

12     TESTIMONY, I JUST WANT TO MAKE SURE I AM ON SOLID GROUND

13     WITH WHERE I WANT TO GO WITH MY QUESTIONING.

14         AND THAT IS, THAT MR. WASHINGTON, WHEN I ASKED HIM THE

15     OTHER DAY WHAT A HOMIE MEANT, HE SAID IT WAS A FRIEND.  I

16     WOULD LIKE TO INQUIRE FURTHER OF THAT BECAUSE HE CLAIMS

17     EMERALD HILLS AND MR. MCDONALD IS A FIVE-NINE BRIMS BOTH

18     BLOOD SETS.

19         AND WHEN HE REFERS TO SOMEONE NAMED C.K., IT IS

20     COMMONLY KNOWN IN STREET LOGO AS CRIPS KILLER.  BLOODS

21     TYPICALLY REFER TO THEMSELVES AS.  IT MIGHT BE A NICKNAME.

22     I WANT TO INQUIRE OF THEM AS WELL, BUT I WANT TO CLEAR IT

23     WITH THE COURT BEFORE I WENT INTO THE LINE OF QUESTIONING

24     REGARDING GANGS.

25         **THE COURT:**  HOW DEEP ARE WE GOING?  WHERE ARE YOU GOING

26     WITH THIS?

27         **MR. BOWMAN:**  WHEN HE SAYS HE IS WITH HIS HOMIES, I WANT

28     TO INQUIRE WHETHER OR NOT THAT MEANS GANG MEMBER, AND ALSO

1    THAT HE IS A GANG MEMBER, THAT HE CLAIMED EMERALD HILLS, AND

2    THAT IS OKAY THEN.

3         MS. LACHER:  DOES IT REALLY MATTER WHAT THE NAME OF THE

4    GANG IS?

5         THE COURT:  IT MIGHT.

6         MS. LACHER:  I KNOW --

7         MR. BOWMAN:  I DON'T KNOW WHAT HIS ANSWER IS GOING TO

8    BE.  OBVIOUSLY, I MIGHT HAVE TO PULL IT OUT OF HIM.

9         AND THEN I WANT TO ASK HIM IF HE KNOWS WHETHER

10   MR. MCDONALD IS A MEMBER OF A GANG.

11        THE COURT:  OF A GANG OR HIS GANG?

12        MR. BOWMAN:  WELL, THEY ARE NOT IN THE SAME GANG, BUT

13   THEY ARE BOTH BLOOD SETS THAT GET ALONG WITH EACH OTHER.

14   SOME BLOOD SETS DO; SOME DON'T.

15        MS. LACHER:  THAT I OBJECT TO.  I DON'T KNOW THAT IT IS

16   REALLY RELEVANT WHETHER THEY ARE PART OF THE SAME GANG.

17   THIS IS NOT A GANG THING.  IT KIND OF ASSUMES SOMEHOW MAYBE

18   THE HOUSES THAT WERE HIT MAYBE SOMEBODY WAS A GANG MEMBER OR

19   MAYBE THERE WAS A REASON OR SOME KIND OF GANG THING BEHIND

20   ALL THIS.  WE ARE FAR REMOVED FROM WHAT THE ISSUE IS.

21        THE COURT:  THE ISSUE RIGHT NOW IS IMPEACHMENT OF

22   MR. WASHINGTON.  MR. WASHINGTON IS GETTING ON THE STAND AND

23   ABLE TO TESTIFY WITHOUT BEING CROSS-EXAMINED ABOUT HIS

24   AFFILIATIONS, HIS PERSONAL AFFILIATIONS, WITH WHATEVER GANG

25   HE HANGS OUT WITH, AND WHETHER OR NOT THERE MIGHT BE SOME

26   CONNECTION TO MR. MCDONALD BY VIRTUE OF THE FACT HE HAS

27   PRESENTED HIMSELF AS A GANGSTER.

28        THERE IS NO QUESTION ABOUT THAT WITH THE TERMS THAT HE

1    HAS BEEN USING, AND I THINK MR. BOWMAN IS CERTAINLY ENTITLED

2    TO INQUIRE INTO THAT.  NOW --

3        **MR. BOWMAN:**  WHEN HE TALKS ABOUT HE DID IT WITH ONE OF

4    HIS HOMIES, I IMAGINE MR. MCDONALD COULD BE CONSIDERED ONE

5    OF HIS HOMIES AND NOT ONE OF HIS FRIENDS AND NOT WANTING TO

6    SNITCH OUT MR. MCDONALD OR ONE OF THE GANG.  IT IS NOT COOL

7    TO GET UP ON THE STAND AND DIME SOMEBODY OUT.  THAT KIND OF

8    GOES TO HIS BIAS, INTEREST OR OTHER MOTIVE HE MIGHT HAVE FOR

9    LYING AND ALSO COULD POINT THE FINGER AT MR. MCDONALD AS

10    BEING ONE OF HIS QUOTE, "HOMIES."

11        **THE COURT:**  WELL, YOU KNOW, I THINK YOU ARE RIGHT,

12    MR. BOWMAN, AND I THINK YOU ARE ENTITLED TO GO THERE.  BUT

13    YOU MAY WANT TO DECIDE WHETHER OR NOT -- HOW FAR YOU WANT TO

14    GO BECAUSE YOU ARE GETTING ON DELICATE GROUND WHEN WE START

15    TALKING ABOUT MR. MCDONALD'S AFFILIATION WITH MR. WASHINGTON

16    AS FAR AS ANY GANG CONNECTION BECAUSE THIS IS NOT A GANG

17    CASE.  IT'S NOT A GANG ALLEGATION.  AND, YOU KNOW, ABSENT

18    MR. MIX GETTING ON THE STAND, I DON'T KNOW.

19        **MR. BOWMAN:**  WELL, IF HE DOES, THAT IS GOING TO BE A

20    WHOLE -- ANOTHER WHOLE QUESTION.

21        **THE COURT:**  THAT IS, ISN'T IT?

22        **MR. BOWMAN:**  I ALSO ASK TO PLAY THE REDACTED VERSION OF

23    THE VIDEOTAPE JUST TO SHOW WHAT THESE GUYS DO WHEN THEY HANG

24    OUT TO SHOW THE EXTENT OF THEIR FRIENDSHIP, THAT THEY SIT

25    AROUND SMOKING CIGARETTES AND DRINKING AT THE TROY STREET

26    ADDRESS.

27        **THE COURT:**  THAT IS NOT IN DISPUTE.  HE ADMITTED

28    EVERYTHING THAT WAS ON THE TAPE AND, YOU KNOW, SO WHAT WOULD

1          MR. BOWMAN:  THANK YOU, YOUR HONOR.

2

3                    TONY WASHINGTON (RESUMED)

4          THE DEFENSE WITNESS, HAVING BEEN PREVIOUSLY SWORN,

5                WAS EXAMINED AND TESTIFIED AS FOLLOWS:

6

7                        CROSS-EXAMINATION

8     BY MR. BOWMAN:

9          Q.    MR. WASHINGTON, LAST WEEK, LAST FRIDAY, YOU TOLD

10    THIS JURY THAT YOU COMMITTED THESE BURGLARIES WITH A PERSON

11    BY THE NAME OF C.K., CORRECT?

12         A.    YES.

13         Q.    IS THAT STILL YOUR TESTIMONY TODAY?

14         A.    YES.

15         Q.    WHO IS C.K.?

16         A.    A FRIEND.

17         Q.    A FRIEND?

18         A.    YEAH.

19         Q.    WELL, LAST WEEK YOU SAID HE WAS ONE OF YOUR

20    HOMIES, RIGHT?

21         A.    SAME.  THAT IS WHAT IT MEAN, A HOME BOY, YEAH.

22         Q.    WHAT IS THE DIFFERENCE BETWEEN A FRIEND AND A

23    HOME BOY?

24         A.    NOTHING.  THAT'S JUST A FIGURE OF SPEECH THAT I

25    USE.

26         Q.    OKAY.

27         A.    A HOME BOY.

28         Q.    A HOME BOY ALSO REFERS TO BEING A GANG MEMBER,

1   RIGHT?

2        A.    NOT REALLY.

3        Q.    NO?

4        A.    NO.

5        Q.    WELL, WERE YOU IN A GANG?

6        A.    NO.

7        Q.    YOU WEREN'T IN A GANG, THE EMERALD HILLS GANG?

8        A.    NO.  I AM -- I HAVE FRIENDS FROM THERE.

9        Q.    YOU HAVE FRIENDS IN THE EMERALD HILLS GANG?

10       A.    YES.

11       Q.    AND TELL THE JURY WHAT THE EMERALD HILLS GANG

12  DOES.  WHAT IS THE EMERALD HILLS GANG ALL ABOUT?

13       A.    I DON'T KNOW.

14       Q.    AH.

15       A.    I DON'T KNOW.

16       Q.    OKAY.  WELL, ARE THEY A BLOOD GANG, A CRIPS GANG,

17  PIRU?  WHAT ARE THEY?

18       A.    IT'S A BLOOD GANG.

19       Q.    OKAY.  IT'S A BLOOD GANG, RIGHT, CORRECT?

20       A.    YES.

21       Q.    AND YOU KNEW THAT, RIGHT?

22       A.    YES.

23       Q.    NOW, BLOODS DON'T LIKE CRIPS, DO THEY?

24       A.    I GET ALONG WITH THEM.

25       Q.    WELL, BLOODS DON'T, RIGHT?

26       A.    YEAH.

27       Q.    AND PEOPLE IN BLOOD GANGS LIKE TO BRAG AND REFER

28  TO THEMSELVES AS CRIP KILLERS, RIGHT?

1        A.      UH-HUH.

2        Q.      "YES"?   IS THAT A "YES"?

3        A.      YES.

4        Q.      AND THAT INITIAL CRIP KILLER IS C.K., CORRECT?

5        A.      UH-HUH.

6        Q.      IS THAT A "YES"?

7        A.      YES.

8        Q.      WELL, HOW MANY C.K.'S ARE IN THE EMERALD HILLS

9    BLOOD GANG?

10       A.      HOW MANY?

11       Q.      YES.

12       A.      IT'S -- I DON'T KNOW HOW MANY.  I DON'T KNOW.

13   EVERYBODY FROM EMERALD HILLS BLOOD GANG.

14       Q.      IS THIS CHARACTER THAT YOU REFER TO AS C.K., IS

15   HE IN A BLOOD GANG?

16       A.      YES.

17       Q.      OKAY.  WHICH SET?

18       A.      HE JUST FROM SOUTHEAST.  HE HANG ON IMPERIAL WITH

19   US.

20       Q.      YOU DO UNDERSTAND WHAT I MEAN BY SET, CORRECT?

21       A.      YEAH.

22       Q.      CAN YOU EXPLAIN TO THE JURY WHAT A SET IS?

23       A.      IT'S A GANG.

24       Q.      OKAY.  IT'S A BLOOD GANG, RIGHT?

25       A.      IT CAN BE A CRIP GANG OR A BLOOD GANG.

26       Q.      OKAY.  SO CRIP GANGS HAVE A NUMBER OF DIFFERENT

27   SETS, CORRECT?

28       A.      YES.

1    Q.    BLOODS HAVE DIFFERENT SETS; IS THAT CORRECT?

2    A.    YES.

3    Q.    OKAY.  AND WHICH BLOOD SET IS THIS PERSON WHO YOU

4    REFER TO AS C.K. IN?

5    A.    HE JUST -- HE FROM SOUTHEAST.

6    Q.    HE IS FROM SOUTHEAST?

7    A.    YEAH.  YOU DON'T HAVE TO HAVE A BLOOD OR A CRIP

8    TO BE FROM SOUTHEAST.

9    Q.    I WANT TO GET A LITTLE BIT MORE INFORMATION ABOUT

10   THIS C.K. PERSON.  WHERE DOES HE LIVE?

11   A.    I DON'T KNOW.  HE LIVE IN SOUTHEAST.

12   Q.    WHERE IN SOUTHEAST?

13   A.    (WITNESS SHRUGS SHOULDERS.)

14   Q.    YOU DON'T KNOW?

15   A.    I DON'T HANG WITH HIM LIKE THAT.

16   Q.    CAN YOU KEEP YOUR VOICE UP?

17   A.    I DON'T BE WITH HIM LIKE IT -- HE IS A BLOCK

18   HANGER.  WE HANG ON THE BLOCK TOGETHER.

19   Q.    WHAT BLOCK DO YOU HANG OUT ON?

20   A.    EUCLID.

21   Q.    WHAT CROSS STREET?

22   A.    FEDERAL.

23   Q.    EUCLID AND FEDERAL?

24   A.    YEAH.

25   Q.    DID HE LIVE NEAR THERE?

26   A.    HE COULD.

27   Q.    I AM SORRY?

28   A.    HE COULD.  I DON'T KNOW.

And lastly, the prosecutor called Detective Jerry Hartman, who provided additional testimony concerning gangs and some of the gang culture.

(See Attached Pages 1610-11)

The People's witness Detective Hartman provided further testimony concerning gangs which the following colloquy took place: (1610.15.28).

Mr. Bowman:        Did you ask Mr. Washington if he was a gang member?

Det. Hartman:      Yes I did.

Mr. Bowman:        What did he say?

Det. Hartman:      He initially denied it, and then he did say he claimed the Emerald Hills Street Gang.

Mr. Bowman:        And what type of gang is Emerald Hills?

Det. Hartman:      It's a Black Street Gang.

Mr. Bowman:        And any particular group? or gang?

Det. Hartman:      They are a Blood gang set out of the City of San Diego claiming the community of Emerald Hills as their turf.

Mr. Bowman:        Just to clarify — when you say a set from a Blood gang, what does a set mean?

Det. Hartman:      It's a faction of that organization for Black (con.1611-1-17) gangs* who will Ly we have Crips and Bloods.  Within each group there are factions that have different names, different communities that they associate in.  The Blood have several sets, several factions otherwise known as sets — and so do the Crips.

Mr. Bowman:        And do — — when gang members refer to other members of their gangs. Do they have a name they use when they refer to other members of the gang?

Det. Hartman:      It depends if it's a Blood or a Crip or Hispanic gang.  But generally, yeah.

Mr. Bowman:        What is the term?

Det. Hartman:      It could be, if they are a Blood gang, it could be Blood.  If they are Crips, it's Cuz, it could be Homie.  Home Boy.

Mr. Bowman:        So Homie or Home Boy refers to another gang member.

Det. Hartman:      Generally Yes.

B. **The courts solution to the defense In Limine objection to the introduction of gangs into appellant's trial was abuse of the trial courts discretion and prejudicial.**

As noted, the prosecutor explained to the court that it did not want to be limited in it's cross, the prosecutor wanted 'to explore whether "HOMIE" meant gang member, and if so, then could appellant be considered one of Mr. Washingtons "HOMIES." (V RT 797.)

Defense counsels objection was on the basis that, **(1)** This was not a Gang case; **(2)** Assumes the house's that were burglarized was because of a Gang thing; and **(3)** The Gang topic was far removed from what the issues was. (V RT 797)

The court ruled the prosecutor would be able to question Washington about his affiliations. (V RT 798-799)

The trial courts ruling was short-sighted and error. There was not a dispute that Mr. Washington and appellant were friends and associated with eachother. Nor was there any need to introduce Gangs into appellants trial. Defense witness Tony Washington was asked what a "HOMIE" was, in which Washington responded that a "HOMIE" was a "FRIEND". (V RT 801-)

Thus, appellant in fact could be considered Mr. Washingtons "HOMIE". To further inquire whether a "HOMIE" was a Gang member was irrelevant and prejudicial In Light of the fact there was not a Gang allegation.

The trial courts caution to limit the Gang questioning to co-defendant Washington (V RT 798) was not effective. Especially when the court earlier noted that the knowledge of co-defendant Washingtons gang affiliation "would" infer that appellant was also a gang member. (V RT 701)

The appellant asserts the trial court should have granted trial counsels earlier objection and request to limit the questioning to the alleged perpetrators nickname (II RT 23) and lastly, any further objection conceivably would have been futile...

## 2. Violation

The appellant contends that the admission of inflammatory gang evidence violated appellant's due process rights and was error under evidence code section 352.

Although appellants counsel did not make a due process objection during trial, appellant's counsel made it clear during her In Limine discussion and objection that she wanted the court to Limit Prosecution inquiry only to the nickname, of alleged perpetrator, and that this was not a 'Gang' thing. (V RT 797)

The court expressly made clear that it would allow for the Gang testimony Because "that's the risk I think you take put putting a Gangster up to vouch for your client." (V RT P. 701) Eventhough it acknowledged prejudicial. Trial counsel raised objections to the requested Gang testimony several times basing her objections on the fact that appellant's case wasn't a Gang thing, or for the benifit of a Gang.

Therefore, raising a due process objection in the trial court would have been futile. There was no real possibility that a due process objection would have been more persuasive. (People V. Hill (1998) 17 Cal. 4th 800-820, 72 Cal. RPTR. 2d 656 952 P. 2d 673; People V. Simon (1927) 80 Cal. App. 675-679, 252 P. 758.)

As noted, the trial court appeared to weigh the possible prejudicial effect the Gang evidence would have on appellant, but decided the people had the right to "Question" defense witness Tony Washington concerning his affiliations. (V RT 797) Thus, clearly deciding the prejudicial value was lower than it's probative value in which the people had the right to Question Washington about his affiliations.

It has been noted "[a] careful weighing of prejudice against probative value under [evidence code section 352] is essential to protect a defendant's due process right to a fundamentally fair trial." (People V. Jennings (2000) 81 Cal. App. 4th 1301-1314, 97 Cal. RPTR. 2d 727; People V. Hoover (2000) 77 Cal. App. 4th 1324-1334, 92 Cal. RPTR. 2d 433.) The California Supreme Court recognized section 352 as providing a realistic safeguard from due process violations. (People V. Falsetta (1999) 21 Cal. 4th 903, 919-920. 89 Cal. RPTR. 2d 847, 986 P. 2d 182; People V. Fitch (1997) 55 Cal. App. 4th 172-183, 63 Cal. RPTR. 2d 753.)

As explained earlier herein, the trial court weighed the prejudice concerning
the challenged Gang evidence but disregard prejudice to appellant, in favor of
probative value in people's right to question witness Tony Washington concerning
his affiliations. Thus, the 352 evaluation is virtually co-extensive with
due process. (See e.g. People V. Marchand (2002) 98 Cal. App. 4th 1056-1060,
120 Cal. RPTR. 2d 687)..

Under evidence code section 210-352 Gang evidence is admissible if it is logically
relevant to some material issue in the case other than character evidence, is
not more prejudicial than probative, and is not cumulative. A properly qualified
Gang expert may, where appropriate, testify to a wide variety of matters,
including Gang Grafitti.

California courts have long recognized gang membership evidence has a potentially
prejudicial effect. Our Supreme court has condemned the introduction of "evidence
of gang membership if only tangentially relevant, Given it's highly inflammatory
impact." (People V. Cox (1991) 53 Cal. 3d 618-660, 280 Cal. RPTR. 692-809 P. 2d
351.)

Evidence of gang membership also creates a risk jurors will infer that the
defendant has a criminal disposition and is therefore guilty of the crime charged
. (People V. Champion (1995) 9 Cal. 4th 879-922, 39 Cal. RPTR. 2d 547. 891 P. 2d
93.)

Evidence of gang membership should be excluded if the evidence is only relevant
to prove a defendant's criminal disposition. Gang evidence is admissible only
when it is logically relevant to some material issue in the particular prosecution,
other than character trait evidence. (People V. Ruiz (1998) 62 Cal. App. 4th
234-240, 72 Cal. RPTR. 2d 572; People V. Perez (1981) 114 Cal. App. 3d 470-477-
478, 170 Cal. RPTR. 619.)

As shown above, gang evidence is relevant if it is "material".

Appellant asserts that because there was no gang allegation in his case and because the victim's were not gang member's, evidence of Appellant's gang affiliation was not relevant and was highly prejudicial.

Appellant's counsel sought to exclude gang testimony and limit the peoples inquiry to only the nickname of the perpetrator in light of defense witness Tony Washington's lack of knowledge of alleged perpetrators real name.

It is appellants position that "[a]s soon as the irrelevant and inflammatory e evidence about Black street gangs, Bloods and Crips and their culture and other intimidating activities came into appellants trial, it was impossible for appellant to get a fair trial.  (Mc kinney V. Rees [(9th Cir. 1993)] 993 F. 2d 1378; People V. Maestas [(1993)] 2o Cal. App. 4th 1482 [25 Cal. RPTR. 2d 644].)"

Specifically Appellants argues:

In the instant case   the prosecutors illiciting of testimony about Bloods being "Crip killers" and not getting along with Crips and the follow-up testimony provided by Detective Hartman, concerning some insight into gang culture, activity and other race related "Black street gang" testimony, was more prejudicial than probative... went far beyond reasonable inquiry into who the alleged perpetrator was and frankly whether the perpetrator was a gang member or not was irrelevant and would prove nothing...

There is no logical reason for the prosecutors reasons behind pursuing such evidence of gang membership, when it was clearly evident appellant and Co-defendant Tony Washington,  were friends and hung together.

Relevant evidence is evidence that goes to prove or disprove a material issue in dispute in the litigation.  Here, the gang evidence 'Proved' nothing but the fact that appellants witness was a gang member, meant appeallant was a gang member also.

The trial courts assertion that appellants trial counsel "opened up the whole idea of gangs and gang nomenclature," into appellant's trial (V RT P. 700) was doubtful in light of the fact that (1) the discussion concerning the gangs was out of the presence of the jurors; (2) Trial counsel merely informed the court of Tony Washingtons lack of knowledge of perpetrators real name, and requested the court limit the prosecutor's inquiry to only the nickname of the accomplice (V RT P. 700.)

Appellant contends the request of his trial counsel, that the court limit the inquiry to the nickname, was a reasonable request in light of the fact, any of the defendant's gang status's did not matter when there was no gang allegations or charge. And would not prove anything. Thus, the courts allowing the gang evidence was error and impacted appellants due process rights to a fair trial and violated Evid. code section 352/1.

**Appellant's trial counsels motion in Limine preserved the issue of gang evidence error for appellate review...**

A motion In Limine to exclude evidence is sufficient manifestation of objection to protect the record on appeal when it complies with Evidence code section 353:

· A specific legal ground for exclusion is advanced and subsequently raised on appeal;

· The motion is directed to a particular, identifiable body of evidence and;

· The motion is made at a time before or during trial when the trial Judge can rule on the evidentiary question in its appropriate context.

If the three requirements are not satisfied and the trial Judge denies the In Limine motion to exclude the evidence, the party seeking exclusion must ordinarily renew the objection at the time the evidence is actually offered at trial to preserve the issue on appeal. People V. Morris (1991) 53 C3d 152-188, 279 CR 270, dissapproved on other grounds. People V. Stansbury Benson (1990) 52 C3d 754-788, 276 CR 827.

1.  Section 352 issues are reviewed for abuse of discretion (People V. Cain (1995) 10 Cal. 4th 133; People V. Cudjo (1993) 6 Cal. 4th 585, 609. The trial courts discretion will not be disturbed unless probative value clearly out weighed by prejudicial effect. (People V. Scheid (1997) 16 Cal. 4th 1, 18.)

Reiteration may be excused if **(1)** the proponet of the motion secures express ruling from the court on the record and **(2)** the court deems that a party's objection to be a continuing one. (People V. Ramos (1997) 15 C4th 1133-1171, 64 CR2d 892; People V. Holt (1997) 15 C4th 619-666, 63 CR2d 782.)

Repitition of objection may be excused when repitition of the objection would be futile as a matter of law or when the objection concerns the use of an involuntary statement or other evidence that might impinge on the defendants constitutional or statutory right, (See People V. Underwood (1964) 61 C2d 113-126, 37, CR 313; People V. Cahill (1994) 22 C4th 296-309, n3, 28 CR 2d.)

Appellants contends that his trial counsel's In Limine motion was satisfactory for purposes of appellate review because,

1.)  Counsel specified the gang evidence was "far removed from" what the issue is. (V RT 797);

2.)  This was not a gang thing (V RT 797), nor was the victims gang members (V RT 797.)

3.)  The motion was In Limine before and during trial, at a time the trial Judge could rule on the evidentiary question in its appropriate context.

For the above reasons the appellant maintains appellant review is appropriate and has not been waived.

If the Respondent claims this issue has been waived for failure to object on proper grounds,

C.  **In the alternative, counsel rendered Ineffective Assistance of counsel for
failure to do so.**

The appellant's position is that counsel preserved the issue for appeal by bringing
1. The In Limine motion, 2. Requesting the trial court to limit questions to nick-
name, 3. Objecting on the grounds that it was not a gang allegation or proof the
crimes were done because the houses were involved in gangs.  Any further objection
would have been futile.  However, in the alternative, if this court believes the
issue has not been preserved sufficiently for appellate review, appellant submits
trial counsels rendered ineffective assistance of counsel by failing to make the
proper objection.  Failure to object to errors which result in a waiver of review
of such errors may also constitute Ineffective Assistance of counsel, (People V.
Scott (1994) 9 Cal. 4th 331-356, Fn 18; People V. Cooper (1991) 53 Cal. 3d 771-831;
People V. Malone (1988) 47 Cal. 3d 1, 33.)  Counsel should have objected to the
evidence as a violation of Due Process and under evidence code 352 as more prejud-
icial than probative.  Even if counsel believed an objection would be overruled,it
was her responsibility to preserve for review on appeal.  For example, in People V.
Jackson (1986) 187 Cal. App. 3d 499, trial counsel failed to move for an order
precluding the prosecutor from impeaching defendant with his prior felony convictions.
on appeal, the attorney general asserted that counsel's omission did not constitute
ineffective assistance of counsel because the impeachment issue had been settled
informally by the court at the outset of trial and a formal motion would have been
futile.  Finding that "[C]ompetent counsel... would have atleast taken steps to
preserve the point for appeal pending clarification of the law by the appellate
court's,   The court found ineffective assistance of counsel and remanded the case
to determine whether the court would in fact have allowed impeachment.  (Id. at 508)
Appellant submits the court's ruling was an abuse of discretion in that the gang
testimony was irrelevant and the accomplices identity as a gang member was in no
way useful or needed when there was no gang allegation.  And further, when asking
what a "HOMIE", meant the witness replied "FRIEND".  Thus, the gang evidence was
inflammatory and not relevant in violation of due-process and Evid. code section
352.

D.   **Relevancy And Inflammatory Evidence.**

"[R]elevancy is the first rule of the admissibility of evidence..." (Traxler
V. Thompson (1970) 4 Cal. App. 3d 278-286.)

Section 351 provides that all relevant evidence as "evidence... having any
tendency in reason to prove or disprove any disputed fact that is of
consequences to the determination of action,"

In the context of criminal cases, the general test of relevancy is whether the
evidence tends to logically, naturally, and by reasonable inference to establish
any material fact sought to be proved  (People V. Kelly (1967) 66 Cal. 2d 232-
239; People V. Jones (1954) 42 Cal. 2d 219-222.)

Under Evid. Code 210,352, gang evidence is admissible if it is logically relev-
ant to some material issue in the case other than character evidence, is not
more prejudicial than probative, and is not cumulative.  A properly qualified
gang expert may, where appropriate testify to a wide variety of matters,
including gang grafitti.

The greater the probative value of the evidence, the greater must be the undue
prejudice in order to justify exclusion (section 352.)

The 'prejudice' referred to in Evid. Code section 352, **3)** applies to evidence
which uniquely tends to evoke an emotional bias against the defendant as an
individual and which has very little effect on the issues.  In applying section
352; prejudice is not synonymous with damaging, (People V. Karis (1988) 46 Cal.
3d 612-638, citing; People V. Yu (1983) 143 Cal. App. 3d 358-377, inner quotes
omitted.)

**3) Section** 352 issues are reviewed for abuse of discretion.  (People V. Cain
(1995) 10 Cal. 4th 1, 33; People V. Cudjo (1993) 6 Cal. 4th 585-609.  The trial
court's discretion will not be disturbed unless probative value clearly is
outweighed by prejudicial effect. (People V. Scheid (1997) 16 Cal. 4th 1, 18.)

Admissibility of gang evidence is reviewed for abuse of discretion Evid. P.C. 21.2.

A trial courts admission of evidence, including gang testimony is reviewed for abuse of discretion. The trial courts ruling will not be disturbed in the absence of a showing it exercised its discretion in an abitrary, capricious, or patently absurb manner that resulted in a miscarriage of justice.

A trial court's exercise of its discretion under section 352 must not be disturbed on appeal except on a showing that the court exercised its discretion is an abitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (Ibid; see also People V. Poplar (1990) 70 Cal. App. 4th 1129; People V. Fitch (1997) 55 Cal. App. 4th 172-183.)

Evidence can be excluded under section 352 if the probability that its admission will create substantial danger of undue prejudice substantially outweighed its probative value.

The California Supreme Court has reaffirmed:

[W]hen ruling on a section 352 motion, a trial court need not expressly weigh the prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under section 352. (People V. Williams (1997) 16 Cal. 4th 153-213; citing People V. Loças (1995) 12 Cal. 4th 415-448-449.)

E. **The Admission of the gang evidence impacted appellant's constitutional right to a fair trial.**

During the appellants counsels objection to the gang evidence, she did not specifically object on the basis of a constitutional violation, should respondent argue that counsel failed to make a constitutional objection to the evidence and thus has waived any right to challenge the error on a constitutional basis, appellant would argue that he has not waived his right to raise the issue on appeal, for two reasons, first:the issue raises fundamental principles of policy and constitutional grounds, for which the refusal of appellate review frusterates rather than serves the interest of justice. (People V. Welch (1995) 5 Cal. 4th 228-237, Arabian,J, concurring; (People V. Mills (1978) 81 Cal. App. 3d 171-176.) Secondly, to avoid

A subsequent habeas proceeding raising the same point, courts have discretion to consider issues on direct appeal in that the collateral proceedings would unduly prolong the appellate process (People V. Blanco (1992) 10 Cal. App. 4th 1167-1172-1173; People V. Allen (1974) 4  Cal. App. 3d 148-153 ["A matter normally not reviewable upon direct appeal, but vulnerable to habeas corpus proceedings based upon constitutional grounds may be considered upon direct appeal...].) Moreover, the United States Supreme Court has consistently held that domestic rules of evidence may not be invoked to preclude a criminal defendant from establishing that be has been denied a fair trial. (See Rock V. Arkansas (1987) 483 U.S. 44, 55-56 [state prohibition of post-hypnosis testimony violates right of defendant to test-ify]; Davis V. Alaska (1974) 415 U.S. 308, 315-321 [94 S. Ct. 1105, 39 L. Ed. 2d 347] ; [refusal to allow defendant to cross-examine key prosecution witness to show his probation status following an adjudication of juvenile delinquency denied defendant his constitutional right to confront witness, notwithstanding state policy protecting anonymity of juvenile offenders]; Chambers V. Mississippi (1973) 410 U.S. 284, 294-303 [93 S. Ct. 1038, 35 L. Ed. 2d 297.], Refusal to permit defendant to cross-examine witness on highly exculpatory matters on the basis of a Mississippi common Law rule that a party may not impeach his own witness combined with hearsay rule; state evid-entiary rules "may not be applied mechanistcally to defeat the ends of justice"]; Washington V. Texas (1967) 388 U.S. 14 [87 S. Ct. 1920, 18 L. Ed. 2d 1019].) [evidentiary statute preventing principals, accomplice, or accessories in same crime to be introduced as witnesses for each other denied defendant's right to have compulsory process for obtaining witnesses in his favor.])

## E.  Application of Law to this case prejudice.

Applying these rules, the trial court's allowing the admission of gangs and gang testimony to impeach Washington or show Washingtons affiliation; was an abuse of discretion. The reality remains, the prejudice was extended to appellant *because the jury would infer appellant's* association with Washington meant appellant was also a gang member, and this prejudice far outweighed the probative value. Appellant was highly prejudiced by the prosecutions illicitation of gangs and there culture, which could have done no more than inflame the jury against appellant and appellant's witness, As the supreme court has observed "There is no reason why we should treat this evidence as any Less "crucial" than the prosecutor and so presumably the jury treated it." (People V. Cruz (1964) 61 Cal. 2d 861-868; See also People V. Woodard (1979) 23 Cal. 3d 329-341 [reversal ordered where the prosecutor "exploited" erroneously admitted evidence during his closing argument].)

Accordingly, the courts decision to allow the prosecution to cross-examine about gangs affiliation and culture highly prejudiced appellant's case. It was not only an abuse of discretion to admit the evidence, but it was a violation of constitutio- al magnitude that denied appellant his due process right to a fair trial. (U.S. Const. Fifth and Fourteenth Amends.)

Defense witness Tony Washington was crucial to appellants defense. The courts deci- sion to allow the prosecutor to question Washington concerning gangs, despite the noted prejudicial effect it would have on appellant, and its irrelevancy, was preju- dicial because appellant could not proceed without Washington's testimony exonerating appellant. Thus appellant had to diminish his right to due process, to invoke his right to present a defense rendering the resulting challenged convictions unreliable in violation of appellants 5th, 6th and 14th Amends, of the United States Constitution.

Accordingly, the appellant ask that the court reverse his conviction for counts #1 and count #2.

1. ARGUMENT #5

2. JUDICIAL ERROR, PROSECUTORIAL MISCONDUCT: THE TRIAL COURT ABUSED ITS DISCRETION

3. WHEN IT ALLOWED A VIDEOTAPE SEIZED AS A RESULT OF A WARRANT (NOV. 6, 2003) IN

4. AS EVIDENCE IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS AND EVIDENCE CODE

5. SECTION 352 AND 356...

6. A. PROCEEDINGS BELOW.

7. During an In Limine hearing September 27, 2004, a videotape which depicted

8. " rapping " was challenged by appellant and appellant's trial counsel. ( appellant

9. implements the original transcript's page's 1-16,)

10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

28.

1    EL CAJON, CALIFORNIA - SEPTEMBER 27TH, 2004 - 11:04 A.M.

2

3                    P-R-O-C-E-E-D-I-N-G-S

4

5        THE COURT:  PEOPLE VS. JOSEPH MCDONALD, SCE234930.

6        MR. BOWMAN:  GOOD MORNING, YOUR HONOR.  DEPUTY DISTRICT

7    ATTORNEY BLAINE BOWMAN FOR THE PEOPLE.

8        MS. LACHER:  GOOD MORNING, YOUR HONOR.  PAM LACHER ON

9    BEHALF OF MR. MCDONALD.  HE IS PRESENT AND SEATED TO MY LEFT

10   BEFORE THE COURT.

11       THE COURT:  ALL RIGHT.  GOOD MORNING, MR. MCDONALD.

12       THE DEFENDANT:  GOOD MORNING.

13       THE COURT:  THIS IS -- WE ARE GOING TO GO THROUGH SOME

14   PRE-TRIAL ISSUES BEFORE WE BRING A JURY PANEL UP.

15       THE COURT HAS HAD AN OPPORTUNITY TO DISCUSS SOME OF

16   THESE ISSUES IN ADVANCE WITH COUNSEL.  WE BROUGHT -- I HAD

17   MR. BOWMAN BRING DOWN A TELEVISION SET WITH A TAPE RECORDER

18   SO THAT WE CAN TAKE A LOOK AT THE VIDEOTAPE ALTOGETHER TO

19   SEE JUST HOW GOOD THE SOUND IS ON THAT THING, AND WHETHER OR

20   NOT IT'S GOING TO ADD ANYTHING TO THE TRIAL.

21       I HAVEN'T YET SEEN THE ACTUAL TAPE.  I HAVE SEEN THE

22   TRANSCRIPT OF IT, WHICH SUGGESTS THAT THERE IS A LOT OF

23   STUFF MISSING; THAT THE QUALITY OF THE SOUND IS NOT VERY

24   GOOD, AND THAT MAY MAKE A DIFFERENCE IN TERMS OF WHETHER OR

25   NOT I AM GOING TO ALLOW THAT TO BE PLAYED.  SO, THAT IS WHY

26   THE VIDEO IS HERE, AND LET'S JUST TAKE THAT THING FIRST

27   AND --

28       MR. BOWMAN:  JUST FOR THE RECORD, I HAVE REDACTED A

1    COPY OF THE TAPE THAT WAS FOUND INSIDE THE CAMERA.  THE TAPE

2    WAS ORIGINALLY 45-MINUTES LONG, WE HAVE REDACTED IT DOWN  TO

3    -- LET ME DOUBLE-CHECK HERE.  I BELIEVE IT IS ABOUT SIX

4    MINUTES OR SO.  SEVEN MINUTES AND 24 SECONDS IS THE RUNNING

5    TIME ON THIS.

6         AND WHAT I HAVE DONE IS I HAVE TURNED THE VOLUME ALL

7    THE WAY UP, BECAUSE AT THE BEGINNING THERE IS A PERSON

8    SAYING SOMETHING, BUT YOU CAN'T REALLY HEAR IT.  JUST SO THE

9    COURT KNOWS, THE VOLUME IS UP AS HIGH AS IT CAN GO, AND THAT

10   IS THE BEST IT GETS.

11        **THE COURT:**  I NEED A STIPULATION FROM BOTH OF YOU THAT

12   SIMONE DOES NOT HAVE TO ATTEMPT TO TRANSCRIBE THIS THING AS

13   IT'S BEING PLAYED.

14        **MR. BOWMAN:**  I WILL STIPULATE TO THAT, YOUR HONOR.

15        **MS. LACHER:**  SO STIPULATED, YOUR HONOR.

16        **THE COURT:**  OKAY.

17        **MR. BOWMAN:**  SHALL I PLAY THE TAPE THEN, YOUR HONOR?

18        **THE COURT:**  YES.

19        **MR. BOWMAN:**  OKAY.

20        (A VIDEOTAPE WAS PLAYED, NOT REPORTED.)

21        **MR. BOWMAN:**  DID YOU WANT TO MARK THAT?

22        **THE COURT:**  NOT YET.  I THINK THERE IS PROBABLY GOING

23   TO HAVE TO BE MORE EDITING TO IT.  YOU WANT TO PLAY THAT

24   TAPE TO THE JURY?

25        **MR. BOWMAN:**  THAT'S CORRECT, YOUR HONOR.  AND AS THE

26   COURT CAN SEE WHERE THE TWO GENTLEMEN ARE, YOU COULD SEE A

27   LOT OF THE SURROUNDING AREA INSIDE THE APARTMENT.  THAT IS

28   THE TROY STREET RESIDENCE WHERE THAT WAS FILMED, AND WE'LL

1    ELICIT TESTIMONY FROM DETECTIVE HARTMAN WHO WILL TELL US

2    THAT IS WHERE IT WAS FILMED BASED ON THE SURROUNDINGS AND SO

3    FORTH.

4        **THE COURT:**  OKAY.

5        **MR. BOWMAN:**  AT LEAST FROM MY PERSPECTIVE, THE FIRST

6    FEW MINUTES OF THE TAPE -- I COULDN'T UNDERSTAND THE FIRST

7    FEW WORDS THAT WERE SAID, BUT UNDER THE RAP SONG IT IS THAT

8    HE TALKS ABOUT A "GLOCK 40" AND A "TREY-EIGHTY," AND THAT

9    MAY HAVE BEEN ONE OF THE COURT'S CONCERNS.

10       **THE COURT:**  IT IS.  I HAVE DIFFERENT QUESTIONS NOW THAT

11   I HAVE SEEN IT.

12       NO. 1, WHO IS THE OTHER MALE IN THE TAPE?  IS THAT

13   MR. WASHINGTON?

14       **MR. BOWMAN:**  I BELIEVE IT IS MR. WASHINGTON.  I HAVE

15   NOT BEEN INVOLVED IN THE CASE FROM THE BEGINNING.  I HAVEN'T

16   SEEN HIM PERSONALLY, BUT I BELIEVE THAT TO BE

17   MR. WASHINGTON.

18       **THE COURT:**  BECAUSE THE VERY START OF THE TAPE WHERE IT

19   IS FOCUSING IN ON MR. WASHINGTON SMOKING, WHATEVER HE IS

20   SMOKING, I DON'T SEE HOW THAT HAS ANYTHING TO DO WITH

21   ANYTHING OTHER THAN, YEAH, THERE WAS A TAPE THAT WAS FOUND

22   IN THE CAMERA THAT THIS GUY WAS ON.  BUT I DON'T SEE HOW IT

23   ADDS ANYTHING TO WHAT IT IS THAT YOU WANT TO PRESENT THIS

24   TAPE FOR.

25       **MR. BOWMAN:**  WELL, THE THEORY OF THE CASE IS THAT THERE

26   WERE TWO GENTLEMEN WHO COMMITTED THESE CRIMES,

27   MR. WASHINGTON AND MR. MCDONALD.

28       **THE COURT:**  RIGHT.

1        **MR. BOWMAN:** THE FACT THAT THEY HANG OUT TOGETHER,

2    SMOKE TOGETHER, DID ALL THESE THINGS TOGETHER, WOULD HELP

3    SUPPORT THE FACT THAT THEY WERE INVOLVED IN THIS TOGETHER AS

4    WELL.

5        SO, IT SHOWS THAT THESE TWO HANG OUT TOGETHER AS

6    FRIENDS IN THE TROY STREET RESIDENCE AND SO FORTH. AND WE

7    THINK IT IS PROBATIVE ON THAT ISSUE, IN FACT, THAT

8    MR. WASHINGTON IS SMOKING WHATEVER, I THINK HE IS SMOKING A

9    SMALL CIGAR OR SOMETHING AT ONE POINT IS NOT PREJUDICIAL AT

10   LEAST TO MR. MCDONALD. AND THE PEOPLE FEEL THAT SHOULD COME

11   IN TO SHOW THEY ARE PALING AROUND TOGETHER AND HANGING OUT

12   TOGETHER.

13       **THE COURT:** DO YOU HAVE AN OBJECTION TO THE TAPE?

14       **MS. LACHER:** I DO, YOUR HONOR. I THINK UNTIL YOU GET

15   TO THE RAP SONG, AND WE ALL KNOW FROM THE TRANSCRIPT WHAT WE

16   THINK IT'S GOING TO SAY, I GUESS THE QUESTION WOULD BE WE

17   DIDN'T KNOW FROM THE TRANSCRIPT YOU WOULD BE ABLE TO PICK

18   OUT WHAT THE PEOPLE NOW SAY IT SAYS; THAT IT ACTUALLY SAYS

19   THAT. I THINK THAT IS ANOTHER ISSUE.

20       I MEAN, WE CAN ALL IMAGINE THAT THAT IS WHAT IT SAID,

21   BUT I AM NOT SO SURE THAT, ABSENT THE TRANSCRIPT, WE WOULD

22   HAVE PICKED THAT UP FROM THAT. I AM NOT SO SURE.

23       THE OTHER PROBLEM, I THINK, LIKE THE COURT SAID, MOST

24   OF THE TRANSCRIPT, OTHER THAN SHOWING MR. WASHINGTON,

25   ASSUMING THAT IS MR. WASHINGTON, AND MR. MCDONALD TOGETHER

26   IN THIS APARTMENT, IT REALLY HAS NO --- IT ADDS NOTHING TO

27   THIS CASE. DOESN'T ADD ANYTHING OTHER THAN SHOWING THEM

28   TOGETHER, AND THERE ARE PLENTY OF OTHER TIMES THEY ARE SEEN

1    TOGETHER.

2          ONE OF THE PEOPLE'S WITNESSES IS THE GUY FROM THE STORE

3    THAT SAYS THEY WERE TOGETHER IN THE STORE TRYING TO SELL THE

4    STOLEN PROPERTY.   THERE WAS A FIELD INTERVIEW WHERE THEY

5    WERE TOGETHER.

6          SO, THERE IS NO QUESTION THEY HANG OUT TOGETHER, AND I

7    DON'T THINK THAT THIS TAPE ADDS ANYTHING SUBSTANTIAL IN THAT

8    NATURE.

9          AND ON THE OTHER SIDE, I THINK IT SHOWS QUITE A

10   DIFFERENT -- I MEAN, THE PART ABOUT HIM SMOKING THE

11   CIGARETTE AND PUFFING IT IN THE FACE, I DON'T THINK THAT

12   ADDS ANY MATERIAL INFORMATION.

13         AND THEN WHEN YOU GET TO THE RAP SONG, LIKE I SAID, I

14   AM NOT SO SURE IT ACTUALLY SAYS WHAT YOU THINK IT SAYS.  BUT

15   IN OUR MINDS WE KNOW WHAT WE THINK IT SAYS BECAUSE WE HAVE A

16   TRANSCRIPT OF WHAT WE THINK IT SAYS.  BUT I DON'T KNOW.

17   ABSENT THE TRANSCRIPT, I DON'T KNOW IF YOU COULD PICK THAT

18   UP FROM WHAT IS BEING SAID.

19         AND THEN THERE IS MORE TO THE CONTEXT OF IT.  I DON'T

20   BELIEVE THE CLOTHING FROM MR. MCDONALD IS DIFFERENT, AT

21   LEAST FROM THE RAP SONG IS DIFFERENT, FROM THE CLOTHING HE

22   IS WEARING OR THE ABSENCE OF CLOTHING.

23         **THE COURT:**  I DON'T THINK THAT THE TAPE IS NECESSARILY

24   SUGGESTING THAT EVERY SCENE THAT IS ON THE TAPE WAS

25   OCCURRING AT THE SAME TIME OR CONSECUTIVELY TIMED.  IT MAY

26   BE, THEY MAY HAVE BEEN AT A DIFFERENT PLACE, EVEN WITH THE

27   RAP SONG.  YOU CAN'T TELL THE LOCATION WHEN MR. MCDONALD IS

28   RAPPING, BUT YOU CAN TELL AT OTHER POINTS.

1      **MS. LACHER:**  WELL, I GUESS THEN THAT ADDS TO THE

2  ARGUMENT IF THE POINT OF PRESENTING THE ENTIRETY OF THE TAPE

3  OF THEM HANGING OUT TOGETHER, AND THEY ARE RAPPING ABOUT THE

4  STOLEN PROPERTY TOGETHER, YOU CAN'T TELL THE TWO, AND THERE

5  IS A GAP IN THERE, AND I DON'T KNOW WHAT ELSE WAS IN THAT

6  GAP.

7      PERHAPS WHAT WAS BEFORE THAT RAP TAPE MIGHT ADD OR SHED

8  LIGHT ON WHAT THEY WERE REALLY TALKING ABOUT IF, IN FACT --

9  AND THAT IS WHAT WE ARE MISSING.

10      **THE COURT:**  WELL, ARE WE MISSING SOMETHING -- I DON'T

11  KNOW.  I DON'T KNOW WHAT THE EDITING PROCESS IS YET, AND I

12  HAVEN'T HAD THAT DESCRIBED TO ME.  SO, MAYBE WE ARE MISSING

13  SOMETHING THAT IS A PREAMBLE BEFORE THE RAPPING, AND WE WILL

14  LET MR. BOWMAN TALK ABOUT THAT IN A MOMENT.

15      BUT, YOU KNOW, I UNDERSTAND YOUR ARGUMENT ABOUT THE

16  CONTEXT WITH REGARD TO THE RAP SONG, BUT CERTAINLY SOMEBODY,

17  NO QUESTION MR. MCDONALD, IS SAYING THOSE WORDS, AND THOSE

18  WORDS HAVE BEEN HEARD.

19      SO, IT'S A STATEMENT BY MR. MCDONALD AND IT IS AN

20  ADMISSION THAT WOULD COME IN.  IT'S A HEARSAY STATEMENT, OF

21  COURSE, BUT IT'S AN ADMISSION BY MR. MCDONALD OR IT CAN BE

22  THE JURY, IF THEY BELIEVE THAT IT'S A TRUTHFUL STATEMENT,

23  CAN FIND IT TO BE AN ADMISSION.

24      **MS. LACHER:**  I GUESS MY PROBLEM IS THAT, ONE, WE DON'T

25  KNOW THE CONTEXT, ASSUMING IT WAS SOMETHING BEFORE IT WAS

26  DONE, TWO, TO PLACE THAT WITH ASSUMING THAT IS TONY WITH

27  TONY AND THE TAPE PUTS THE TWO TOGETHER, BUT ON THE RAP PART

28  OF IT, IT IS JUST MR. MCDONALD.

1       .  SO, TO PLACE THE TWO TOGETHER, ONE OF THE ISSUES IS

2    WHETHER OR NOT HE WAS THE ONE THAT DID THE BURGLARY.   THE

3    SECOND ONE IS, YEAH, MAYBE PERHAPS HE WAS IN POSSESSION OF

4    STOLEN PROPERTY, BUT WASN'T THAT SECOND PERSON THAT WAS WITH

5    MR. MCDONALD DURING THE BURGLARIES.

6        SO, TO PUT THIS ENTIRE TAPE TOGETHER, IT MAKES AN

7    INFERENCE THAT MAY NOT NECESSARILY BE DRAWN, ESPECIALLY

8    SINCE THERE IS A GAP IN THE DAYS OR TIME IN WHICH THAT TAPE

9    WAS DONE.  IT COULD HAVE BEEN THREE DAYS LATER AND --

10       **THE COURT:**  SURE.

11       **MS. LACHER:**  -- AND SO THAT, I THINK AT THE VERY LEAST,

12   IT NEEDS TO BE EDITED AGAIN, AND WE NEED TO KNOW WHAT WAS

13   BEFORE THAT RAP SONG.

14       **THE COURT:**  MR. BOWMAN?

15       **MR. BOWMAN:**  WELL, IT ALMOST SOUNDS LIKE SHE IS MAKING

16   A 356 ARGUMENT.  THE WHOLE TAPE SHOULD BE PLAYED TO PUT IT

17   IN CONTEXT, AND I THINK THAT IS HER OPTION.

18       WE ARE NOT OFFERING THE ENTIRE TAPE.  WE ARE JUST

19   OFFERING A SMALL PORTION OF THE TAPE BECAUSE, FRANKLY, I

20   DON'T SEE THAT THE REST OF THE TAPE -- I HAVE NOT VIEWED THE

21   ENTIRE TAPE.

22       WHAT I AM TELLING YOU NOW IS BASED ON MY DISCUSSION

23   WITH MR. ROMO AND HIS REASONING.  AND JUST SO THE RECORD IS

24   CLEAR, THE CASE WAS PREPARED BY MR. ROMO AND GIVEN TO ME

25   ABOUT A WEEK AGO THE TRIED.

26       HE ALREADY HAD THIS REDACTION PREPARED, SO I WAS NOT

27   INVOLVED IN THAT REDACTION.  BUT ACCORDING TO MR. ROMO, HE

28   DID NOT FEEL IT WAS APPROPRIATE TO PLAY THE ENTIRE 35- TO

1   45-MINUTE TAPE WHEN NOT ALL OF THAT IS NECESSARILY PROBATIVE

2   TO THE ISSUE.  AND HIS BELIEF WAS, AND I SHARE HIS BELIEF,

3   THAT THOSE PORTIONS THAT DEAL WITH THE SCENES IN THE

4   APARTMENT AT TROY STREET, WHERE I BELIEVE MR. MCDONALD IS

5   DENYING THAT HE LIVED THERE WHERE THE STOLEN PROPERTY WAS

6   FOUND, THAT PORTION, COUPLED WITH THE RAP SONG, IS ALL THAT

7   IS IMPORTANT.

8       IF THE DEFENSE WANTS TO PUT IN PERSPECTIVE, WE CAN PLAY

9   THE ENTIRE TAPE, AND I DON'T HAVE ANY OBJECTION TO THAT.

10      BUT I THINK THE THRESHOLD ISSUE, FIRST OF ALL, IS

11  WHETHER OR NOT THE COURT IS GOING TO ALLOW THE TAPE IN, AND

12  IF SO, WHETHER THE DEFENSE UNDER 356 WANTS THE ENTIRE TAPE

13  PLAYED.

14      AND IF THE COURT MAKES THAT RULING, THAT IS FINE.  MY

15  PREFERENCE IS JUST TO PLAY THE REDACTED VERSION IN AN

16  INTEREST OF SAVING TIME.

17      **MS. LACHER:**  YOUR HONOR, I HAVE ACTUALLY ONLY LOOKED AT

18  THE EDITED VERSION, BUT MR. MCDONALD TELLS ME THAT ONE OF

19  THE THINGS THAT IS MISSING IS A STATEMENT FROM MR. BURTON

20  CONCERNING -- TALKING ABOUT THE GUNS WHICH WERE MISSING.

21      **THE COURT:**  I AM SORRY?

22      **MS. LACHER:**  A STATEMENT BY MR. BURTON.  HE IS REGINA

23  BURTON'S EX-HUSBAND.  HE IS THE THIRD-PARTY CULPABILITY

24  PERSON, AND HE IS TALKING ABOUT THE GUNS, WHICH ARE MISSING

25  SUPPOSEDLY.

26      **THE COURT:**  ON THE TAPE?

27      **MS. LACHER:**  ON THE TAPE.

28      **THE DEFENDANT:**  CAN I SAY SOMETHING JUST REAL FAST?

1    WHEN I WAS PRO PER, I WATCHED THIS WHOLE TAPE.  A LOT

2  OF THINGS THAT WERE ORIGINALLY ON THIS TAPE WERE MISSING.

3  THERE IS NO SUCH THING AS AN UNREDACTED VERSION.

4    THE WHITE WEDDING THAT THEY WERE SAYING IT WAS AN

5  ESTABLISHED DATE.  IT HAD A DATE ON THERE.  IT WAS CLARENCE,

6  REGINA'S HUSBAND, WHICH IS REGINA'S HUSBAND TALKING ABOUT

7  GUNS.

8    THERE IS ONE SCENE THAT COMES, AND THEN THAT SCENE IS

9  BACK IN FRONT OF THAT SCENE, WHICH SAYS HOW COULD THAT

10  HAPPEN?  LIKE, WE ARE IN THIS SETTING RIGHT HERE AND THEN

11  THIS SETTING LEAVES AND THERE IS ANOTHER SETTING AND WE ARE

12  BACK IN THIS SETTING AGAIN WEARING DIFFERENT CLOTHES.  I

13  DON'T SEE HOW THAT HAPPENS.

14    SO, THERE WERE A LOT OF THINGS TAKEN OUT OF HERE

15  PURPOSELY, AND THERE IS NO SUCH THING AS AN UNREDACTED TAPE.

16  THERE IS NO WHITE WEDDING ON HERE.

17    THERE IS NUMEROUS OTHER BLACK MALES TALKING ABOUT GUNS

18  AND EVERYTHING ELSE THAT IS MISSING OUT OF HERE, AND I DON'T

19  KNOW HOW AN UNREDACTED COPY AND A REDACTED COPY, IF ALL

20  THOSE SCENES AREN'T IN THERE.

21    THE COURT:  I DON'T KNOW.  I HAVEN'T SEEN THE

22  UNREDACTED COPY.  ALTHOUGH MR. ROMO GAVE THE COURT A COPY,

23  YOU REMEMBER THAT, HE GAVE THAT TO ME.  AND I HAVE THAT.

24  AND WE CAN TAKE A LOOK AT THAT WHOLE THING TOO.

25    MS. LACHER:  I THINK WE SHOULD, YOUR HONOR.

26    BUT I THINK WHAT MR. MCDONALD IS ALSO SAYING IS THAT

27  THE UNREDACTED VERSION IS NOT A TRUE VERSION.

28    THE COURT:  I KNOW THAT IS WHAT HE IS SAYING, AND I

1    DON'T KNOW WHETHER -- I HAVEN'T HEARD A FOUNDATION LAID BY

2    WHOEVER IT WAS THAT FOUND THE TAPE AND THEY ARE GOING TO, I

3    EXPECT, SOMEBODY WHO FOUND THE TAPE INSIDE THE, INSIDE THE

4    CAMERA AND WOULD COME IN AND TESTIFY THAT THAT IS THE TAPE

5    THAT THEY FOUND INSIDE THE CAMERA.  AND IT IS IN THE SAME

6    CONDITION THAT IT WAS IN WHEN THEY FOUND IT.  AND THAT IS

7    WHAT THEY USED TO MAKE THEIR REDACTED COPIES FROM IT.

8         IF THEY WERE TO SAY THAT, THEN IF THERE IS STUFF THAT

9    IS MISSING FROM THAT, THEN IT'S NOT REALLY MUCH I CAN DO

10   ABOUT THAT.  THAT IS THE TAPE.  THE REPRESENTATION HAD BEEN

11   THAT THIS ONE WAS AN UNREDACTED COPY AGAIN, AND I AM GOING

12   TO ASSUME FOR THESE PURPOSES AT THIS POINT THAT THAT TAPE IS

13   AN EXACT DUPLICATE OF THE TAPE THAT WAS FOUND INSIDE THE

14   CAMERA, THAT WAS PLACED IN EVIDENCE AND THEN WE WILL GO FROM

15   THERE.

16        NOW, IF THERE IS SOME FOUNDATIONAL GLITCH ON THE

17   ORIGINAL, THEN WE WILL DEAL WITH THAT.  BUT WE WILL TAKE A

18   LOOK AT THE WHOLE THING NOW.

19        **THE DEFENDANT:**  MAY I BE ABLE TO POINT OUT AS SOON AS

20   IT HAPPENS MOST -- MOST OF THE FRONT TAPE IT IS GOING TO

21   TURN BLUE LIKE THIS, AND YOU ARE GOING TO SEE A SCENE WHERE

22   I AM WEARING A BLUE JERSEY AND STUFF LIKE THAT WITH A RED

23   BEANIE, AND THEN IT WILL GO TO A WHOLE ANOTHER SCENE WITH ME

24   WEARING DIFFERENT CLOTHES AND EVERYTHING, AND THEN IT WILL

25   COME BACK TO THAT SCENE.  SO SOMEBODY HAS TAMPERED WITH THAT

26   TAPE.

27        **THE COURT:**  WELL, SOMEBODY MAY HAVE EDITED THE TAPE,

28   BUT THAT DOESN'T MEAN THAT SOMEBODY THAT MADE THE TAPE IN

1    THE FIRST PLACE, WHETHER IT WAS YOU OR MR. WASHINGTON OR

2    MR. BURTON, OR SAYS SILL B. DEMILLE, OR WHOEVER IT IS THAT

3    CREATED THAT MOVIE.  COULD BE THE PERSON WHO PUT THAT THING

4    TOGETHER.

5        ALL THIS TAPE IS REPRESENTED TO ME AS BEING IS IT'S IN

6    THE SAME CONDITION AS THE TAPE WAS THAT THEY FOUND IN THE

7    CAMERA.  AND IF THERE ARE, YOU KNOW, THINGS THAT ARE MISSING

8    OR DIFFERENT PASSAGES, THEIR CLAIM WILL BE THAT THOSE THINGS

9    WERE MISSING AT THE TIME THEY FOUND IT.

10       **THE DEFENDANT:**  THAT IS WHAT THEY ARE CLAIMING.

11       **THE COURT:**  THAT IS WHAT THEY ARE GOING TO TESTIFY TO.

12   I EXPECT THAT IS WHAT THEY ARE GOING TO TESTIFY TO.

13       **MR. BOWMAN:**  YOU KNOW, YOUR HONOR, AS THE COURT

14   PROBABLY UNDERSTANDS AND KNOWS, IF YOU HAVE A VIDEO CAMERA,

15   YOU CAN RECORD SOMETHING, STOP IT, FAST FORWARD AND RECORD

16   SOMETHING ELSE LATER DOWN THE TAPE.

17       OBVIOUSLY, MY UNDERSTANDING IS THE WEDDING THAT

18   MR. MCDONALD IS REFERRING TO, THOSE PHOTOGRAPHS WERE TAKEN

19   ON THE MEMORY STICK FROM THE VIDEO CAMERA.  I AM NOT CERTAIN

20   THAT THERE WAS ANY VIDEO OF THE WEDDING, BUT THERE WERE -- I

21   AM SORRY.  THERE WERE SOME STILL PHOTOS THAT WERE TAKEN ON

22   THE MEMORY STICK INSIDE THE CAMERA.  THERE WAS NO VIDEO OF

23   THE WEDDING.  AND THAT MAY BE LEADING TO SOME CONFUSION

24   HERE.

25       SECONDLY, WITH RESPECT TO THE TIME THAT MS. LACHER

26   TALKED ABOUT, THE GUN THAT WAS STOLEN FROM THE HAVERN

27   RESIDENCE ON OCTOBER 9TH AND RECOVERED ON NOVEMBER 6TH, SO

28   WE HAVE A SHORT TIME FRAME THAT WE ARE REFERRING TO HERE

1    THAT WE CAN NAIL THIS DOWN TO.

2         I THINK MS. LACHER WAS TALKING ABOUT WE ARE NOT SURE

3    WHEN THIS WAS FILMED.  WE KNOW IT WAS FILMED WITHIN THAT

4    ONE-MONTH PERIOD OF TIME SO.

5         **MS. LACHER:**  I DON'T THINK THAT --

6         **THE COURT:**  LET ME JUST LET YOU KNOW WHAT I AM THINKING

7    WITH REGARD TO WHAT WE HAVE SEEN SO FAR, THE SEVEN AND A

8    HALF MINUTE THING, AND THAT IS THE ONLY, THE MOST RELEVANT

9    PIECE OF INFORMATION IS THE RAP THAT I THINK IS RELEVANT.

10   IT'S MR. MCDONALD.  HE IS SAYING THOSE WORDS THAT ARE ON THE

11   TAPE.  THERE IS NO QUESTION ABOUT IT.

12        SECONDARILY IS WHEN THEY ARE IN THE APARTMENT AND THE

13   WOMAN --

14        **MR. BOWMAN:**  REGINA.

15        **THE COURT:**  -- WHEN SHE COMES IN, AT THAT POINT

16   FORWARD, I AM ASSUMING THAT THAT -- YOU ARE OFFERING THAT TO

17   SHOW THAT THERE IS SOME SORT OF A RELATIONSHIP BETWEEN THE

18   THREE OF THE PEOPLE THAT ARE IN THE ROOM AND THE PHYSICAL

19   LAYOUT OF THE ROOM.

20        **MR. BOWMAN:**  YES.  AND TO DISPUTE THE FACT THAT HE IS

21   NOW CLAIMING HE DID NOT LIVE THERE AT THE TIME THAT THE

22   STOLEN PROPERTY WAS FOUND IN THE HOUSE.

23        **THE COURT:**  NOW, THAT IS SOMETHING THAT MAY OR MAY NOT

24   BE RELEVANT IF IT COMES INTO DISPUTE.  IN OTHER WORDS, THE

25   RELATIONSHIP BETWEEN MR. MCDONALD AND THE MALE, FEMALE OR

26   BOTH OF THEM, THAT MAY BECOME AN ISSUE IF THERE IS A DENIAL

27   OF ANY KIND OF A RELATIONSHIP.  YOU KNOW, IF THERE IS A

28   CLAIM THAT NO, I HAVE NEVER BEEN IN THAT APARTMENT OR I

1   WASN'T IN THAT APARTMENT, WHENEVER THE VIDEO WAS TAKEN, THEN

2   THAT WOULD BE RELEVANT FOR THAT OTHER REASON, BUT JUST

3   TAKING THE PHOTOS, I DON'T SEE THEM TO BE TERRIBLY RELEVANT.

4       **MR. BOWMAN:**  AND THIS IS UNDER 352, I TAKE IT, CORRECT?

5       **THE COURT:**  YES.  UNDER 352, I HAVE TO WEIGH PROBATIVE

6   VALUE VERSUS PREJUDICE.  NOW, I DON'T SEE A WHOLE LOT OF

7   PREJUDICE IN THAT EITHER.  I JUST DON'T SEE A LOT OF, YOU

8   KNOW, PROBITY IN IT.

9       **MR. BOWMAN:**  I UNDERSTAND.

10      **THE COURT:**  AND THAT IS MY CONCERN.  SO, IN A SITUATION

11  WHERE THE PROBATIVE VALUE IS LOW, THE PREJUDICIAL IMPACT

12  DOESN'T HAVE TO BE VERY HIGH TO KEEP IT OUT UNDER 352.  SO,

13  YOU KNOW, I AM NOT SURE THAT THAT PORTION OF THE TAPE IS

14  SOMETHING THAT I THINK IS NECESSARILY APPROPRIATE FOR YOUR

15  CASE-IN-CHIEF.

16      NOW, ALL OF THIS IS A TOTAL WASTE OF BREATH, IF YOU

17  WANT THE WHOLE TAPE PLAYED, BECAUSE I AM INCLINED THAT IF

18  THERE IS ANY CONCERN THAT ANYTHING IS BEING TAKEN OUT OF

19  CONTEXT, THAT WE PLAY THE WHOLE TAPE.  AND MR. BOWMAN SAYS

20  HE DOESN'T OBJECT TO THAT, AND I DON'T HAVE A PROBLEM WITH

21  THAT EITHER.

22      **MR. BOWMAN:**  THE REASON I DON'T OBJECT, I THINK THE LAW

23  CALLS FOR IT.  I THINK UNDER 356 THEY ARE ALLOWED TO SEE THE

24  WHOLE TAPE, IF A SMALL PORTION -- AND THAT IS THE REASON WHY

25  I DON'T OBJECT.

26      **MS. LACHER:**  YOUR HONOR, I HAVEN'T HONESTLY SEEN THE

27  WHOLE TAPE.

28      **THE COURT:**  WELL, LET'S WATCH IT AND GET THE SAME

```
 1    STIPULATION THAT SIMONE DOESN'T HAVE TO RECORD IT, AND WE

 2    WILL PLAY THE WHOLE TAPE.

 3         MR. BOWMAN:  SO STIPULATED.

 4         MS. LACHER:  SO STIPULATED.

 5         THE COURT:  OKAY.

 6         MR. BOWMAN:  IT'S A 49-MINUTE TAPE.

 7         THE COURT:  WE WILL STOP AT NOON.

 8                    (THE TAPE WAS PLAYED.)

 9         THE COURT:  ALL RIGHT.  IT'S NOON.  WE WILL TAKE THE

10    NOON RECESS AT THIS TIME.  WE WILL BE IN RECESS UNTIL 1:30.

11         MR. BOWMAN:  THANK YOU.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

EL CAJON, CALIFORNIA, MONDAY, 9/27/04 - **1:30 P.M.**

1

2

3                          P-R-O-C-E-E-D-I-N-G-S

4

5      **THE COURT:** DEFENDANT IS PRESENT WITH COUNSEL AND THE

6  DISTRICT ATTORNEY IS PRESENT.

7      MR. BOWMAN, YOU WERE GOING TO CONTINUE ON WITH THE

8  TAPE?

9      **MR. BOWMAN:** YES, I WILL START RIGHT WHERE WE LEFT OFF.

10                         (A TAPE WAS PLAYED.)

11     **THE COURT:** THAT'S IT.

12     **MR. BOWMAN:** TIME FLIES.

13     **THE COURT:** ALL RIGHT.  NOW, EVERYBODY HAS SEEN IT, THE

14  WHOLE THING.

15      AS FAR AS WHAT I THINK IN TERMS OF THE ORIGINAL, MY

16  INCLINATION IS TO ALLOW THE RAP IN AND ONLY THE RAP IN THE

17  PEOPLE'S CASE-IN-CHIEF, UNLESS THERE IS GOING TO BE SOME

18  ISSUE AS TO THE RELATIONSHIP BETWEEN MR. MCDONALD AND THE

19  OTHER PEOPLE THAT ARE IN THE VIDEO.

20      OR IF THERE IS SOME DISPUTE ABOUT THE -- ABOUT THERE

21  BEING A VIDEO TAKEN OF THE PREMISES AT, IS THAT TROY STREET?

22     **MR. BOWMAN:** YES, YOUR HONOR.

23     **THE COURT:** OKAY.  IF THERE IS THE CLAIM THAT NO --

24  NO -- THAT THE VIDEO DOESN'T SHOW TROY STREET, THEN WE WILL

25  HAVE THE OFFICER TESTIFY TO THAT AND SHOW THE VIDEO WITH

26  REGARD TO THAT FOR IMPEACHMENT.  BUT OTHER THAN THAT, I

27  DON'T SEE ANY REAL RELEVANCE TO THAT.

28     **MR. BOWMAN:** SO, WE NEED TO REDACT THAT TAPE THEN JUST

1    TO INCLUDE THE RAP THEN, I TAKE IT?

2        THE COURT:  YEAH, JUST THAT STUFF AROUND THE RAP.

3        AND AS FAR AS A 356 POINT OF VIEW, IF YOU WANTED MORE

4    THAN THAT IN THERE, IT WOULD BE LIMITED, I THINK, TO JUST

5    THE PARTY WHERE THE RAP TAKES PLACE.  BECAUSE THE 356 REALLY

6    JUST TALKS ABOUT THINGS THAT ARE CONTEMPORANEOUS WITH THE

7    STATEMENT OR PART OF THE SAME STATEMENT.  AND THE EARLIER

8    STUFF FROM DIFFERENT DATES OR DIFFERENT LOCATIONS IS NOT

9    PART OF THE SAME CONVERSATION.

10        MR. BOWMAN:  BUT THE COURT WOULD ALLOW THE DETECTIVE TO

11   TESTIFY THAT HE VIEWED THE VIDEO AND THERE ARE SCENES FROM

12   THE TROY STREET RESIDENCE DEPICTING THE DEFENDANT?

13        THE COURT:  SURE.

14        MR. BOWMAN:  OKAY.  BECAUSE AS I WAS WATCHING IT NOW,

15   THERE WAS A SCENE WHERE THERE WAS A FIRE OUT ON THE PORCH

16   THAT IS TAKEN FROM THE PORCH OF THE TROY STREET RESIDENCE.

17   IF YOU LOOK ACROSS THE STREET, YOU CAN SEE THE PRODUCE

18   STATION AND THE GAS STATION ACROSS THE STREET.  IT LOOKS

19   LIKE THE MAJORITY OF THE FILM WAS DONE FROM THAT RESIDENCE,

20   AND THAT IS THE TESTIMONY I WILL ELICIT FROM THE DETECTIVE

21   THEN.

22        MS. LACHER:  WE WILL GO WITH THE COURT'S ORIGINAL

23   INCLINATION, JUST THE LITTLE BLURB.

24        THE COURT:  THEN GET ANOTHER COPY OR GET THE REDACTED

25   COPY REDACTED A LITTLE BIT MORE, AND THEN WE WILL BE GOOD TO

26   GO WITH THAT.

27        MR. BOWMAN:  I DIDN'T HEAR WHAT MS. LACHER SAID.  JUST

28   THE RAP PORTION?

1. ( IN LIMINE HEARING CONTINUED. ON P. 17 BELOW )

2. LACHER: THAT'S IT.

3. THE COURT: SO, THAT'S ITEM NO. 1.

4. B. THE COURTS SOLUTION TO ALLOW THE CHALLENGED VIDEOTAPE INTO EVIDENCE OVER
5. APPELLANT AND COUNSELS OBJECTION, WAS ABUSE OF DISCRETION AND PREJUDICIAL.

6. 1. COUNSELS OBJECTION.

7. As noted, the prosecutor explained that he wanted to play the videotape to show

8. appellant's "RAP", in which the appellant rapped about a glock 40, and a 'tre-

9. eighty." The prosecutor also sought to show that appellant and co-defendant, TONY

10. WASHINGTON hung out together. Defense counsel objected on the basis that 1) you

11. couldn't understand what was said on the videotape absent transcripts depicting

12. what the prosecution thought was said on the videotape, 2) The videotape added

13. nothing to the case besides appellant and co - defendant TONY WASHINGTON seen

14. together in the videotape and inside the 8614 Troy st. residence. Counsel argued

15. that other evidence besides the videotape could establish the fact that appellant

16. and Mr. WASHINGTON hung out together, 3) The depiction of appellant and
17. Co-defendant smoking added nothing to the case and, 4) the videotape would be

18. taken out of context and 5) that to allow the videotape into evidence which
19. depicted appellant and Mr. WASHINGTON together on the tape with the issue being

20. whether or not appellant was the

21. other person who committed the Burglaries with washington; would allow the jury

22. to infer that appellant was in fact that other person, when the evidence only

23. shows that appellant may have possessed stolen property. therefore to put the

24. entire tape together would allow for an inference that may not necessarily be

25. drawn. Especially since there was a gap in the days and time in which the tape

26. was done (II RT p. 6-7)

27. Appellant also argued that the tape was not authentic. Informing the court that

28. the videotape was not a true copy of the original. Appellant claimed that the

1. videotape was missing excerpts which depicted several black males discussing guns

2. ( II RT  9. ) appellant's trial counsel  reiterated appellant's claims (II RT

3. p. 9). Trial counsels objection to the videotape, as well as appellant's challenge

4. to the tapes authencity, was sufficient to preserve the issue for appeal. because

5. the  court made its ruling that the tape would come in, any further objections

6. by appellant or trial counsel would have been futile.

7. VIOLATION.

8. Evidence Code Section 356 provides : " whenever a part of an act, declaration

9. conversation, or writing is given in evidence, the adverse party is entitled to

10. inquire into the rest of the act, declaration, conversation or writing. The

11. purpose of this provision is to keep evidence in context  and to ensure that

12. the trier of fact is not misled by hearing only a partial account of certain

13. evidence. this is referred to as the rule of completeness.

14. As evidence Code Section 356 explained, the adverse party is entitled to inquire

15. into the rest of the act, declaration, conversation or writing. In the instant

16. case the appellant was denied this opportunity to inquire into the rest of the

17. evidence re videotape, because the trial court or any other appropriate official

18. failed to establish the videotapes authencity. Thus, not addressing  the appellant

19. and counsel's contention that the videotape was missing parts also (II RT P.

20. 8-10).

21. The appellant argues that the trial court should have first established the chain

22. of - custody to address whether or not the videotape was authentic.

23. The chain - of - custody' rule is but a variation of the principle that real

24. evidence must be authenticated prior to its admission into evidence. U.S. V.

25. HOWARD - ARIAS ( 4th cir. 1982) 679 F2d 363, 366.

26. 'The purpose of this threshold requirement is to establish that the item to be

27. introduced... Is what it purports to be" Mueller and Kirkpatrick, Evidence under

28. the rules, P. 957 (2d  ed 1993.)

1. Consequently, " Chain- of- custody issues are present whenever pysical evidence

2. capable of submission to the jury is introduced at trial." People v. Baldine (2001)

3. 94 C4th 773, 779, 114 CR 2d 570.

4. The chain- of- custody is establish when the party offering a particular item

5. in evidence shows that it is reasonably certain the evidence has not been altered

6. see People v. Lucas 3 C4th 495, 459, 11 CR2d 353.

7. The trial court's exercise of discretion in admitting the evidence over improper

8. chain-of-custody objection is reviewed for abuse of discretion. People v. Catlin

9. (2001) 26 C4th 81, 134, 109 CR2d 31.

10. Here, the appellant argued that the tape was not the original and was missing

11. parts. The trial court assumed someone would testify to its authencity (II RT

12. 9-10). However, there was not any testimony of the tapes authencity, thus the

13. the court abused its discretion and violated Evidence Code Section 356 and

14. appellant's 5th and 14th amendments rights of the constitution and fair trial.

15. BECAUSE THE COURT DID NOT ESTABLISH THE TAPES AUTHENCITY, AND DECIDED THE TAPE

16. WOULD COME IN AS FAR AS THE "RAP" ANY FURTHER OBJECTION WOULD HAVE BEEN FUTILE.

17. The proceedings sequed off into other matters and the videotape situation was

18. not visited again until well into appellant's trial. continuing on ( RT 1569).

19. In which the following colloquy took place:

20. MR.BOWMAN:  I also ask to play the redacted version of the videotape just to

21. show what these guys do when hang out to show the extent of there friendship

22. that they hang around smoking cigarettes and drinking at the TROY street address.

23. THE COURT: That is not in dispute. He admits everything that was on the tape

24. and, you know, so what would the entire tape be showing other than something

25. that confirms what he has already testified to?

26. MR. BOWMAN: Well, I didn't want to show the 49-minute tape. I wanted  to show

27. the redacted version , just of them  hanging out and just to give the jury an

28. actual view of what these guys do when they hang out together. they are buddies.

1. They videotaped them drinking and smoking and hanging out at the

2. residence . And if he is claiming that he didn't live there, I think it paints

3. a better picture for the jurors to actually see the activity than to be told about

4. it, so.

5. THE COURT: You are not going to be allowed to do that. It is cumulative.

6. MR. BOWMAN: I understand the court's caution about how far I want to go with Mr.

7. WASHINGTON. I understand that as well, so.

8. THE COURT: I don't want to be trying this case in another two years.

9. After the above colloquy, the prosecutor brought forth another oral motion to

10. play the tape. ( appellant again implements the original transcripts P. 1569-

11. 77.)

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

28.