C.1

```
 1    EL CAJON, CALIFORNIA, TUESDAY, MAY 4, 2004, A.M., D-9

 2

 3

 4        (THE FOLLOWING PROCEEDINGS WERE HAD IN A CLOSED

 5    COURTROOM.  ALL SPECTATORS AND THE DISTRICT

 6    ATTORNEY HAVE BEEN EXCUSED.  PRESENT IS THE

 7    DEFENDANT, HIS ATTORNEY OF RECORD, MR. MICHAEL

 8    RUIZ, COURT PERSONNEL AND STAFF:)

 9

10

11        THE COURT:  PEOPLE VERSUS JOSEPH MC DONALD.

12        MR. RUIZ:  GOOD MORNING, MICHAEL RUIZ, OFFICE OF

13    THE PUBLIC DEFENDER, ON BEHALF OF JOSEPH MC DONALD.

14    WE'RE PRESENT BEFORE THE COURT.  MR. MC DONALD WOULD

15    LIKE TO CONDUCT A MARSDEN HEARING.

16        THE COURT:  MR. RUIZ, YOU HAVE INDICATED TO THE COURT

17    THAT YOUR CLIENT IS DESIROUS OF DISCHARGING THE PUBLIC

18    DEFENDER AS HIS ATTORNEY OF RECORD; IS THAT CORRECT,

19    MR. MC DONALD?

20        THE DEFENDANT:  YES, SIR, YOUR HONOR.

21        THE COURT:  AND, ACCORDINGLY, THIS IS A CLOSED HEARING.

22    THE DISTRICT ATTORNEY AND ALL SPECTATORS HAVE BEEN EXCLUDED

23    PRESENT ONLY ARE COURT PERSONNEL AND STAFF AND, OF COURSE,

24    YOUR ATTORNEY.

25            SINCE IT IS A CLOSED HEARING, WHAT YOU SAY TO ME

26    WILL BE HELD IN CONFIDENCE, AND IT IS ORDERED THAT THE --

27    AT THE CONCLUSION OF THESE PROCEEDINGS, THE COURT REPORTER

28    IS NOT TO TRANSCRIBE HER NOTES AND THOSE NOTES ARE TO BE
```

1    SEALED AND THEY ARE ONLY TO BE UNSEALED AND TRANSCRIBED IF

2    THIS COURT OR A COURT OF COMPETENT JURISDICTION SHOULD MAKE

3    SUCH AN ORDER.

4         ACCORDINGLY, AS I HAVE INDICATED, YOU MAY SPEAK

5    FREELY TO ME, MR. MC DONALD, AND WHAT YOU NEED TO ESTABLISH

6    IS WHAT YOUR ATTORNEY HAS NOT DONE THAT YOU THINK HE SHOULD

7    HAVE DONE OR, CONVERSELY, WHAT HE HAS DONE THAT YOU DON'T

8    THINK HE SHOULD HAVE DONE.

9         WHY DO YOU THINK THE PUBLIC DEFENDER SHOULD BE

10   DISCHARGED AS YOUR ATTORNEY OF RECORD?

11      THE DEFENDANT:  FIRST OF ALL, YOUR HONOR, THERE IS

12   AN IMPORTANT WITNESS THAT I FEEL SHOULD HAVE BEEN

13   SUBPOENAED.

14      THE COURT:  ARE YOU TALKING ABOUT MR. WASHINGTON?

15      THE DEFENDANT:  I'M TALKING ABOUT MR. CLARENCE

16   BURTON.

17      THE COURT:  B-U-R-T-O-N?

18      THE DEFENDANT:  YES, SIR.

19      THE COURT:  OKAY.  WHERE IS HE?

20      THE DEFENDANT:  I DON'T KNOW WHERE HE IS AT, BUT HE

21   IS -- I FEEL HE IS A CRUCIAL WITNESS TOWARDS THIS CASE.

22      THE COURT:  OKAY.

23      THE DEFENDANT:  BECAUSE THAT IS HOW THE PROSECUTION

24   FIRST ESTABLISHED THEIR CASE IS BASED ON HIS STATEMENT.

25   I FELT HE SHOULD HAVE BEEN LOCATED.  HE CAN PROBABLY GIVE

26   INFORMATION THAT WOULD EXONERATE ME FROM THE PARTICULAR

27   CHARGE THAT HE GAVE THE STATEMENT ON.

28      THE COURT:  I TAKE IT BY THAT, THAT MR. RUIZ HAS BEEN

O.3

1   UNABLE TO LOCATE THIS WITNESS?

2       THE DEFENDANT:  YES, SIR.

3       THE COURT:  HAS HE BEEN UNWILLING TO LOCATE THIS

4   WITNESS OR HE JUST DOESN'T THINK HE IS IMPORTANT?

5       THE DEFENDANT:  I WOULDN'T SAY HE HAS BEEN UNWILLING

6   TO LOCATE THIS WITNESS, BUT I WILL SAY THAT I HAVE ASKED

7   HIM TO FILE A MOTION THAT THIS WITNESS BE PRODUCED.

8       THE COURT:  IS THIS WITNESS IN CUSTODY?

9       THE DEFENDANT:  THIS WITNESS IS -- CURRENTLY, I DON'T

10  KNOW IF HE IS IN CUSTODY OR NOT.

11      THE COURT:  WHERE IS HE?

12      MR. RUIZ:  YOUR HONOR, MR. BURTON IS SOMEWHERE IN

13  SAN DIEGO COUNTY.  HE HAS -- I MEAN, SO THE COURT KNOWS,

14  I HAVE GONE TO GREAT LENGTHS TRYING TO FIND MR. BURTON,

15  INCLUDING GETTING D.M.V. PRINTOUT.

16      THE COURT:  I AM NOT DONE WITH MR. MC DONALD.

17      MR. RUIZ:  I HAVE BEEN LOOKING FOR HIM.

18      THE COURT:  MR. MC DONALD, YOU WANT AN ORDER TO

19  PRODUCE THIS WITNESS?

20      THE DEFENDANT:  WHAT I AM SAYING IS THIS,

21  YOUR HONOR --

22      THE COURT:  WHO DO I ORDER TO PRODUCE HIM?

23      THE DEFENDANT:  THE PROSECUTION.  THEY HAD NO PROBLEM

24  GETTING INTO CONTACT WITH THIS WITNESS WHEN THEY NEEDED

25  TO TALK TO HIM, WHEN THEY NEEDED FOR HIM TO GIVE A

26  STATEMENT.

27      THE COURT:  SO THEY KNOW WHERE HE IS AT?

28      THE DEFENDANT:  I GUESS SO.  I AM ASKING THAT THEY

0.4

1   PRODUCE THIS WITNESS.  I HAVE ASKED HIM TO PUT IN A

2   MOTION THAT THEY PRODUCE THIS WITNESS.

3       THE COURT:  YOU ARE TELLING ME THE PEOPLE KNOW

4   WHERE HE IS AT BUT THEY WON'T TELL MR. RUIZ, AND THEY

5   CAN FIND HIM, BUT MR. RUIZ CANNOT?  IS THAT WHAT YOU

6   ARE TELLING ME?

7       THE DEFENDANT:  WHAT I AM TELLING YOU IS I HAVE ASKED

8   MR. RUIZ TO FILE A MOTION.

9       THE COURT:  THERE IS NO SUCH MOTION.

10      THE DEFENDANT:  TO PRODUCE A CONFIDENTIAL INFORMANT.

11      THE COURT:  NO.  YOU KNOW -- YOU KNOW WHO HE IS.  THERE

12  IS SUCH A THING AS A MOTION TO DISCLOSE IDENTITY, BUT YOU

13  DON'T NEED THAT BECAUSE YOU KNOW WHO HE IS.  THE ONLY THING

14  YOU NEED IS --

15      THE DEFENDANT:  NO.  I --

16      THE COURT:  -- TO FIND HIM.  STOP INTERRUPTING WHEN

17  I'M TALKING.  YOU DON'T GET TO TALK WHEN I'M TALKING, AND

18  I DON'T GET TO TALK WHEN YOU'RE TALKING.  WE CAN'T TALK

19  AT THE SAME TIME, BECAUSE THIS REPORTER CAN ONLY TAKE DOWN

20  ONE OF US AT A TIME.

21          SO, FIRST OF ALL, THERE IS NO SUCH THING AS A

22  MOTION TO PRODUCE.  THERE IS A MOTION TO DISCLOSE OR

23  IDENTIFY, BUT YOU DON'T NEED THAT BECAUSE YOU KNOW WHO

24  HE IS.  THE ONLY QUESTION IS, HOW DO WE FIND HIM.

25      THE DEFENDANT:  I WANT TO HAVE INFORMATION TO

26  DISCLOSE HIS LOCATION.  THEY KNOW, BUT THEY AREN'T

27  TELLING US.

28      THE COURT:  IF THEY KNOW, I WILL MAKE THEM TELL US.

0.5

1    THE DEFENDANT:  SECOND OF ALL, I WAS ASKING MR. RUIZ

2  TO PROVIDE ME WITH ADEQUATE INFORMATION CONCERNING THESE

3  ALLEGED CRIME SITES SO THAT I CAN GET A BETTER UNDERSTANDING

4  OF WHAT NEEDS TO BE DONE ON MY DEFENSE AND BE BETTER

5  INFORMED ON WHAT NEEDS TO BE DONE ON MY DEFENSE.

6    THE COURT:  CRIME SITES?  THERE IS MORE THAN ONE?

7    THE DEFENDANT:  YES, SIR.

8    THE COURT:  AND YOU DON'T KNOW WHAT THESE ALLEGATIONS

9  ARE AS TO WHERE THE CRIME SITES ARE?

10    THE DEFENDANT:  I KNOW THE ALLEGATIONS, BUT I HAVEN'T

11  BEEN OUT TO THE CRIME SITES MYSELF.

12    THE COURT:  OF COURSE NOT.  YOU HAVE BEEN IN JAIL.

13  HOW DO YOU EXPECT TO GO TO THE CRIME SITES?

14    THE DEFENDANT:  WHAT SAYING IS, MY ATTORNEY -- AND

15  IT'S MY UNDERSTANDING HE HAS A PRIVATE INVESTIGATOR,

16  WHICH HASN'T BEEN HERE TO TALK TO ME AT ALL WHEN I HAVE

17  ASKED THAT INVESTIGATOR TO DO THAT, GO OUT TO THESE SITES

18  AND, YOU KNOW, GATHER INFORMATION CRUCIAL TO MY DEFENSE

19  IN THIS CASE.

20    THE COURT:  LIKE WHAT?

21    THE DEFENDANT:  LIKE DISTANCE, LOCATION FROM WHERE

22  PEOPLE ARE STANDING AND THEY SAY THEY SAW ME.  JUST ALL

23  THE ELEMENTS THAT WE WOULD BE ABLE TO GIVE POSITIVE

24  IDENTIFICATION.

25    THE COURT:  OKAY.

26    THE DEFENDANT:  BECAUSE DUE TO THE FACT THAT THE --

27  THIS LINEUP THAT THEY TOOK WAS BIASED.  I AM THE ONLY

28  DARK-SKINNED MALE ON THAT, AND THE VICTIM IS LOOKING

P. 6

1    FOR A DARK-SKINNED MALE.

2        THE COURT:  YOU WERE THE ONLY THE MALE OR YOU WERE

3    THE ONLY BLACK PERSON OR DARK BLACK PERSON?

4        THE DEFENDANT:  I AM THE ONLY DARK PERSON.  THERE

5    WAS NOTHING BUT LIGHT-SKINNED MALES.

6           I FEEL THAT THESE VICTIMS IDENTIFIED ME ONLY

7    BECAUSE I WAS THE ONLY DARK-SKINNED MALE ON THAT PICTURE.

8    AND THE REASON BEING, I READ ALL OF THEIR TESTIMONIES,

9    AND IT IS VERY CONFLICTING AND VERY INCONSISTENT WITH

10   THE ORIGINAL STATEMENTS.

11       THE COURT:  YOU ARE TELLING ME WHAT YOU CONSIDER TO

12   BE EVIDENTIARY PROBLEMS IN THIS CASE.  WHAT HAS MR. RUIZ

13   NOT DONE THAT YOU THINK HE SHOULD HAVE?

14       THE DEFENDANT:  MR. RUIZ TRIED TO CONTINUE ME FOR --

15   PERSUADE ME TO TAKE THE DEAL DESPITE MY INNOCENCE, AND I

16   FEEL IF IT WAS IN MY BEST INTEREST, HE WOULD DO MORE TO

17   SECURE AN ADEQUATE, COMPETENT DEFENSE GOING UP AGAINST

18   THE CHARGES I'M FACING, AND THE LENGTH OF TIME I AM

19   FACING.

20       THE COURT:  MR. MC DONALD, NOW, MY LOOKING AT THE

21   INFORMATION AND NOT KNOWING ANYTHING ABOUT THE FACTS OF

22   THIS CASE, OTHER THAN WHAT THE INFORMATION TELLS ME,

23   THERE ARE FOUR COUNTS OF RESIDENTIAL BURGLARY OR ATTEMPTED

24   RESIDENTIAL BURGLARY, WHICH LEADS ME TO BELIEVE THAT THERE

25   ARE FOUR DIFFERENT CRIME SITES.

26       THE DEFENDANT:  YES, YOUR HONOR.  YES, SIR.

27       THE COURT:  AND THERE MAY BE WITNESSES THAT ARE MISTAKEN

28   AS TO EACH OF THOSE.  IS HE ENCOURAGING YOU TO SETTLE THIS

1    CASE?

2    THE DEFENDANT: YES, YOUR HONOR, YES, HE IS. HE IS.

3    HE HAS ASKED ME TO SIGN A PAPER STATING THAT AGAINST HIS

4    WISHES AND AGAINST THE WISHES OF HIS SUPERIORS AND/OR

5    COWORKERS -- BASICALLY, THAT I SHOULD TAKE THIS DEAL, AND

6    I SHOULDN'T TAKE IT TO TRIAL, YOUR HONOR. MY INNOCENCE

7    SHOULD BE FIRST AND FOREMOST IN THIS INSTANCE, AND I WILL --

8    I AM TRYING TO ADHERE TO MY RIGHT TO A FAIR TRIAL AND THE

9    RIGHT TO A COMPETENT DEFENSE, AND I DON'T FEEL THAT HAS

10   BEEN MET.

11   THE COURT: HE IS NOT FORCING YOU TO PLEAD GUILTY,

12   IS HE?

13   THE DEFENDANT: THE WAY THAT THEY ARE PRESSURING ME,

14   YOUR HONOR, I MEAN, THERE IS NO WAY, YOU KNOW, I CAN GO

15   TO TRIAL CLEARHEADED, YOUR HONOR, AND BE ABLE TO

16   PARTICIPATE WITH THEM PRESSURING FOR ME TO PLEAD GUILTY

17   TO SOMETHING I AM INNOCENT FOR.

18   THE COURT: DID YOU HEAR YOURSELF, WHAT YOU SAID?

19   YOU ARE TELLING ME HE IS LEANING ON YOU SO HARD IT IS

20   GOING TO TAKE AWAY YOUR FREE WILL; IS THAT WHAT YOU ARE

21   SAYING?

22   THE DEFENDANT: THAT IS NOT WHAT I AM SAYING.

23   THE COURT: YOU SAID THEY ARE PRESSURING YOU.

24   THE DEFENDANT: YES, YOUR HONOR, THAT IS WHAT I SAID.

25   I CAN'T GO TO TRIAL WITH A CLEAR HEAD AND CLEAR -- YOU

26   KNOW WHAT I AM SAYING? A CLEAR CONSCIENCE, DUE TO THE

27   FACT THAT THEY ARE PRESSURING ME TO TAKE A DEAL DESPITE

28   MY INNOCENCE.

1    THE COURT:  WOULDN'T IT BE MORE ACCURATE TO SAY THEY

2    WERE, PERHAPS, ENCOURAGING YOU TO TAKE A DEAL?

3    THE DEFENDANT:  I CALL IT PRESSURING.

4    THE COURT:  MAYBE IT IS BASED ON THEIR EVALUATION OF

5    THE EVIDENCE AGAINST YOU.  DO YOU THINK IT IS BECAUSE HE

6    WANTS TO BE PLAYING GOLF?

7    THE DEFENDANT:  NO, SIR.  I DON'T THINK THAT IS THE

8    CASE AT ALL.

9    THE COURT:  WHY DO YOU THINK HE IS DOING IT?

10    THE DEFENDANT:  I DON'T KNOW WHY HE IS DOING THAT.

11    THAT IS WHAT I'M TRYING TO FIGURE OUT.  I DON'T HAVE NO

12    COMPETENT DEFENSE HERE, YOUR HONOR.  I FEEL A LOT CAN BE

13    DONE TO PUT TOGETHER A COMPETENT DEFENSE, YOUR HONOR.

14    THE COURT:  OKAY.  IS THERE ANYTHING ELSE THAT YOU WOULD

15    LIKE TO SAY BEFORE I TALK TO MR. RUIZ?

16    THE DEFENDANT:  AND I WOULD LIKE TO SAY THAT -- NO.

17    NO.

18    THE COURT:  MR. RUIZ, THERE ARE SEVERAL ISSUES THAT

19    NEED TO BE ADDRESSED.  THE INVESTIGATION REGARDING THE

20    CRIME SITES, THE LINEUP, AND THE ELUSIVE WITNESS,

21    MR. BURTON.

22    MR. RUIZ:  YES, YOUR HONOR.

23    STARTING WITH THE CRIME SITES, I PUT OUT

24    INVESTIGATION REQUESTS.  BOTH MYSELF AND MY INVESTIGATOR

25    PERSONALLY HAVE GONE TO THE SITE OF THESE ALLEGED

26    BURGLARIES AND RESIDENTIAL BURGLARIES.  I HAVE PHYSICALLY

27    GONE TO EACH OF THOSE HOMES.  I HAVE, WITH MY INVESTIGATOR,

28    TAKEN MEASUREMENTS AND TAKEN THEM IN DIFFERENT POSITIONS

1   TO LOOK AT DIFFERENT VANTAGE POINTS.

2       SO AS FAR AS THE ALLEGATION THAT I HAVE NOT TAKEN

3   THE TIME TO GO TO THE CRIME SCENES, THAT IS UNFOUNDED.  I

4   HAVE PERSONALLY GONE, NOT ONLY THE INVESTIGATOR.

5       AS FAR AS THE PHOTO LINEUP GOES, AT THE TIME OF

6   THE PRELIMINARY EXAMINATION, MR. GULLEY MADE A MOTION FOR

7   A LIVE LINEUP, THAT WAS DENIED.  BECAUSE OF THE

8   DISCREPANCIES IN THE PHOTO LINEUP, I HAVE RETAINED AN

9   EXPERT WITNESS, DR. MAC SPEIDEN, TO COME TO TRIAL.

10   DR. MAC SPEIDEN WILL TESTIFY AS TO THE INACCURACIES AS

11   TO THE PHOTO LINEUP.

12      THE COURT:  IS THERE AN EYEWITNESS?

13      THE COURT:  NO.  A LOT IS CIRCUMSTANTIAL.

14      THE COURT:  THERE IS SOME DIRECT EVIDENCE?

15      MR. RUIZ:  THERE IS SOME DIRECT EVIDENCE.  ONE WITNESS

16   DIRECTLY SAW MR. MC DONALD AND IDENTIFIED HIM BOTH IN THE

17   LINEUP AND AT THE PRELIMINARY HEARING.

18       SO I'VE TAKEN THOSE POSITIONS IN TRYING TO ASSIST

19   HIM.  AND MY POSITION WITH HIM IS THAT I DON'T FEEL THAT

20   GOING TO TRIAL IS IN HIS BEST INTEREST.

21       AS FAR AS CLARENCE BURTON GOES, CLARENCE BURTON

22   IS A PERSON THAT I HAVE TRIED TO FIND; MY INVESTIGATORS

23   HAVE TRIED TO FIND HIM.  I EXPLAINED TO MR. MC DONALD THAT

24   UNLESS THE PROSECUTION IS GOING TO USE HIS TESTIMONY IN

25   TRIAL, THERE IS NO CONFRONTATION ISSUE AND WITHOUT A

26   CONFRONTATION ISSUE, THEY DON'T HAVE TO BRING THEM HIM

27   TO US.

28       AND THERE IS, I WOULD SAY, A BREAKDOWN IN

P.10

1  COMMUNICATION AS FAR AS THE OUTLOOK OF HOW THIS CASE

2  SHOULD GO, THE STRATEGIES IN THE CASE, AND THE DEFENSE

3  THAT MR. MC DONALD WANTS TO PUT ON.

4       MR. MC DONALD, AMONG OTHER THINGS, WOULD LIKE TO

5  TESTIFY.  THAT IS AGAINST MY ADVICE DUE TO THE IMPEACHMENT

6  THAT IS GOING TO OCCUR WHEN HE DOES SO.

7       THERE IS JUST -- WE DO HAVE A BREAKDOWN IN

8  COMMUNICATION.  THERE IS NOT A HOSTILE ENVIRONMENT BETWEEN

9  US, BUT I WOULD ADMIT THAT WE DON'T SEE THINGS EYE TO EYE,

10  SO TO SPEAK.

11     THE COURT:  OKAY.  NOW, HE FACES SOME SIGNIFICANT

12  TIME --

13     MR. RUIZ:  VERY SIGNIFICANT.

14     THE COURT:  -- ON THIS INFORMATION BECAUSE OF THE

15  NUMBER OF COUNTS AND THE STRIKE AND HIS PRISON PRIORS.

16     MR. RUIZ:  CORRECT.

17     THE COURT:  SO YOU ARE, OBVIOUSLY, OBLIGATED TO

18  CONVEY TO HIM THE OFFERS THAT HAVE BEEN MADE.

19     MR. RUIZ:  CORRECT.

20     THE COURT:  AND AS YOU SEE FIT, TO ENCOURAGE OR

21  DISCOURAGE HIM.

22          HAVE YOU -- I FORGET HIS TERM.  HAVE YOU

23  PRESSURED HIM?

24     MR. RUIZ:  WHAT I DID THIS MORNING, I PROVIDED

25  MR. MC DONALD WITH A LETTER OUTLINING, BASICALLY, THE

26  STATE OF THE CASE, OUTLINING THE CHARGES, THE QUOTE,

27  UNQUOTE, NICKEL PRIOR, THE PROBLEM WITH SOME OF THE

28  FACTS THAT WE KNOW TO BE FACTS BASED UPON THE PRELIMINARY

O.11

1    EXAMINATION.  IN FACT, I HAVE CONSULTED WITH NUMEROUS

2    ATTORNEYS, MISS COYNE, FROM MY OFFICE, AS WELL, ADVISING HIM

3    THAT AFTER CONSULTING WITH THESE OTHER ATTORNEYS AS WELL, WE

4    BELIEVE IT IS IN HIS BEST INTEREST TO ACCEPT THE PEOPLE'S

5    OFFER.

6         THE COURT:  YOU HAVE TO COMMUNICATE THAT TO HIM.

7         MR. RUIZ:  I DO.  AND I HAVE PROVIDED A LETTER TO

8    HIM.

9         THE COURT:  BASED ON YOUR EVALUATION OF THE WITNESSES

10   AND THE FACT THAT YOU MAY PREVAIL ON SOME OF THE COUNTS

11   BUT, PERHAPS, NOT ALL COUNTS.

12        MR. RUIZ:  I EXPLAINED I NEED TO PREVAIL ON ALL FOUR

13   BURGLARIES IN ORDER TO BEAT THE OFFER.

14        THE COURT:  NOW WHERE DOES MR. WASHINGTON FIT INTO

15   THIS.

16        MR. RUIZ:  MR. WASHINGTON IS A CO-DEFENDANT IN THIS

17   CASE.  MR. WASHINGTON PLED GUILTY TO TWO COUNTS OF

18   RESIDENTIAL BURGLARY.  MR. WASHINGTON HAS ALREADY BEEN

19   SENTENCED.  HE IS AT THE DEPARTMENT OF CORRECTIONS.  HE

20   HAS BEEN IN COMMUNICATIONS WITH MY CLIENT.  THERE IS SOME

21   UNDERSTANDING THAT MR. WASHINGTON HAS EXONERATING EVIDENCE

22   TO OFFER AT TRIAL.

23        THE COURT:  ON ALL COUNTS OR SOME OF THE COUNTS?

24        MR. RUIZ:  THAT IS NOT CLEAR.

25        THE COURT:  YOU ARE PURSUING THAT?

26        MR. RUIZ:  THAT IS WHY I WANT TO INTERVIEW

27   MR. WASHINGTON.

28        THE COURT:  AND YOU ARE SATISFIED THAT YOU HAVE

O.12

1  DONE EVERYTHING YOU CAN TO FIND MR. BURTON?

2      MR. RUIZ:  AS FAR AS MY ABILITY, ABSENT FILING THAT

3  MOTION THAT HE WANTS ME TO FILE FOR THE PROSECUTION TO

4  PRODUCE HIM.

5      THE COURT:  THERE IS NO SUCH MOTION.  IT DOESN'T EXIST.

6  IT CAN'T BE DONE.

7      MR. RUIZ:  RIGHT.

8      THE COURT:  ALL RIGHT.  MR. RUIZ, WHAT DO YOU FEEL YOU

9  HAVE NOT DONE YET TO GET READY FOR TRIAL, OTHER THAN A

10  CONFERENCE WITH MR. WASHINGTON?

11      MR. RUIZ:  I WOULD LIKE TO FIND MR. BURTON, WHICH I

12  CAN'T DO.  I AM GOING TO FILE PRETRIAL MOTIONS TO SEVER

13  THE CASE.

14      THE COURT:  SEVER THE COUNTS?

15      MR. RUIZ:  YES.  IN LIMINE TYPE THINGS.  AND I NEED TO

16  SPEAK WITH MR. WASHINGTON.

17         THE ONLY OTHER LITTLE IMPORTANT THING I NEED IS

18  TO GET A COPY OF MR. MC DONALD'S EYEGLASS PRESCRIPTION.  IT

19  PLAYS INTO THE TRIAL IN SOME WAY.

20      THE COURT:  ANYTHING ELSE, MR. RUIZ?

21      MR. RUIZ:  OTHER THAN THAT, NOTHING ELSE, YOUR HONOR.

22      THE COURT:  MR. MC DONALD, WHAT ELSE?

23      THE DEFENDANT:  YOUR HONOR, I DISAGREE WHEN MR. RUIZ

24  HAS TALKED TO ME ABOUT MY CASE.  HE HAS QUOTED THINGS

25  THAT WERE UNTRUE, QUOTED THINGS FROM CERTAIN ASPECTS OF

26  MY CASE THAT WERE UNTRUE.

27      THE COURT:  LIKE WHAT?

28      THE DEFENDANT:  THAT ONE OF THE WITNESSES SAID HE

p.13

1   IDENTIFIED TWO MALES.  AND ME KNOWING MY CASE, THAT

2   WITNESS DIDN'T SAY NOTHING ABOUT IDENTIFYING TWO MALES.

3   HE SAID HE IDENTIFIED ONE MALE AND COULDN'T GET ANY TYPE

4   OF IDENTIFICATION OF THE OTHER PERSON.

5       THE COURT:  NOW WAIT A MINUTE.  YOU ARE SAYING

6   MR. RUIZ IS MAKING THINGS UP TO TELL YOU WHAT YOU

7   WANT TO HEAR?

8       THE DEFENDANT:  I AM NOT SAYING MAKING THESE THINGS

9   UP, HE IS NOT WELL-INFORMED ON MY CASE.  HE IS SAYING --

10  HE TOLD ME ONE WITNESS SAID THAT HE IDENTIFIED TWO MALES.

11  IN FACT, THAT IS NOT TRUE.  THE WITNESS SAID THAT HE

12  IDENTIFIED ONE MALE AND COULDN'T GET ANY TYPE OF

13  IDENTIFICATION OF THE OTHER SUSPECT.

14      THE COURT:  OKAY.  ANY OTHER BASIS?

15      THE DEFENDANT:  OKAY.  AND AS FAR AS THE CONFIDENTIAL

16  INFORMANT --

17      THE COURT:  ARE WE BACK TO BURTON?

18      THE DEFENDANT:  YES.  BACK TO MR. CLARENCE BURTON.  I

19  JUST FEEL THAT MR. CLARENCE BURTON SHOULD HAVE BEEN FOUND

20  BY NOW.  IT IS LIKE REALLY LATE IN MY TRIAL PROCEDURES,

21  LIKE, REALLY LATE, AND HE SHOULD HAVE BEEN LOCATED A LONG

22  TIME AGO.

23          YOU KNOW, IF SOMEBODY WAS REALLY DILIGENTLY

24  PURSUING MY CASE, THEN MR. BURTON WOULD HAVE BEEN

25  CONTACTED A LONG TIME AGO.

26      THE COURT:  WHO IS MR. BURTON?

27      THE DEFENDANT:  WHO IS MR. BURTON?

28      THE COURT:  YEAH.

D.14

1    MR. RUIZ:  HIS COUSIN.

2    THE DEFENDANT:  MY -- THE LADY THAT WAS HEAD OF THE

3    HOUSEHOLD ON TROY STREET, THAT IS HER HUSBAND, AND HE

4    TOLD ME THAT SHE RELAYED THE MESSAGE TO MR. RUIZ'

5    INVESTIGATOR TELLING HIM MR. CLARENCE BURTON WOULD BE

6    PRESENT AT A FAMILY HEARING FOR CUSTODY OF THEIR CHILDREN

7    AND THAT IS WHERE YOU CAN FIND HIM, AND THAT HIS

8    INVESTIGATOR CAN FIND HIM.  SO I DON'T FEEL THEY HAVE

9    BEEN DILIGENTLY SEARCHING.

10    THE COURT:  WAS HE THERE?

11    THE DEFENDANT:  WAS HE WHERE?

12    THE COURT:  WAS HE AT THE FAMILY GET-TOGETHER?

13    THE DEFENDANT:  YES.  HE WENT TO THE FAMILY

14    GET-TOGETHER.

15    THE COURT:  AND NOBODY KNOWS WHERE HE IS?

16    THE DEFENDANT:  NOBODY WAS THERE TO LISTEN TO MISS

17    REGINA BURTON'S CLEAR STATEMENT THAT, YES, HE WILL BE

18    AT FAMILY COURT TODAY.

19    THE COURT:  IS HE TRYING TO AVOID YOU?  IS MR. CLARENCE

20    BURTON TRYING TO AVOID YOU AT THIS MOMENT?

21    THE DEFENDANT:  THAT IS WHY I WOULD LIKE TO ADHERE

22    TO MY RIGHT TO QUESTION THIS WITNESS, YOU KNOW, TO

23    CROSS-EXAMINE THIS WITNESS, TO FIGURE OUT WHAT IS GOING

24    ON.  I FEEL HE MIGHT BE ABLE TO EXONERATE ME IN THIS CASE

25    DUE TO HIS STATEMENT THAT HE GAVE TO THE POLICE.  MAYBE

26    HE KNOWS SOMETHING I DON'T KNOW.

27    THE COURT:  HOW IS HE GOING EXONERATE YOU?

28    THE DEFENDANT:  I DON'T KNOW.  THAT IS WHAT I'M TRYING

O·15

1 TO FIGURE OUT, BECAUSE HE HAS EVERY REASON TO WANT ME OUT OF

2 HIS LIFE.

3     THE COURT:  IS HE LIKE AN ALIBI WITNESS THAT COULD PUT

4 YOU SOMEPLACE ELSE?

5     THE DEFENDANT:  I WOULDN'T SAY THAT.

6     THE COURT:  WHAT IS SO VALUABLE ABOUT MR. BURTON?

7     THE DEFENDANT:  WHAT IS SO VALUABLE ABOUT MR. BURTON?

8 HE GAVE A STATEMENT.  I WANT TO KNOW WHY HE GAVE THAT

9 STATEMENT.

10     THE COURT:  YEAH.  WAIT.  WAIT.  WAIT.  A STATEMENT

11 MEANS NOTHING.

12     CAN THEY USE HIS STATEMENT, MR. RUIZ?

13     MR. RUIZ:  NO.

14     THE COURT:  THEY CAN'T USE THIS STATEMENT.  THEY DON'T

15 HAVE MR. BURTON.

16     THE DEFENDANT:  THAT IS NOT WHAT I AM CONCERNED WITH.

17 I AM CONCERNED WHY HE GAVE THAT STATEMENT.  I'M CONCERNED

18 WHY HE GAVE THIS STATEMENT, AND I WANT TO QUESTION HIM TO

19 FIND OUT WHAT IS GOING ON.

20     THE COURT:  YOU HAVEN'T TOLD ME YET THAT HE IS AN

21 INDISPENSABLE WITNESS.

22     THE DEFENDANT:  HE CALLED AND SAID I WAS ROBBING HOUSES

23 AND BRAGGING ABOUT IT, AND THAT I LIVED AT A CERTAIN

24 ADDRESS, WHICH I DON'T LIVE AT.

25     THE COURT:  MR. BURTON DOESN'T LIKE YOU, DOES HE.

26     THE DEFENDANT:  HE DOESN'T.

27     THE COURT:  ARE THEY GOING TO BE ABLE TO USE ANY OF

28 THOSE STATEMENTS IN TRIAL?

○ 16

1    THE DEFENDANT:  THEY USED THEM TO PURSUE THIS.

2    THE COURT:  THEY USED IT TO TRIGGER THE INVESTIGATION?

3    THE DEFENDANT:  YES.

4    THE COURT:  THAT IS ONE THING.  NOW THEY HAVE TO

5    CONVICT YOU.  CAN THEY USE THAT AS EVIDENCE AGAINST

6    YOU?

7    THE DEFENDANT:  YOUR HONOR, AT THIS POINT, I JUST

8    WANT TO FIGURE OUT WHAT IS GOING ON WITH MR. CLARENCE

9    BURTON AND FIND OUT WHY HE GAVE THAT STATEMENT.

10    THE COURT:  ALL RIGHT.  WELL, ANYTHING ELSE,

11    MR. MC DONALD?

12    THE DEFENDANT:  IF YOU DO NOT WANT TO -- WANT TO

13    GRANT MY MOTION FOR THE MARSDEN HEARING TO DISMISS MY

14    COUNSEL, I WOULD LIKE TO GO PRO PER.

15    THE COURT:  OKAY.

16    THEY ARE NOT RELATED.  THERE IS ONE ISSUE AS TO

17    WHETHER OR NOT THEY WILL CONTINUE TO REPRESENT YOU.  THAT

18    WOULD BE ANOTHER ISSUE, WHETHER YOU ARE GOING TO REPRESENT

19    YOURSELF.  THAT IS A DECISION YOU ARE GOING TO HAVE TO

20    MAKE.  I DON'T KNOW HOW YOU ARE GOING TO FIND MR. BURTON

21    BY YOURSELF.  OF COURSE, YOU WILL HAVE AN INVESTIGATOR.

22    BUT YOU HAVE THAT RIGHT, MR. MC DONALD.  I AM NOT GOING

23    TO TALK YOU IN OR OUT OF IT.

24    AS FAR AS RELIEVING MR. RUIZ, THE ANSWER IS NO,

25    BECAUSE HE HAS NOT SHOWN ANYTHING OTHER THAN HIS DILIGENT

26    PREPARATION IN THIS CASE AND THAT HE HAS PUT OUT EVERY

27    EFFORT.  AND I THINK YOU ARE BLOWING A LOT OF SMOKE.

28    THE LINEUPS, HE IS DEALING WITH.  I MEAN, HE

1   CAN'T MAKE THEM DISAPPEAR.  YOU ARE ASKING FOR MAGIC.

2   HE HAS INVESTIGATED THE CRIME SCENE.  HE CAN'T FIND

3   MR. BURTON.  IT DOESN'T SOUND LIKE ANYBODY CAN FIND

4   BURTON.  AND IT ALSO DOESN'T SOUND LIKE MR. BURTON

5   NEEDS TO BE FOUND.  IT WOULD BE NICE TO ANSWER SOME OF

6   YOUR QUESTIONS AND YOUR CURIOSITY.

7          MR. RUIZ IS ONE OF THE MOST COMPETENT ATTORNEYS

8   IN THE PUBLIC DEFENDER'S OFFICE.  HE IS PREPARED AND IS

9   ASKING FOR MORE TIME AND HAS TAKEN STEPS TO GET HOLD OF

10  MR. WASHINGTON AND IS GETTING READY.  YOU MAY NOT LIKE

11  THE INFORMATION THE HE IS BRINGING TO YOU.  YOU MAY NOT

12  LIKE IT BECAUSE YOU MAY BE INNOCENT OF ALL THESE COUNTS.

13  THAT MAY WELL BE, BUT HE IS NOT DEALING WITH PROCLAMATIONS

14  OF INNOCENCE, HE IS DEALING WITH THE PEOPLE'S HARD EVIDENCE

15  AGAINST YOU.  HE IS DOING IT EFFECTIVELY AND EFFICIENTLY.

16  THE ONLY DIFFICULTY IN COMMUNICATION IS SELF-INFLICTED,

17  BUT MY ADVICE TO YOU WOULD BE TO TALK TO HIM AND HELP

18  HIM.

19         BUT I AM GOING TO DENY YOUR MOTION TO DISCHARGE

20  HIM.

21         AND SO NOW, IF YOU WANT TO REPRESENT YOURSELF,

22  CERTAINLY, YOU HAVE THAT RIGHT, AND I WON'T GET INTO

23  THE WISDOM OF IT.

24         SO, THESE PROCEEDINGS ARE CONCLUDED.

25         THE MOTION IS DENIED.

26         AND THE ADMONITION THAT THE COURT REPORTER SEAL

27  HER NOTES AND THAT THOSE NOTES ARE NOT TO BE TRANSCRIBED

28  UNLESS THIS COURT OR A COURT OF COMPETENT JURISDICITON

○ .18

1    SHOULD MAKE SUCH AN ORDER IS REITERATED.

2

3

4

5    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT NOW

6    IN THE PRESENCE OF THE DISTRICT ATTORNEY AND ALL

7    SPECTATORS:)

8

9

10    THE COURT:  THESE PROCEEDINGS ARE NOW ONCE AGAIN OPEN.

11    SO, MR. MC DONALD, IN TERMS OF MAKING APPLICATION FOR

12    SELF-REPRESENTATION, YOU NEED TO FILL OUT A FORM.  THAT

13    FORM IS BEFORE YOU.  IS IT ALREADY FILLED OUT?

14    MR. MC DONALD:  YES.

15    THE COURT:  OKAY.  SO -- WE NEED TO GET MR. BENNETT,

16    SINCE THIS IS NO LONGER A CLOSED HEARING.

17    ALL RIGHT.  THE DISTRICT ATTORNEY IS NOW AGAIN

18    BEFORE THE COURT.

19    MR. MC DONALD, I NOW HAVE BEFORE ME A FORM

20    ENTITLED "ACKNOWLEDGEMENT CONCERNING RIGHT OF

21    SELF-REPRESENTATION" WITH WHAT APPEARS THEREON TO BE

22    YOUR INITIALS AND YOUR SIGNATURE.

23    ARE THESE YOUR INITIALS AND YOUR SIGNATURE ON

24    THIS FORM THAT HAS YOUR NAME ON IT?

25    THE DEFENDANT:  YES, SIR.

26    THE COURT:  DID YOU READ AND UNDERSTAND THIS FORM?

27    THE DEFENDANT:  YES.

28    THE COURT:  AND I ALSO TAKE IT, AS FAR AS THE OFFENSES

O.19

1  THAT ARE CHARGED AND THE MAXIMUM PUNISHMENT THAT YOU FACE,

2  THESE WERE FILLED OUT BY YOU AND MR. RUIZ?

3       THE DEFENDANT:  YES, YOUR HONOR.

4       THE COURT:  AND YOU HAVE READ AND UNDERSTOOD THEM,

5  MR. MC DONALD?

6       THE DEFENDANT:  YES, YOUR HONOR.

7       THE COURT:  NOW, MR. MC DONALD, YOU, APPARENTLY,

8  UNDERSTAND THE MAXIMUMS THAT YOU FACE, YOU HAVE INDICATED

9  YOUR EDUCATIONAL BACKGROUND AND YOUR ABILITY TO READ AND

10 WRITE.  IN TERMS OF REPRESENTING YOURSELF, WHICH I AM

11 ABOUT TO APPROVE, YOU WILL BE GIVEN PRO PER STATUS IN

12 THE JAIL.  YOU WILL GET LIMITED ACCESS TO THE JAIL LIBRARY

13 FACILITIES.  IT IS NOT ENTIRELY DETERMINED BY THE SHERIFF.

14 THE COURT OVERSEES IT AND ENSURES YOU HAVE ADEQUATE ACCESS.

15 IT WILL BE ACCESS TO SPECIFIC BOOKS.  IT IS NOT ACCESS TO

16 A WORD PROCESSOR OR COMPUTER OR TELEPHONE SERVICES.  IN

17 FACT, WE'RE IN THE PROCESS OF TIGHTENING THAT WHOLE THING

18 UP SO IT DOESN'T TURN INTO A SOCIAL HOUR.

19       IN ORANGE COUNTY, BASICALLY, THE INMATES SPECIFY

20 WHAT BOOKS THEY WANT, AND THEY ARE PROVIDED TO THEM IN THE

21 CELL.

22       SO YOU WILL HAVE THOSE PRIVILEGES.  A RUNNER

23 WILL BE APPOINTED TO ASSIST YOU.  AN INVESTIGATOR WILL

24 BE APPOINTED TO ASSIST YOU.

25       THE MATTER IS PRESENTLY SET FOR TRIAL NOW.  I

26 WILL GIVE A BRIEF CONTINUANCE.  WE'RE NOT STARTING ALL

27 OVER AGAIN AS IF YOU WERE JUST BEING ARRAIGNED.  THE

28 CASE HAS BEEN AROUND FOR A LONG TIME.  I WILL PROBABLY

P. 20

1   GIVE A TRIAL DATE ABOUT SIX WEEKS HENCE.  YOU WILL COME

2   TO COURT ABOUT EVERY OTHER WEEK TO MONITOR AND SUPERVISE

3   YOUR PREPARATION.  YOU WILL NOT HAVE THREE YEARS TO GO

4   THROUGH LAW SCHOOL AND TO FAMILIARIZE YOURSELF WITH THIS

5   CASE.  YOU ARE GOING BY YOURSELF AND YOU ARE ON YOUR OWN.

6   IS THAT DECISION THAT YOU HAVE MADE?

7        THE DEFENDANT:  YES, YOUR HONOR.

8        THE COURT:  IN TERMS OF SETTING A DATE, WE'LL NEED

9   MR. ROMO PRESENT.

10            SO, FOR THAT, WE WILL HAVE MR. ROMO PRESENT AND

11  SELECT A DATE.  AND BECAUSE OF THE AGE OF THE CASE, THAT

12  DATE WILL APPROACH AND WE'LL DO OUR BEST TO MAKE SURE YOU

13  HAVE EVERY OPPORTUNITY TO PREPARE.

14            AS YOU HAVE DESCRIBED IT, MR. RUIZ, YOU HAVE DONE

15  A SIGNIFICANT AMOUNT OF PREPARATION.  YOUR INVESTIGATOR AND

16  DISCOVERY WILL BE MADE AVAILABLE TO MR. MC DONALD SO THAT

17  WE DON'T HAVE TO REINVENT THE WHEEL.

18       MR. RUIZ:  I DO HAVE NUMEROUS VIDEOTAPES AND PICTURES

19  ON COMPACT DISKS.  I DON'T KNOW IF HE WILL BE ABLE TO ACCESS

20  A WAY OF VIEWING THESE THINGS IN CUSTODY OR NOT.

21       MR. BENNETT:  I'M NOT SURE, BUT BEFORE MR. RUIZ TURNS

22  OVER DISCOVERY TO THE DEFENDANT, THERE MAY BE MATERIAL THAT

23  MAY NEED TO BE REDACTED BEFORE THAT IS DONE.  I WANT TO MAKE

24  SURE MR. ROMO --

25       THE CLERK:  HE IS ON HIS WAY DOWN.

26       THE COURT:  ALL RIGHT.  WITH THAT LIMITATION.

27            SO, MR. ROMO IS ON HIS WAY DOWN, AND WE'LL

28  DISCUSS A TRIAL DATE WHEN HE ARRIVES.

O. 21

1     MR. BENNETT:   YES, YOUR HONOR.

2

3

4               (BREAK TAKEN.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

○.22

1       THE BAILIFF:  RETURNING TO THE MC DONALD MATTER.

2       THE COURT:  MR. ROMO IS NOW BEFORE THE COURT.

3            MR. ROMO, THE DEFENDANT HAS MADE APPLICATION TO

4   REPRESENT HIMSELF.  I HAVEN'T APPROVED IT.  I'M ABOUT TO.

5   AND WHEN I DO, IT IS PRESENTLY SET FOR TRIAL TODAY, AND IT

6   IS GOING TO NECESSITATE A CONTINUANCE OF THAT TRIAL.

7       MR. ROMOR:  WELL, YOUR HONOR, I WOULD LIKE TO MAKE A

8   FEW COMMENTS BEFORE THE COURT MAKES ANY KIND OF CONTINUANCE

9   OR GRANTS ANY KIND OF CONTINUANCE.

10      THE COURT:  I HAVE A PRO PER NOW.  I HAVE TO GIVE HIM

11  TIME TO PREPARE.

12      MR. ROMO:  THIS IS THE SECOND TIME HE HAS GONE PRO PER.

13  HE HAS MADE APPLICATION TO GO PRO PER BEFORE AND HE WAS

14  INFORMED AT THAT TIME THAT THE TRIAL WASN'T GOING TO BE

15  CONTINUED AND THAT WAS TWO OR THREE TRIAL SETTINGS BEFORE

16  AND IT APPEARED THAT HE WAS READY, WILLING AND ABLE TO GO

17  FORWARD AT THAT TIME.

18      THE COURT:  WAS HE GRANTED PRO PER STATUS?

19      MR. ROMO:  HE WAS.  INITIALLY, HE WAS ACTUALLY GRANTED

20  PRO PER STATUS.

21      THE COURT:  ACCORDING TO THE MINUTE ORDER, HE

22  WITHDREW THAT REQUEST.

23      MR. ROMO:  HE DID, SORT OF, AFTER THE FACT, ONCE

24  MR. RUIZ HAD A CHANCE TO TALK TO HIM.  BUT FOR AWHILE

25  THERE, HE WAS BY HIMSELF.

26      THE COURT:  FOR "AWHILE"?

27      MR. ROMO:  A MATTER OF HOURS.

28      MR. RUIZ:  IF I COULD ADDRESS THAT.  THE DISTRICT

1  ATTORNEY GOT ASSIGNED THIS CASE --

2      THE COURT:  THAT IS NOT A BASIS FOR ME TO DENY

3  PRO PER STATUS AT THIS TIME.  AND THE PRO PER APPLICATION

4  CAN, TO A CERTAIN EXTENT, MANIPULATE INTO THE SYSTEM

5  A CERTAIN AMOUNT OF CONTINUANCES.  THAT IS THE NATURE

6  OF THE BEAST.

7          WE HAVE SEVERAL -- WE HAVE A COUPLE CONSTITUTIONAL

8  ISSUES HERE.  THE RIGHT TO SELF-REPRESENTATION AND THE

9  DEFENDANT'S RIGHT TO A SPEEDY TRIAL.  THEY, UNFORTUNATELY,

10  HAVE A GREATER WEIGHT THAN THE PEOPLE'S RIGHT TO A SPEEDY

11  TRIAL IN THIS CASE.  HE HAS A RIGHT TO BE PREPARED.

12          LIKE I TOLD HIM BEFORE, THAT PERIOD OF PREPARATION

13  IS NOT GOING TO ENTAIL SENDING HIM TO LAW SCHOOL.  IT IS

14  GOING TO GIVE -- IT IS NOT A SIMPLE CASE.  THERE ARE

15  NUMEROUS CHARGES, THE EXTENSIVE PUNISHMENT THAT HE FACES,

16  THERE IS A QUESTION OF WITNESSES.  SO I HAVE TO GIVE HIM,

17  AND I WANT TO GIVE HIM A CERTAIN AMOUNT OF TIME

18  TO PREPARE.  I DON'T HAVE TO GIVE HIM, PERHAPS, AS MUCH

19  TIME AS HE WOULD LIKE, BUT I AM LOOKING AT SIX TO EIGHT

20  WEEKS.

21          AND I AM GOING TO HOLD HIS FEET TO THE FIRE.

22  I AM GOING TO HAVE HIM HERE REGULARLY.  HE MAY OR MAY

23  NOT BE PREPARED IN THAT TIME, AS PREPARED AS MR. RUIZ

24  WOULD LIKE FOR HIM TO BE PREPARED, BUT HE IS ENTITLED

25  TO SOME TIME.

26      MR. ROMO:  WELL, YOUR HONOR, I THINK THAT THE DEFENDANT

27  HAS BEEN AWARE OF THE DISCOVERY IN THIS CASE FROM THE VERY

28  BEGINNING.

O.24

1    THE COURT:  THAT IS WHY I AM NOT GOING TO GIVE HIM

2  A LOT OF TIME.

3    MR. ROMO:  AND WE ALREADY ARE GOING TO HAVE HIS ONE AND

4  ONLY, AS FAR AS THE PEOPLE KNOW, WITNESS IN COURT FOR HIM.

5  WE'VE ALREADY ARRANGED THAT.

6    THE COURT:  WHAT ARE YOU SAYING?

7    MR. ROMO:  WHAT I AM SAYING, THERE IS NO LEGAL REASON

8  FOR HIM TO HAVE BEYOND NEXT TUESDAY, BECAUSE THERE IS

9  NOTHING IN THIS CASE THAT IS NEW THAT HE DOESN'T ALREADY

10  KNOW AND HASN'T KNOWN ABOUT BEFORE.  HE SAT THROUGH THE

11  PRELIMINARY EXAMINATION, HE SAW THE WITNESSES WHO ARE ALL

12  VICTIMS OF RESIDENTIAL BURGLARIES, EVERYTHING HAS BEEN OUT

13  IN THE OPEN.  THERE IS NO SECRET DISCOVERY OUT THERE.

14        THERE IS VIRTUALLY NO REASON WHATSOEVER WHY

15  HE CAN'T GO TO TRIAL IN A WEEK, AND I AM ASKING THE COURT

16  TO GO AHEAD AND KEEP THE TRIAL DATE.  THE DEFENDANT DOES

17  NOT HAVE A RIGHT TO MANIPULATE CONTINUANCES WITH THE SOLE

18  AIM TO DISCOMFORT AND GIVE PROBLEMS TO THE WITNESSES IN THIS

19  CASE.  THERE IS A SERIOUS WITNESS PROBLEM IN THIS CASE IN

20  THAT THEY HAVE, FOR FIVE TIMES NOW, BEEN TOLD "NOPE, NOT

21  TODAY."

22    THE COURT:  WHAT ARE THEY GOING TO DO?  TELL YOU "WE

23  HAVE A FIVE TIME LIMIT, AND WE'RE NOT GOING TO COME TO

24  COURT ANYMORE BECAUSE WE ARE WITNESSES AND DON'T HAVE TO

25  COME TO COURT WHEN WE HAVE TO?"

26    MR. ROMO:  I AM NOT SUGGESTING THAT THE COURT IS

27  BEING UNREASONABLE IN GRANTING SOMEBODY THEIR PRO PER

28  STATUS.

1    THE COURT:  I HAVE TO.

2    MR. ROMO:  I KNOW YOU DO.

3    THE COURT:  IT IS NOT DISCRETIONARY, MR. ROMO.

4    MR. ROMO:  BUT I BELIEVE THERE IS A PRECEDENCE, I WILL

5    TRY TO FIND IT, WHEN ON THE EVE OF TRIAL -- THIS IS, IN

6    FACT, THE TRIAL DATE, WHEN SOMEBODY ELECTS TO GO PRO PER

7    ON THE TRIAL DATE, IT IS NOT WITHOUT PRECEDENCE THAT THE

8    COURT SAYS "YOU CAN, BUT YOU ARE GOING TO GO TO COURT TODAY

9    BECAUSE YOU HAVE KNOWN ALL THIS TIME."

10    THE COURT:  EVEN MR. RUIZ IS NOT READY TO GO TO TRIAL.

11    MR. ROMO:  HE IS READY TO GO.  ALL HE NEEDS TO DO IS

12    TALK TO MR. WASHINGTON.  THAT IS ONE THING HE HASN'T DONE.

13    WE CAN -- MR. WASHINGTON IS GOING TO BE OBTAINED ON THE

14    10TH.  WE'RE PREPARING FOR THAT NOW.  MR. WASHINGTON WILL

15    BE AVAILABLE FOR INTERVIEW BY THE DEFENDANT ON -- NO LATER

16    THAN THE 11TH, AS WELL.

17    THE COURT:  OKAY.

18    MR. ROMO:  SO I DON'T SEE WHAT THERE IS AT ALL ABOUT

19    THIS CHANGE IN CIRCUMSTANCES THAT WOULD CAUSE THE

20    CONTINUANCE TO BE LEGALLY MANDATED.  I KNOW YOU HAVE THE

21    POWER AND DISCRETION TO DO IT.  WHAT I AM SUGGESTING IS

22    THIS IS ANOTHER ATTEMPT BY THE DEFENDANT TO MAKE THE

23    PROSECUTION DIFFICULT.  WE

24    ARE GOING TO BE LOSING WITNESSES WHO WILL BE

25    GOING ON VACATION.  A POLICE OFFICER AND OTHER WITNESSES

26    HAVE PREPAID VACATIONS.  THERE ARE ABOUT 16 CIVILIAN

27    WITNESSES IN THIS CASE, SOMEWHERE IN THAT NEIGHBORHOOD,

28    AND THEN FIVE OR SIX LAW ENFORCEMENT.  WE'RE GETTING INTO

26

1   VACATION TIME.  I AM GOING TO HAVE TO FIND OUT -- IF WE

2   SET A TIME NOW, I KNOW THAT WE'RE GOING TO END UP

3   CONTINUING IT AGAIN, IN WHICH CASE WE LOSE A MAJOR WITNESS

4   WHO IS LEAVING THE STATE TO GO TO SCHOOL.

5       THE COURT:  YOU JUST TOOK YOUR ARGUMENT AND SLAMMED IT

6   ON THE FLOOR.

7       MR. ROMO:  NO.  WHAT I AM SAYING --

8       THE COURT:  YOU BASICALLY SAID YOU'RE GOING TO HAVE

9   TO CONTINUE IT AGAIN BECAUSE OF YOUR WITNESSES OR BECAUSE

10  OF HIS REPRESENTATION.

11      MR. ROMO:  IF WE GO ANOTHER SIX WEEKS, WE'RE RUNNING

12  INTO SERIOUS WITNESS SCHEDULING PROBLEMS.

13      THE COURT:  OKAY.

14      MR. ROMO:  IF WE GO NEXT TUESDAY, AS WE HAVE, YOU

15  KNOW, ANTICIPATED EARLIER THIS MORNING, THERE WILL NOT

16  BE THOSE PROBLEMS.

17      THE COURT:  IF HE GOES PRO PER, I CANNOT FORCE HIM

18  TO TRIAL NEXT TUESDAY.

19      MR. ROMO:  YOUR HONOR, TODAY WAS THE TRIAL DATE.

20  YOU COULD FORCE HIM TO TRIAL TODAY.

21      THE COURT:  WITH MR. RUIZ I COULD, AND MR. RUIZ

22  CONVINCED THE COURT THAT HE NEEDS TO COMPLETE CERTAIN

23  REPRESENTATION.

24          MR. ROMO, I AM GOING TO GIVE HIM A BRIEF PERIOD

25  OF TIME, A REASONABLE PERIOD OF TIME.  I AM OFFERING TO

26  YOU AN OPPORTUNITY TO HAVE A SAY IN THAT DATE WHICH,

27  HOPEFULLY, WILL BE ONE -- YOU DON'T EVEN HAVE TO MAKE

28  THAT DECISION TODAY.  I WILL BRING HIM BACK NEXT TUESDAY.

1   I WILL BRING HIM BACK NEXT TUESDAY, AND WE CAN SET A

2   TRIAL DATE THEN IN APPROXIMATELY FOUR TO SIX WEEKS.

3   THAT WILL COMPLY WITH YOUR WITNESSES' NEEDS.

4       MR. ROMO:  WELL, I UNDERSTAND THE COURT FEELS

5   COMPELLED TO DO IT.  I DON'T FEEL THE COURT IS COMPELLED

6   TO DO IT.

7       THE COURT:  WE'VE RESOLVED THAT, MR. ROMO, MOVE ON TO

8   ANOTHER TOPIC.

9       MR. ROMO:  THE ONLY THING, CAN I ASK TO COME BACK

10  NEXT WEEK SO I CAN HAVE A CHANCE TO TALK TO WITNESSES TO

11  FIND OUT WHAT IS GOING ON WITH THEIR LIVES?

12      THE COURT:  THERE IS THE MATTER OF DISCOVERY.

13  MR. BENNETT MADE A VALID POINT THAT SOME OF THE DISCOVERY

14  MR. RUIZ HAS, HE MAY NOT BE ABLE TO TURN OVER TO THE

15  DEFENDANT.

16      MR. ROMO:  THAT'S CORRECT.

17      THE COURT:  SO THE DISCOVERY THAT YOU PROVIDED HIM,

18  BEFORE IT IS TURNED OVER TO THE DEFENDANT, MUST BE

19  REVIEWED BY THE DISTRICT ATTORNEY.  IT IS THEIR EVIDENCE.

20  THEY CAN REVIEW IT.  THEY CAN REDACT IT.  IF YOU DISAGREE

21  WITH ANY OF THAT, THEN WE CAN HAVE A FURTHER HEARING.  BUT

22  NO DISCOVERY OBTAINED FROM THE DISTRICT ATTORNEY IS TO BE

23  PROVIDED TO THE DEFENDANT UNTIL IT HAS BEEN REVIEWED BY AND

24  APPROVED BY THE DISTRICT ATTORNEY.

25      MR. ROMO:  WE'VE ALREADY SPOKEN BRIEFLY ABOUT THAT

26  BEFORE YOU TOOK THE BENCH.  ALL OF THE DISCOVERY THAT I

27  PROVIDED SO FAR HAS BEEN REDACTED AS TO ADDRESSES AND

28  PHONE NUMBERS FOR THE VARIOUS CIVILIAN WITNESSES, AND

O.28

1    ALL OF THE PHOTOGRAPHS, TAPES, LETTERS, THERE'S NO

2    PROBLEM WITH ALL OF THAT, PLUS THE REDACTED REPORTS CAN

3    BE TURNED OVER.

4         THE ONE THING THAT THE PEOPLE ARE GOING

5    TO OBJECT TO IS THE VARIOUS INDIVIDUAL PHONE NUMBERS

6    AND ADDRESS FOR THE WITNESSES.  I PROPOSE THAT IF THE

7    DEFENDANT WANTS TO HAVE ANY OF THESE INDIVIDUALS

8    INTERVIEWED, THE D.A.'S OFFICE WILL MAKE THOSE PEOPLE

9    AVAILABLE TO WHATEVER INVESTIGATOR IS APPOINTED TO

10   ASSIST, AND THOSE INTERVIEWS WILL BE CONDUCT IN THE

11   D.A.'S OFFICE OR POLICE STATION, SO THAT THOSE

12   ADDRESSES REMAIN CONFIDENTIAL.

13   THE COURT:  OKAY.

14   MR. ROMO:  AND THAT IS WHAT I'M ASKING, THAT THE

15   ADDRESSES AND PHONE NUMBERS NOT BE TURNED OVER.  THAT IS

16   THE ONLY THING.  THOSE WERE SUPPLIED IN A SEPARATE LETTER.

17   THAT WAS NOT DISCOVERY, AS SUCH, IT WAS A LETTER TO THE

18   DEFENSE ATTORNEY PERSONALLY.

19   THE COURT:  DO YOU WISH TO BE HEARD AS TO THE

20   LETTER?

21   MR. RUIZ:  I DID SPEAK WITH MR. ROMO, AS HE MENTIONED.

22   I WILL NOT PROVIDE THE LETTER TO MR. MC DONALD.

23   THE COURT:  THAT INFORMATION IS NOT TO BE PROVIDED TO

24   THE DEFENDANT.

25        DEFENDANT'S MOTION TO REPRESENT HIMSELF IS

26   APPROVED.  HE IS HEREBY GRANTED PRO PER STATUS.  PUBLIC

27   DEFENDER IS RELIEVED.

28        THERE WILL BE A STATUS READINESS HEARING ON

1  TUESDAY, MAY 11, 9:30 A.M., IN THIS DEPARTMENT, TO SET

2  A TRIAL DATE.

3          THANK YOU COUNSEL.

4      MR. RUIZ:  AND, YOUR HONOR, I AM GOING TO PROVIDE HIM

5  WITH C.D.'S AND PICTURES AND VIDEOTAPES.  I DON'T KNOW IF

6  THE JAIL IS GOING TO ALLOW HIM TO VIEW THOSE ITEMS.

7      THE COURT:  THAT MAY OR MAY NOT BECOME A PART OF

8  HIS PRO PER STATUS.  THAT IS SOMETHING HE HAS TO WRESTLE

9  WITH.

10     MR. RUIZ:  THANK YOU.

11     THE COURT:  THANK YOU

12

13

14          (ADJOURNMENT IN THIS MATTER.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA )
                              SS.
COUNTY OF SAN DIEGO )


    I, TAMMY L. NIELSEN, CSR NO. 9143, AN OFFICIAL REPORTER

OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN AND FOR

THE COUNTY OF SAN DIEGO, DO HEREBY CERTIFY THAT AS SUCH

REPORTER, I REPORTED IN SHORTHAND THE TESTIMONY ADDUCED AND

THE PROCEEDINGS HAD AT THE HEARING OF THE ABOVE ENTITLED

CAUSE, AND THAT THE FOREGOING TRANSCRIPT, CONSISTING OF

PAGES NUMBERED *0.1* THROUGH *29 / 49* INCLUSIVE, IS A FULL, TRUE

AND CORRECT RECORD OF THE TESTIMONY AND EVIDENCE ADDUCED AND

PROCEEDINGS HAD AT THE HEARING OF SAID CAUSE.


    DATED THIS 25TH DAY OF AUGUST, 2005, AT SAN DIEGO,

CALIFORNIA.


                                                   
TAMMY L. NIELSEN
CSR NO. 9143
OFFICIAL REPORTER



EX
"D"

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN DIEGO

### EAST COUNTY DIVISION

DEPARTMENT 9                                    HON. LOUIS HANOIAN, JUDGE

---

THE PEOPLE OF THE STATE OF
CALIFORNIA,

        Plaintiff,

vs.                                             Case No. SCE234930

JOSEPH McDONALD,

        Defendant.

---

Reporter's Transcript

September 21, 2004

Volume 1

Pages 1 through 17

Appearances:

    For the Plaintiff:    JAMES ROMO
                         Deputy District Attorney

    For the Defendant:    Pam Lasher
                         Attorney at law

                         Dana Peabody, RMR, CRR
                         CSR Certificate No. 6332
                         Official Reporter
                         El Cajon, California

1      El Cajon, California, September 21, 2004

2

3      THE COURT:  People versus Joseph McDonald,

4  SCE234930.

5      MR. ROMO:  James Romo for the People.

6      MS. LASHER:  Good morning, Your Honor, Pam

7  Lasher on his behalf.  He is present in custody and

8  before the Court.

9      THE COURT:  Okay.  This matter was put on

10  calendar actually I guess at your request,

11  Miss Lasher.  You were calling in to ask that the

12  matter be put on calendar.  All is well I hope?

13      MS. LASHER:  Well, I'm -- yesterday I got a

14  phone call from his girlfriend indicating that it

15  was his desire and through her he was relating the

16  desire to me -- it was his desire that they no

17  longer needed my services.  And given the upcoming

18  trial date, I thought it best that I calendar the

19  matter so we could resolve the issue today.

20      THE COURT:  Okay.

21      MS. LASHER:  After our discussions in chambers,

22  I went back and talked to Mr. McDonald.  We didn't

23  have a discussion about me or my services, just at

24  the Court's request I asked what he was anticipating

25  telling the Court, and it appears he would like an

26  appointed lawyer.  Further than that, we did not

27  get.

28      THE COURT:  Well, so are you making a motion to

11:33:2
11:33:2
11:33:2
11:33:2
11:33:2
11:33:3
11:33:30
11:33:34
11:33:30
11:33:38
11:33:44
11:33:48
11:33:54
11:33:56
11:33:58
11:34:02
11:34:04
11:34:06
11:34:06
11:34:10
11:34:12
11:34:16
11:34:18
11:34:20
11:34:26
11:34:26

1    be relieved?

2        MS. LASHER:  It wasn't my request.  I think

3    that's his request.

4        THE COURT:  Well, you are his attorney, and if

5    he wants to have you relieved, then it's still your

6    motion, not his.

7        MS. LASHER:  Well, on his behalf then, I guess I

8    am.

9        THE COURT:  Okay.  The problem with that, of

10   course -- well, Mr. Romo, why don't you chime in

11   here.

12       MR. ROMO:  Well, Your Honor, I think the problem

13   is well-known.  This, according to my count, is

14   about the eighth, possibly the ninth date that the

15   trial has been set.

16       THE COURT:  No, I think it's the tenth.

17       MR. ROMO:  It could be the tenth.  All I know is

18   that the Court has been aware for over a month that

19   there were significant witness problems in this

20   case.  Mr. Nicholas Brecht is going to be deployed

21   to the Middle East on October 5th.  He is a

22   necessary witness, identification witness, in the

23   case, and it was well-known to all that he would be

24   available on Thursday and Friday, the 30th of

25   September and the 1st of October for testimony.

26   He's on military leave until the 29th, and he is

27   being shipped overseas on the 5th.  That was made

28   aware not only to counsel but to the Court, as I

11:34:
11:34:
11:34:
11:34:
11:34:
11:34:
11:34:
11:34:
11:34:
11:35:0
11:35:0
11:35:0
11:35:0
11:35:1
11:35:1
11:35:1
11:35:1
11:35:2
11:35:2
11:35:28
11:35:30
11:35:34
11:35:38
11:35:42
11:35:46
11:35:50
11:35:54
11:36:00

1    said, I believe over a month ago.  Certainly by the    11:36:0

2    time Miss Lasher was appointed on the case, that    11:36:1

3    fact was made known to the Court and to the defense.    11:36:1

4            I don't find -- it seems to me that this is    11:36:2

5    not a motion that's made in good faith.    11:36:2

6    Mr. McDonald was given pro per status in May, and he    11:36:3

7    selected July 12th as an appropriate date.  What    11:36:3

8    happened was he was given pro per status on the 4th,    11:36:4

9    the Court gave me leave to the 11th -- to come back    11:36:4

10    on the 11th to try to find out when all of the    11:36:4

11    witnesses in the case would be available.  Everybody    11:36:5

12    agreed that July 12th would be the appropriate date.    11:36:5

13    That was -- if you go back to the record, on 5-11    11:36:5

14    that was the firm date Mr. McDonald says -- said he    11:37:0

15    could be ready, and the Court said you will be    11:37:0

16    ready, you will go.  We were before this Court    11:37:0

17    shortly before that date.  It might have been on    11:37:1

18    that date.  Mr. McDonald convinced this Court that    11:37:1

19    there was still some things that he had to do that    11:37:1

20    he couldn't do.  And over the People's strenuous    11:37:1

21    objection, realizing the witness problems we had, it    11:37:2

22    was continued yet again.    11:37:2

23            This time all parties again agreed on    11:37:2

24    September 27th.  That was also said that is in    11:37:3

25    stone, that is going to be it.  We have numerous    11:37:3

26    civilian witnesses who have been subpoenaed, been    11:37:4

27    prepared for trial, have arranged their schedules no    11:37:4

28    fewer, as the Court says, 10 times.  The public,    11:37:4

1  particularly the civilian witnesses in this case,                    11:37:5

2  have a right to have their case heard, particularly                  11:37:5

3  when we know for a fact that one of them is going to                 11:38:0

4  be gone, lost to us, for at least a year, maybe more                 11:38:0

5  the way the deployments are being done in the Middle                 11:38:0

6  East.                                                                11:38:0

7          So there has been more than reasonable                       11:38:1

8  time, there was unreasonable time for the defense to                 11:38:1

9  be ready for trial, and now one week knowing -- one                  11:38:1

10  week before the trial date, knowing that we're going                11:38:2

11  to be losing Mr. Brecht for good, knowing that we've                11:38:2

12  had significant witness scheduling problems with                    11:38:2

13  another witness who's out of state going to college,                11:38:3

14  bringing her in during the semester is not an easy                  11:38:3

15  thing.  That's asking her to give up a day of                       11:38:3

16  college, which she's going to have to make up, and                  11:38:4

17  now we're saying we're going to have to -- the                      11:38:4

18  defense says they want another continuance?  I don't                11:38:5

19  find that this is in good faith.                                    11:38:5

20          And I think that there's plenty of case law                 11:38:5

21  and cases where the Court finds that this is not                    11:38:5

22  good faith to deny the continuance.                                 11:39:0

23          Now, it may be that he has a right to fire                  11:39:0

24  Miss Lasher.  He was perfectly happy being pro per.                 11:39:0

25  He can either be pro per or the Court can reappoint                 11:39:1

26  Miss Lasher as his appointed attorney, but I don't                 11:39:1

27  see any reason why we can't go to trial on the 27th.               11:39:1

28  We've had almost a year to prepare for this case,                   11:39:2

1  this is not a very difficult case factually.  As a

2  matter of fact, it's one of the simplest cases that

3  there are, factually.  There are no significant

4  legal issues.  Quite frankly there's no reason in

5  the world why we need to continue this case for any

6  reason.

7      MS. LASHER:  Your Honor, understanding that I'm

8  retained, and even Mr. Romo indicated, I guess,

9  Mr. McDonald would have an automatic right to fire

10  me, I think that perhaps the Court outside the

11  presence of the DA's office could listen to what

12  Mr. McDonald's complaints might be to determine

13  whether or not it's good faith given the issues

14  involved relating to whether this is a good faith

15  request or not.

16      THE COURT:  Well, *Marsden* hearings don't happen

17  in retained counsel cases, and that's almost what

18  you're asking the Court to do is to conduct a

19  *Marsden* hearing on retained counsel.

20          And I haven't heard any basis upon which,

21  you know -- doesn't sound as if we're dealing with a

22  financial issue.  This is not a matter of not being

23  paid or not being an ability to pay.  You know, he

24  may want to control things that you don't want him

25  to control, and that's going to happen any time that

26  there's an attorney present, but what I'm going to

27  do is I have -- I've looked over the procedural

28  history of this case.  This case is coming up on a

11:39:2
11:39:2
11:39:3
11:39:3
11:39:3
11:39:4
11:39:4
11:39:4
11:39:4
11:39:5
11:39:5
11:39:5
11:40:00
11:40:0
11:40:04
11:40:10
11:40:12
11:40:16
11:40:18
11:40:22
11:40:28
11:40:32
11:40:34
11:40:40
11:40:44
11:40:46
11:40:50
11:40:56

1   year, You know, since the alleged offenses had

2   occurred.  The complaint was filed in November of

3   this year with appointed -- and counsel was

4   appointed for Mr. McDonald and Mr. Gulley and then

5   Mr. Ruiz.

6       THE DEFENDANT:  Can I talk yet?

7       THE COURT:  Not yet.

8       THE DEFENDANT:  I want to talk, too.  I want to

9   have a chance.

10       THE COURT:  I'm going to give you a chance to

11   talk because you're going to have to make a decision

12   when I'm done talking.

13       THE DEFENDANT:  All right.

14       THE COURT:  Because I'm making some findings now

15   with regard to the procedural history of the case.

16       And originally a trial date was set for

17   January of this year, January 26th with -- and the

18   Public Defender was on the case, Mr. Ruiz was on the

19   case, and he was prepared for trial.  They continued

20   the trial to the 1st of March of this year.  Then on

21   the 1st of March the trial date was continued until

22   the 22nd of March.  Then on the 12th of March the

23   trial date was continued to the 26th of March.  That

24   was the third time that the trial date had been

25   continued.  On the 12th of April the trial date was

26   continued to the 4th of May, which is the fourth

27   continuance.  On the day of trial, on the 4th of

28   May, the defendant moved to have the Public Defender

11:41:0
11:41:0
11:41:0
11:41:0
11:41:1
11:41:1
11:41:2
11:41:2
11:41:2
11:41:2
11:41:2
11:41:2
11:41:2
11:41:2
11:41:3
11:41:32
11:41:36
11:41:42
11:41:44
11:41:46
11:41:52
11:41:54
11:42:00
11:42:02
11:42:04
11:42:10
11:42:14
11:42:18

1    relieved.  That was denied.  He was granted pro per          11:42:2

2    status, and the matter was trailed till the 11th of         11:42:2

3    May for the setting of another date.  Actually this         11:42:3

4    is the first continuance.  On the 11th of May with          11:42:3

5    Mr. McDonald in control at that time, he having been        11:42:4

6    granted pro per status, the matter was continued            11:42:4

7    till the 12th of July, which was the sixth time that        11:42:5

8    the trial date had been changed or continued.               11:42:5

9         On the 27th of May the defendant filed his            11:42:5

10    170.6; and Judge Preckel was taken off the case, and       11:43:0

11    then the matter was assigned to me on the 28th of          11:43:0

12    May for all purposes, and we met at that time, and I       11:43:0

13    told you, Mr. McDonald, that the time, that the 12th       11:43:1

14    of July, was going to be a firm trial date, there          11:43:1

15    wasn't going to be any continuances at that time.          11:43:2

16    We had a readiness conference, several readiness           11:43:2

17    conferences, we had one on the 10th of June where          11:43:2

18    you had some experts lined up to examine some              11:43:3

19    fingerprint evidence, and then we had another status       11:43:3

20    conference on the 22nd of June.  And at that time          11:43:3

21    you and I discussed outside the presence of Mr. Romo       11:43:4

22    some course of investigation that you were taking          11:43:4

23    that required that we continue the case again, and         11:43:4

24    over, if you will recall, vehement objections of           11:43:5

25    Mr. Romo, I continued -- I granted your continuance        11:43:5

26    request.  At that time I said I was going to               11:43:58

27    continue the case based on that and that we were           11:44:02

28    going to set it off for two weeks before we selected      11:44:04

a date even.  We didn't select the date on that

date, but I did notify Mr. Romo that I was going to

be granting you a continuance so you could pursue

your course of investigation.  And I would give him

time to figure out when he could get all of his

witnesses available because he had the witness

problems then that he has now, only he didn't have

them quite as serious as they are now.

So we met on the 12th of July, which was

the previously set trial date, set the matter for a

trial date of the 27th of September, and you will

recall that I said that under no circumstances will

this matter be continued again, and you were the

trial attorney at the time, and you agreed, and you

took part in selecting that date, and said you were

going to be ready, that you weren't going to need

any more time.  In fact, you know, based upon what I

had observed of your knowledge of the case and your

mastery of the factual and procedural aspects of

this case, that aside from pursuing your other line

of investigation, that you were ready to go then in

July.

Then you come back -- we come back a month

later on the 12th of August, and Miss Lasher comes

in as retained attorney, and I informed you at the

time that I was not going to be granting any

continuances of the matter before I accepted

Miss Lasher's, you know, coming into the case or

1  substitution in because you had waived your right to
2  counsel as of the 12th of August.  You had been in
3  charge of the matter for more than three months at
4  that time, three months and a week, and you had
5  completed all the investigation that needed to go,
6  and I was of the impression that if we were going to
7  trial on the 12th of August, you'd have been ready
8  to go, and you wanted Miss Lasher to represent you,
9  and that's fine.
10         But at that point you gave up your right to
11  represent yourself and retain counsel, which is, of
12  course, your right to be represented by counsel.
13  But you'd already waived your right to counsel
14  previous to that.  And I allowed her to come in with
15  the proviso that there was not going to be a
16  continuance of this case, and she said she could be
17  ready, and from what I've heard so far today, she
18  will be ready to try this case on Monday.
19         Now, today for the first time one week
20  before the date that is set for trial where Mr. Romo
21  has witnesses that are going -- that are coming in
22  from out of state that have had to have been
23  subpoenaed that are disrupting their lives to come
24  in here based upon the continuance that we granted
25  in July, and another person is going to become
26  unavailable shortly after this trial begins, which
27  means there is a very small window when we can get
28  this person in.  You want to fire your retained

11:45:4
11:45:4
11:45:4
11:45:5
11:45:5
11:45:5
11:45:5
11:46:0
11:46:0
11:46:0
11:46:1
11:46:1
11:46:1
11:46:1
11:46:2
11:46:2
11:46:2
11:46:3
11:46:32
11:46:38
11:46:42
11:46:46
11:46:48
11:46:50
11:46:52
11:46:56
11:46:58
11:47:02

1    attorney and then ask me to appoint you counsel.    11:47:0

2    And frankly I'm not inclined to do that.    11:47:0

3            You know, her withdrawal or having her    11:47:1

4    removed as counsel is within my discretion, and I    11:47:1

5    don't have to necessarily grant that, but if I were    11:47:2

6    to grant her withdrawal from the case and you're    11:47:2

7    asking for a new appointed counsel, I have to give    11:47:2

8    appointed counsel an opportunity to prepare for the    11:47:3

9    trial, and there's no way that any appointed counsel    11:47:3

10    is going to walk in and say I'm ready in a week.    11:47:3

11    That just isn't going to happen unless of course I    11:47:4

12    appoint Miss Lasher, which I guess is one of the    11:47:4

13    things I could do, but, you know, I haven't heard    11:47:4

14    anything that there's a reason that she's being    11:47:5

15    relieved because there's a problem financially.    11:47:5

16    Yes, Mr. McDonald?    11:47:56

17        THE DEFENDANT:  First of all, I was provided    11:47:58

18    with Mr. Stacy Gulley to start off with back in    11:48:00

19    November.    11:48:02

20        THE COURT:  Yeah.    11:48:04

21        THE DEFENDANT:  I didn't ask to be relieved of    11:48:04

22    him.  For some reason, unbeknownst to me, he was    11:48:06

23    relieved, he was taken off the case.  Nobody    11:48:08

24    conferred with me or nothing.  As soon as I came in    11:48:12

25    the courtroom, I had a whole nuther attorney that    11:48:14

26    didn't know nothing about the case.    11:48:16

27        THE COURT:  You had Mr. Ruiz.    11:48:18

28        THE DEFENDANT:  I was perfectly satisfied to Mr.    11:48:20

1  Gulley. To this day I don't have no explanation of

2  why he was taken off my case. Mr. Ruiz was not

3  prepared to proceed with any type of motions that

4  Mr. Gulley prepared, he didn't have ample enough

5  time or anything, so I've been prejudiced all

6  throughout this case, and as my constitutional

7  rights, I have a right to be, you know, defended

8  competently at all stages of my case.

9      THE COURT: That's true.

10     THE DEFENDANT: I'm the one facing 26 years

11  here. And what I'm trying to do is just get

12  competence in my case. It's not -- this is not no

13  simple case where, you know, it's -- you know, a

14  couple years. This is 26 years of my life, so I'm

15  going to fight for my life, and I want to have a

16  person on the side of me that's going to defend me

17  properly. That's period, you know. And if it

18  prejudice the DA, well, that's his job. I'm saying

19  this is 26 years of my life that I'm facing.

20     THE COURT: Well, I mean we're going back. Mr.

21  Gulley is a member of the Public Defender's office,

22  and the Public Defender assigns attorneys to cases,

23  whatever their rules are.

24     THE DEFENDANT: But that prejudiced me. Nobody

25  conferred with me. I didn't sit here and cry and

26  complain and say well, what happened to my attorney?

27  I went with the flow because that's all I had to do.

28     THE COURT: Okay.

11:48:2
11:48:2
11:48:2
11:48:3
11:48:3
11:48:3
11:48:3
11:48:3
11:48:4
11:48:4
11:48:4
11:48:4
11:48:5
11:48:5
11:48:5
11:48:5
11:49:0
11:49:0
11:49:0
11:49:1
11:49:1
11:49:1
11:49:1
11:49:2
11:49:2
11:49:2
11:49:2
11:49:2
11:49:3
11:49:32

1    THE DEFENDANT:  Now, I hired an attorney to try
2    to defend me, and we come to trial, and it's not
3    even express with my wishes.  It's like she was not
4    prepared to present my side of the story.  I want to
5    have a person sitting on the side of me that's going
6    to represent me, period.  I'm facing 26 years now.
7    If a lot of people's math, I can't deal with that.
8    I'm the one that's going to have to do the 26 years
9    if I get found guilty.
10    THE COURT:  That's right.
11    THE DEFENDANT:  So all I'm hearing here is
12    somebody's going to Afghanistan or wherever they're
13    going.  I'm going to prison if I get found guilty
14    for 26 years.
15    THE COURT:  Well, I don't know how long you're
16    going to prison or even if you're going to prison.
17    THE DEFENDANT:  That's what I'm saying.  I'm
18    telling you how long I'm facing.
19    THE COURT:  I understand your exposure may be 26
20    years.
21    THE DEFENDANT:  I'm kind of mad and enough said
22    here too.  This is no funny game or something.  This
23    is a person's life that we're talking about right
24    here.
25    THE COURT:  Yeah, and it's one of those things
26    where you hire an attorney in August with the idea
27    that that person who you have --
28    THE DEFENDANT:  Right, and it didn't come -- it

11:49:3
11:49:3
11:49:3
11:49:3
11:49:4
11:49:4
11:49:5
11:49:5
11:49:5
11:49:5
11:49:5
11:49:5
11:50:0
11:50:0
11:50:0
11:50:0
11:50:0
11:50:1
11:50:1
11:50:1
11:50:1
11:50:1
11:50:1
11:50:2
11:50:2
11:50:2
11:50:2
11:50:2



1 didn't pan out that way.  If you hire a person and

2 it doesn't do a job, you're going to do what you got

3 to do, too.  Damn who cares about it.  All I'm

4 asking is to have a person on the side of me to

5 represent me competently.

6     THE COURT:  You're asking the Courts to delay

7 again after two times.  You were represented by

8 attorneys in the past, and you fired the attorneys.

9 You decided to represent yourself.  You decided

10 against that.

11     THE DEFENDANT:  The first attorney did three

12 continuances.  Came from the first attorneys, Stacy

13 Gulley, one he was having a baby, one some other

14 thing.  One Mr. Romo was busy convicting my

15 codefendant somewhere else, so he granted a

16 continuance for him, too.  These are not all

17 continues on my behalf.  You make it seem like I'm

18 the one getting all these continues.  No, the DA has

19 been getting his continuances, and Mr. Gulley had

20 his continuances to take care of his family

21 business.  I'm not the bad guy.  I'm sitting here

22 trying to defend myself competently.  That's it.

23 That's all I'm asking.  Why is everybody trying to

24 make it seem like I'm the one causing problems?  All

25 I'm trying to do is get a competent person on the

26 side of me I feel competent with, go to trial, get

27 it out the way.  Simple.  Very simple.

28     THE COURT:  Well, you say competent and defend

11:50:3
11:50:3
11:50:3
11:50:5
11:50:5
11:50:5
11:50:5
11:50:5
11:51:0
11:51:0
11:51:0
11:51:0
11:51:1
11:51:1
11:51:1
11:51:1
11:51:2
11:51:2
11:51:2
11:51:30
11:51:32
11:51:34
11:51:38
11:51:40
11:51:44
11:51:46
11:51:48
11:51:54

1    my way.  Those are --

2        THE DEFENDANT:  I'm saying competent because

3    that -- as you know, when I was representing myself,

4    I was telling you that I did not stay at this

5    residence.  When she came in last week, what did she

6    say?  Oh, the defendant was staying at this

7    residence.  She did not confer with me, and that was

8    not my wish.  I'm saying I did not stay with this

9    crooked investigator said I said.  She says well,

10   yeah, you know, he says some things to the

11   investigator.  These are entirely against what I was

12   trying to put together.  I have not had my

13   codefendant subpoenaed down here yet.  I have not

14   came across a couple witnesses I need to proceed.  I

15   have other avenues that I'm hiring an attorney to

16   do, and these have not been met.  I am not ready to

17   proceed.

18       Now, I'm not trying to, you know, give you

19   a hard time or nothing like that.  I'm just trying

20   to go and proceed competently.  That's it.  I want

21   to be on the same playing field as the DA.  They got

22   all their ducks in a row, as he keeps saying, but I

23   don't have mine.  So who's prejudiced here?  And I'm

24   the one that's going to do the 26 years if I am

25   found guilty.  It's very simple.

26       THE COURT:  Mr. Romo.

27       MR. ROMO:  Your Honor, the problem is is that

28   the facts are the facts.  The People's witnesses is

11:51:5
11:51:5
11:52:0
11:52:0
11:52:0
11:52:0
11:52:1
11:52:1
11:52:1
11:52:2
11:52:2
11:52:2
11:52:2
11:52:3
11:52:3
11:52:3
11:52:4
11:52:4
11:52:4
11:52:4
11:52:5
11:52:5
11:52:5
11:53:02
11:53:06
11:53:10
11:53:10
11:53:14

1  going to say that he heard from the defendant's

2  parole officer that the defendant said that he was

3  living there.   And the defendant has every

4  opportunity to cross-examine the parole officer who

5  has been subpoenaed.  Are you lying or what?  I mean

6  the fact that he needs investigation as to whether

7  or not the parole officer said that to the officer

8  or not, that's something that could have been

9  done in January.  That was part of the original

10  discovery.  He indicates that he's looking for

11  witnesses.  Everybody's got -- whether it's the

12  defendant here, whether it's Westerfield, I don't

13  care what you're facing.  You've got so much time to

14  find witnesses, and if you don't find them, there's

15  got to be some good reason or some efforts that

16  you're showing that you might ever find them.  If

17  there's something that is keeping the defendant from

18  finding these witnesses, whoever they are, whether

19  they're character witnesses or whether they're

20  witnesses to where he was living at that time,

21  there's nothing to indicate whether or not there's

22  been good faith effort on that part or if there has

23  been -- whether these witnesses are ever going to be

24  found.

25         So in that case are we saying that we will

26  just keep postponing this trial?  10 years from now

27  he's still saying I'm looking for these witnesses,

28  it's still 26 years of my life.  I mean we've had

11:53:1
11:53:2
11:53:2
11:53:2
11:53:3
11:53:3
11:53:4
11:53:4
11:53:4
11:53:4
11:53:5
11:53:5
11:53:5
11:54:0
11:54:04
11:54:06
11:54:10
11:54:12
11:54:16
11:54:20
11:54:22
11:54:26
11:54:28
11:54:30
11:54:32
11:54:34
11:54:38
11:54:40

1    more than enough time, and that's what I said                         11:54:4

2    about -- it was more than reasonable time for all of                 11:54:4

3    this to be done.  And if it isn't done, then -- then                 11:54:4

4    it's not -- it's at some point you just have to cut                  11:54:5

5    it off.  You can't always be adding time or else in                  11:55:0

6    every single case it would be a simple thing.  The                   11:55:0

7    defense would just say well, Your Honor, I'm looking                  11:55:0

8    for Mr. So who I know will exonerate me.  The fact                    11:55:1

9    of the matter is Mr. So is either nonexistent or                     11:55:1

10   moved to another state or can't be found, but we'll                  11:55:1

11   just keep continuing this case out ad infinitum                      11:55:2

12   until -- well, until all the people's witnesses die                  11:55:2

13   or I die or something.  But the fact is is that                      11:55:3

14   we've had more than enough time --                                   11:55:3

15        THE DEFENDANT:  Your Honor --                                   11:55:3

16        MR. ROMO:  -- to find witnesses.  And unless                    11:55:3

17   there's a showing of due diligence, unless there's                   11:55:4

18   some indication that these witnesses even exist,                     11:55:4

19   that this isn't just some contrived defense, then I                  11:55:5

20   don't see any good faith in continuing this trial.                   11:55:5

21        MS. LASHER:  Your Honor, perhaps I can enlighten                11:55:5

22   the Court, but I prefer to do that outside the DA's                  11:56:0

23   office.                                                              11:56:0

24        THE COURT:  Well, we'll take this up at two                     11:56:0

25   o'clock this afternoon.                                              11:56:0

26        MS. LASHER:  I have a 1:30 matter downtown.                     11:56:0

27   Could we do it at 2:30?                                              11:56:1

28        THE COURT:  2:30.                                               11:56:1

1        MS. LASHER:   Thank you.

2        (The proceedings were concluded.)

11:56:1

STATE OF CALIFORNIA    } SS

COUNTY OF SAN DIEGO    }

People vs. JOSEPH MCDONALD, Case No. SCE234930


  I, Dana Peabody, CSR No. 6332, an official reporter of the Superior Court of the State of California, in and for the County of San Diego, hereby certify that I reported in machine shorthand the proceedings had in the above-entitled cause, and that the foregoing transcript, consisting of pages numbered 1 through 17, inclusive, is a full, true, and correct transcript of the said proceedings held on September 21, 2004.

  Dated at Wilton, New York, this 2nd day of May, 2006.


            *Dana Peabody*
            Dana Peabody
            CSR No. 6332

Filed 1/16/07 P. v. McDonald CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D046881 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE234930) |
| JOSEPH HILTON McDONALD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge. Affirmed as modified.

Joseph Hilton McDonald was convicted by a jury of three counts of first degree burglary (Pen. Code,[1] §§ 459, 460); attempted first degree burglary (§§ 459, 460, 664), petty theft with a prior (§§ 484, 666), possession of stolen property (§ 496, subd. (a)), and possession of a firearm by a felon (§ 12021, subd. (a)(1)). True findings were also made that McDonald had served a separate prison term (§ 667.5, subds. (a), (b)) and had been

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

convicted of serious/violent felonies within the meaning of the three strikes law (§§ 667, subds (b)-(i), 1170.12, 668). He was sentenced to a total term of 22 years and 4 months.

On appeal, McDonald contends reversal is required because a photographic line-up was impermissibly suggestive; the court erred in admitting impeachment evidence or his counsel was ineffective in failing to object to the evidence; an enhancement should have been stricken rather than stayed; and the abstract of judgment needs to be corrected. We find merit to the last two contentions and therefore order the judgment modified. Otherwise, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *McDonald's Living Situation*

In late August 2003, McDonald, a California Youth Authority parolee, was given approval to live at a sober living home, One Day At A Time, on 36th Street in San Diego. As a condition of parole, McDonald was required to keep his parole officer informed about where he was living.

On October 16, 2003, McDonald told a San Diego police officer he was living at 4120 Polk Street in the City Heights area of San Diego. At the time he spoke to the officer, he was with Tony Washington, who was arrested for petty theft and being drunk in public.

On October 17, McDonald's parole officer made a random home visit to One Day At A Time. The parole officer saw only two pairs of pants in the closet in McDonald's room, no linens on the bed, and no toiletries and came to the conclusion McDonald was not staying there on a regular basis.

2

Beginning in middle to late October, a clerk who worked in a produce store saw McDonald and Washington entering and leaving Regina Burton's apartment on Troy Street in Spring Valley. Burton's apartment was directly across from the market. The clerk saw McDonald and Washington every day; when he was not busy he would look out the window, and it appeared to him that McDonald and Washington were living in the apartment. Sometimes they came to the store.

On the evening of November 4, 2003, McDonald went to the parole office with Burton, whom he identified as his cousin,[2] and requested and was given permission to move to her Troy Street apartment.

On November 5, the police conducted surveillance on the Troy Street apartment. McDonald and Washington came in and out of the front door several times before getting into a car and leaving. Their observations were inconsistent with Burton's claim that on November 5 she had picked up McDonald from the One Day At A Time residence.

On November 6, the police executed a search warrant on the Troy Street apartment, arrested McDonald, and searched his car. As detailed below, property from the burglaries was found in the apartment and car.

Washington, McDonald, and Burton testified that while McDonald spent a significant amount of time at the Burton apartment in October and November 2003, he never, or only once, spent the night there and he continued to reside at One Day At A

---

[2]    Burton testified her husband, Clarence Burton, was McDonald's second cousin.

3

Time.  Washington began living in Burton's apartment on October 23.  McDonald was not living at Burton's apartment on November 5 or 6.

### October 9, 2003 -- Burglary of Havern Residence

On October 9, 2003, at about 1:00 p.m., Jolene Havern (Jolene)[3] arrived home at her parents' house on Vista Arroyo and found it had been burglarized.  Her mother, Janet Havern (Janet), arrived home a short time later.  Jewelry boxes in Jolene's room had been disturbed but nothing had been taken.  Her parents' room had been ransacked.  Among the items taken from the residence were a JVC camcorder, owner's manual and cables, a tripod, a soft-sided cooler used as a carrying case for the camcorder, jewelry, and a London Fog suitcase.

On November 6, The JVC camcorder, cables and soft-sided cooler were found in the Troy Street residence.  The owner's manual for the camcorder was found in the glove compartment of McDonald's car.  The videotape in the camcorder included photographs from a wedding taken by Jolene as well as scenes taken at the Troy Street apartment that included McDonald, Washington and Burton.  The London Fog suitcase and tripod were found inside McDonald's car trunk.

Jolene had dated Washington a year or two earlier.  Over a four month period, he had visited her home several nights a week.  After they stopped dating, he continued to call her occasionally.

---

[3]     At times we use first names, not out of disrespect, but to distinguish parties with the same last name.

### October 15, 2003 - Borrego Burglary

On October 15, 2003, at about 11:00 a.m., Adrian Borrego's next door neighbor in Spring Valley was working in his backyard. He made eye contact with a young black man with beaded hair he saw walking alongside Borrego's house. Borrego was not at home. The neighbor saw the man meet another man, whom the neighbor could not see well because he was in the shadows. The two men then went to a car and drove away. The neighbor wrote down the license plate number of the car. When Borrego returned home, the neighbor told Borrego about the incident, described the man he had seen and asked Borrego if the man was a friend. Borrego said no. A window screen had been removed from Borrego's residence and a window had fallen inward towards his daughter's bed but nothing was missing from the house.

The license plate number was traced to McDonald's car.

### October 23, 2003 - Meza Burglary

On October 23, 2003, about 1:00 p.m., McDonald and Washington went to Central Avenue in Spring Valley where Peter and Michele Meza reside. McDonald asked the Mezas' next door neighbor, Terina Noa (Terina), who was sitting on her front porch, for a glass of water. Washington remained on the street. Terina turned and yelled to her husband Elias Noa (Elias) inside the house that there was a man outside who wanted some water. When she turned around, McDonald was standing on the porch within four or five feet. She again yelled for Elias to bring some water. She felt suspicious of McDonald because he was peering into her house as if he was "casing" it. Eventually, Elias gave McDonald some water in a plastic cup and told McDonald to keep the cup and

5

leave. He watched McDonald walk up to Washington and then saw both start walking toward the Meza house. Elias went back inside. Terina, who had gone inside when Elias gave the water to McDonald, returned to the porch 20 to 30 minutes later. She noticed McDonald and Washington coming out of the Meza driveway. Both had bicycles, McDonald was carrying a camera bag and Washington was carrying a black bag. They had not earlier had the bicycles or bags. As soon as they left, Terina went to the Meza house, knocked on the door, and after finding no one was home, called the Mezas' business number to tell them what she had seen.

When the Mezas returned home, they found their bedroom had been ransacked. Among the items taken from the home were a palm pilot, jewelry, a digital video camera and bag, the children's bicycles, and two guns, one of which had been recently issued to Peter Meza who is a deputy sheriff.

Around this time McDonald and a man went to the produce market across from the Troy Street apartment. McDonald pulled jewelry out of his pocket and offered to sell it to the store clerk and a customer, neither of whom was interested in purchasing.

Both Terina and Elias positively identified McDonald in a photo array as the man who had asked for water. They also identified him at trial.

The Mezas' guns, palm pilot, and digital video camera were found in the Troy Street apartment.

*October 23, 2003 - Morgan Attempted Burglary*

The Meza residence had a rental unit on the ground floor occupied by Dennis Morgan and his wife. When Morgan arrived home about 3:00 p.m., on October 23, 2003,

he found a window screen near the kitchen door was bent and partially removed, the door to the living room was open, and a window sash was pulled away from the wall. From the damage to the window sash and a plant as well as scuff marks and finger marks on the exterior wall, it was apparent someone had used the window sash and planter to climb up to the balcony and gain entry to the Meza residence. It did not appear anyone had entered the Morgan residence and nothing was found missing.

*November 3, 2003 - Petty Theft at E & L Therapy*

On November 3, 2003, Michelle Porras discovered her wallet had been taken out of her purse, which had been placed in a desk drawer in a back office at E & L Therapy where Porras worked. E & L Therapy was located in an office building with other businesses in Chula Vista.

About 30 minutes before Porras discovered the theft, at about 1:00 p.m., she was in the break room with a coworker eating lunch. The break room had a door to the parking lot, which was not the general public entrance to the building or to E & L Therapy. McDonald opened this back door and asked Porras and the coworker where the front entrance was located. Not knowing who he was or what business he was looking for, Porras directed him to the building's front entrance. McDonald left.

Another E & L Therapy employee, Nicholas Brecht, saw McDonald in the back office rummaging through the cabinets under the sink. He thought McDonald might be a plumber. When Brecht walked into the front area of E & L Therapy where most of the people worked, he asked if anybody knew about the man who was working on the sink. Nobody knew anything. Brecht waited for McDonald to come out of the back area.

7

When McDonald emerged, he asked Brecht, "Do you know where the bathroom is?"
McDonald was about a foot away. Brecht pointed to some glass doors and directed
McDonald to go out the doors and to his right. After McDonald left, Brecht suggested
his coworkers go to the back office to check if anything was missing. Porras discovered
her wallet was missing.

Other people in the building also saw McDonald. An administrative assistant for
Remedy Staffing, Annayette Esquer, worked on the first floor of the building. Remedy
Staffing had a door from its lobby to the restrooms. These restrooms also had an
entrance from the building's lobby. Around lunchtime, McDonald came out of the
restroom door into Remedy Staffing and asked Esquer if any jobs were available. When
she said no, McDonald started to go out Remedy Staffing's main entrance but then asked
if he could use the bathroom. She said yes. He was in the bathroom for a short period of
time and then left by the business's main entrance.

Elena Martinez was working as a receptionist at Capital Funding on the second
floor of the building. Between noon and 1:00 p.m., she saw McDonald on the stairs and
then walking down a hallway that was not generally open to the public; the hallway had a
"restricted access" sign. McDonald was out of her view for about 30 seconds. He later
came up to her desk and asked about the restrooms. She told him they were downstairs.
She watched as he walked downstairs. She saw the door to the bathroom shut.

At trial, Porras, Brecht, Esquer and Martinez identified McDonald as the man they
had seen on November 3. Porras and Brecht had been earlier shown a photographic
lineup. Porras had identified McDonald and Brecht had selected two photos, one of

8

which was of McDonald.  Brecht and Martinez had attended a live line-up where they both selected two persons, one of whom was McDonald.

On November 6, Porras's Nordstrom credit card, gym membership card and Movie Watcher's card were found under the front passenger seat of McDonald's car.

### *Defense*

Washington testified McDonald did not participate in any of the burglaries. Washington had pleaded guilty to the Havern and Meza burglaries and during trial testified about committing the Borrego burglary.

Washington often borrowed McDonald's car; McDonald was unable to drive because he had broken his glasses.  Washington committed the crimes with a "homie" named "C.K." who he would meet at a trolley station.  Washington did not know where C.K. lived and did not have his phone or pager number.  When he was arrested, he told the police detective that McDonald was not involved.  He denied there was any conversation between himself and McDonald where McDonald suggested Washington should take the blame for the crimes because Washington was likely to get probation while McDonald was likely to go to prison.

Burton testified McDonald was not living with her, but at One Day At A Time. McDonald let her use his car when her car was not working.  She would often pick him up at One Day At A Time and he would always return to the facility in the evening to sleep because it had a curfew.

Burton specifically remembered what occurred on October 23, 2003, the day of the Meza/Morgan crimes, because it was her son's birthday.  She picked up McDonald at

9

One Day At A Time, brought him with her to her 11:00 a.m. kick boxing class at San Diego City College, ate lunch with him in Chula Vista, dropped him off at One Day At A Time and then, driving McDonald's car, returned to the Troy Street apartment.

She also specifically recalled November 3, the day of the E & L Therapy petty theft. She went with McDonald to One Day At A Time to pick up his food voucher between noon and 1:00 p.m. He was with her when she went grocery shopping, she dropped McDonald and Washington at her apartment, and then left her apartment about 2:00 p.m.. The records for One Day At A Time, however, indicated that McDonald did not receive a food voucher on November 3; the last voucher he received was on October 20.

In 2003, Burton and McDonald had been just friends. However, they had since fallen in love. She visited him twice a week in jail. She had deposited money in his jail account.

McDonald denied being involved in any of the burglaries. He testified he was not living in Burton's apartment. He let Burton and Washington regularly borrow his car. He never saw the guns in the apartment. He first learned of the video camera in the trunk of his car when he read the police report. He did not know Porras's cards were under the front passenger seat and had not seen them prior to trial. He never tried to sell jewelry to anybody in the market across from the Troy Street apartment. He had no conversation with Washington while in the holding cell because the deputies would not let them talk.

10

*Rebuttal*

When Washington was arrested, he initially denied any involvement in the burglaries. He later admitted he committed the Borrego and Meza burglaries with McDonald and gave details about the burglaries, including that McDonald climbed up to the rear balcony of the Meza residence. He said the burglaries were McDonald's idea and he went along only because he was McDonald's friend and was going to "watch his back." Washington claimed the camcorder was from his aunt's house.

McDonald, when he was interviewed by the police, denied any involvement in the crimes, but after being asked if his fingerprints would be on the guns taken in the Meza burglary, admitted he had handled them at one point.

McDonald and Washington were placed in the holding cells. Each was alone in a cell. McDonald yelled to Washington that they were in a lot of trouble and that Washington would probably get probation but McDonald was looking at prison time because he was on parole. About 15 minutes later, McDonald told a detective that Washington wanted to talk to the detective and would tell him McDonald had nothing to do with the burglaries.

The detective then went to Washington's holding cell and asked if Washington wanted to talk about something. Washington said yes. He said McDonald was not involved with the burglaries; he did them with someone else whom he knew but could not describe. The detective looked at Washington and essentially told him that he knew what was going on, could appreciate that he wanted to take care of McDonald, but that both he and Washington knew that McDonald was the other person who did the

11

burglaries. Washington bowed his head, nodded, and said, "Yeah," acknowledging that what the detective said was correct.

## DISCUSSION

### I

*Suggestive Identification Procedure*

McDonald contends the photo array used by the police was unduly suggestive because he had the darkest complexion of the African American males used in the array.

Four witnesses were shown the photo array: Terina and Elias Noa on November 4, 2003, Porras on November 12, 2003, and Nicholas Brecht several months after Porras's wallet was taken. Detective Jerry Hartman generated the photo array using a computer program containing thousands of photographs that selects photographs similar to the suspect's description. Among the characteristics the detective was looking for were African American males, about the same age as McDonald, who had some facial hair and braided hair. At the time he generated the array, he did not have information indicating the suspect was a "dark complected" African American; he did not learn that until he talked with Porras. At trial, he stated what was "dark complected" was a matter of opinion, and that different people have different opinions of what is dark, light and medium. Detective Hartman acknowledged McDonald was the darkest male in the lineup but noted the photo array specifically admonishes the witnesses that they are not to

12

look at the complexion because there are many factors that could change the complexion of a person.[4]

To determine whether a pretrial identification procedure is so unreliable that it violates a defendant's right to due process, a court must look at whether the identification procedure was unduly suggestive and unnecessary. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152.) A pretrial identification procedure is unduly suggestive if it " 'suggests in advance of identification by the witness the identity of the person suspected by the police.' " (*People v. Hunt* (1977) 19 Cal.3d 888, 894.) It is not necessary in assembling a photo array to surround the defendant's photo with people who are nearly identical in appearance. (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) The defendant bears the burden of showing unfairness "as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

If the pretrial identification procedure was unduly suggestive, then the courts look at the totality of circumstances to determine whether the procedure was nonetheless reliable. (*People v. Carter, supra,* 36 Cal.4th at p. 1152; *People v. Yeoman* (2003) 31 Cal.4th 93, 125.) In viewing the totality of circumstances, the courts consider " 'such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.)

---

4    The photo array included the statement: "Also, photographs may not depict the

We have independently reviewed the photo array. The six men in the array are generally similar in appearance. All are African American men of a similar age, with similar hairstyles and facial features. While McDonald's complexion is darker than the other men, it is not radically darker, particularly in the black-and-white photo arrays shown to the witnesses. Moreover, the photo array specifically warned the witnesses the photo array might not accurately reflect the individual's complexions. The fact one of the witnesses, Nicholas Brecht, selected two photos also undercuts McDonald's claim the array was unduly suggestive, that is, that it suggested in advance which individual Brecht should select. We conclude the photo array was not unduly suggestive.

Furthermore, even if we were to find the photo array was unduly suggestive, we would not reverse because the totality of the circumstances shows the procedure was nonetheless reliable. The photo arrays were shown to the majority of the witnesses within two weeks of the offenses; Brecht did not see the photo array until several months later. All the witnesses had a good opportunity to view the suspect at close or relatively close range. Each witness personally interacted with the suspect, responding to the suspect's request for water or for directions. There were no issues as to lighting conditions; the suspect was either viewed outside during the day or inside a business

true complexion of a person."

14

during working hours.  The witnesses' descriptions of the suspect generally matched McDonald.[5]

Finally, we note this is not a case that relied solely on eyewitness identification. McDonald was linked to the crimes through the license plate of his car and through the property of the victims found in the Troy Street residence or in his car.

## II

### Impeachment of Burton

McDonald contends the court erred in allowing the prosecutor to examine Burton about letters she had written to McDonald, including in August 2004, detailing her sexual fantasies and love for him.  He contends the evidence should have been excluded because they were not timely disclosed.  He also contends defense counsel was incompetent by failing to pursue exclusion as a discovery sanction and failing to raise hearsay and relevancy objections.

During direct examination, Burton testified she spent much time with McDonald from August 2003 until he was arrested on November 5, 2003.  Beginning on October 29, they were together almost every day, but he did not sleep at her apartment.  During cross-examination, she admitted she visited McDonald twice a week in the jail, had put money into McDonald's jail account, had hired a lawyer for him at one point, and was in love with him.  She testified she had told McDonald their relationship would not continue if he

---

5    For example, the Noas described the suspect as an African American male, 20 to 25 years old, braided hair, about 6'2", with a muscular build.  The probation report,

were released and she testified she would not lie for McDonald. When the prosecutor asked if she currently thought of her relationship with McDonald being "sexual in nature at all," Burton answered, "How can it be sexual when he is incarcerated?" The prosecutor then asked if Burton had written to McDonald about sexual fantasies she had about him. Defense counsel objected because she had received copies of the letters just prior to Burton's direct examination, and expressed concern some of the letters might involve the attorney/client privilege or defense strategies when Burton may have been "working for" McDonald when he was self-represented. The prosecutor responded that the letters had been obtained by the previous prosecutor, involved correspondence after defense counsel "came on the case," and argued Burton's expressed sexual fantasies were relevant to showing "bias, interest or other motive." The court noted McDonald had received the letters, found no attorney/client issues were present or defense strategy issues were involved, and they were relevant to showing Burton's possible bias. The court stated it would not excuse Burton after cross-examination and defense counsel could have that evening to examine the letters and to try to rehabilitate her the following day.

The prosecutor then proceeded to cross-examine Burton on some details of her sexual thoughts and fantasies contained in the letters, and how she had written that she would love him forever. He also asked her if they had ever engaged in oral sex or sexual

---

completed in November 2004, shows McDonald as 25 years old, black, 6'2", and weighing 204 pounds.

intercourse, which she denied. Defense counsel did not object to any specific question nor did she raise any further general objections to the evidence.

### (A) Discovery Violation

Section 1054 et seq. provides for reciprocal discovery between the prosecution and the defense in criminal trials. "The purpose of section 1054 et seq. is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial." (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201.) A prosecutor is required to disclose to the defense "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" that is in the prosecutor's possession. (§ 1054.1, subd. (c).) If the prosecutor fails to disclose evidence after an informal or court-ordered discovery request, "a court may make any order necessary to enforce the provisions of [the] chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).)

Here, the letters were written to McDonald and therefore he had knowledge and possession of them. This is not a situation where the defendant was previously unaware of the existence of the evidence. The letters did not involve evidence establishing McDonald's guilt, but went to a collateral issue of a witness's credibility. The court's decision not to excuse the witness following cross-examination and allow defense counsel time to review the letters was a reasonable response to defense counsel's objection.

17

### (B) Ineffective Assistance of Counsel

McDonald contends defense counsel was ineffective in failing to further object to the late discovery, and argues counsel should have objected to admission of the evidence under Evidence Code section 352 because the probative value of the evidence was outweighed by a danger of undue prejudice.[6]

" '[A] conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes both of the following:  (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted.' " (*People v. Padilla* (1995) 11 Cal.4th 891, 935-936, italics omitted, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there

---

6    McDonald also asserts the excerpts from the letters constituted inadmissible hearsay but he fails to make any further argument or citation of authority to support his argument and therefore we may deem this argument waived. (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979; *McComber v. Wells* (1999) 72 Cal.App.4th 512, 522-523.)

Code, §§ 210, 780, subd. (a).)  "A trial court's exercise of discretion in admitting or rejecting evidence pursuant to Evidence Code section 352 'will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice.' " (*People v. Cain* (1995) 10 Cal.4th 1, 33.)

Here, the evidence was relevant to establishing the extent of Burton's bias and motive to lie.  Further, the evidence was relevant to impeach Burton's testimony that she was not contemplating continuing a relationship with him if he were acquitted.  In contrast to her trial testimony, the letters, written only a few months earlier, indicated she wanted to be with him and would love him forever.

Moreover, even if we were to agree with McDonald that defense counsel should have objected, we would not reverse because there is no reasonable probability the verdict would have been different had the evidence been excluded.

Even without the letters, Burton's credibility was severely undermined.  She had already admitted that she was in love with McDonald and thus that she had a bias in McDonald's favor and a motive to lie.  The excerpts from the letters merely provided additional details about the extent of her bias.  Burton's testimony intended to show McDonald was not living in her apartment and to provide McDonald with an alibi for the burglaries was undercut not merely by evidence of her potential bias but by other evidence showing she was lying, including the lack of McDonald's personal belongings at One Day At A Time as of October 17, records contradicting her claim she and McDonald picked up a food voucher at One Day At A Time on November 3, the observations of the

20

produce market clerk about seeing McDonald at the apartment, and by police surveillance of the apartment.

Moreover, there was overwhelming evidence establishing McDonald's guilt. Not only were there multiple eyewitness identifications but also property from the burglaries was found in his car and the Troy Street apartment.

There is no reasonable probability that had the jury not heard about Burton's sexual fantasies, the jury would have acquitted McDonald.

### III

#### *Staying Versus Striking Enhancement*

The court stayed a one-year section 667.5, subdivision (b) enhancement and instead imposed a five-year prior serious felony enhancement under section 667, subdivision (a).

In *People v. Jones* (1993) 5 Cal.4th 1142, 1152, the court held it is improper to impose both a section 667, subdivision (a) serious felony enhancement and a section 667.5, subdivision (b) enhancement based on the same serious felony. The *Jones* court ordered the section 667.5, subdivision (b) enhancement stricken. (See also *People v. Solis* (2001) 90 Cal.App.4th 1002, 1021; *People v. Gonzales* (1993) 20 Cal.App.4th 1607, 1610, but see *People v. Walker* (2006) 139 Cal.App.4th 782, 794, fn. 9.) Accordingly, we order the section 667.5, subdivision (b) enhancement stricken.

IV

*Correction of the Abstract of Judgment*

As the Attorney General concedes and we agree, there are errors in the abstract of judgment.

First, the abstract erroneously indicates that the burglaries in counts 2 and 3 were imposed as "consecutive 1/3 violent." There is no evidence supporting a finding these burglaries were violent. Accordingly, the abstract of judgment should be corrected to reflect "consecutive 1/3 non-violent."

Second, while there is a check mark on the abstract of judgment indicating "Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two strikes)," the actual individual sentences do not reflect this sentencing, that is, do not reflect, as the court ordered in its oral pronouncement, that the sentences were to be doubled as provided by the three strikes law. When discrepancies exist, the oral pronouncement of judgment generally prevails. (*People v. Price* (2004) 120 Cal.App.4th 224, 242.) Accordingly, the abstract of judgment should be corrected as follows:

<u>Count 1</u>: a term of eight years rather than four years.

<u>Count 2</u>: a term of two years and eight months rather than one year and four months.

<u>Count 3</u>: a term of two years and eight months rather than one year and four months.

<u>Count 4</u>: a term of one year and four months rather than eight months.

<u>Count 5</u>: a term of one year and four months rather than eight months.

22

<u>Count 6</u>: a term of one year and four months rather than eight months.

<u>Count 7</u>: a term of one year and four months rather than eight months.

Third, the abstract of judgment fails to indicate the court stayed imposition of sentence on count 6, receiving stolen property.

## DISPOSITION

We order the abstract of judgment to be corrected to reflect:  the striking of the section 667.5, subdivision (b) one-year enhancement; count 1 has a term of eight years; counts 2 and 3 are nonviolent felonies and each have a term of two years, eight months; counts 4 to 7 each have a term of one year, four months; count 6 is stayed; 5 years for the prison prior allegation, and the total term is 22 years 4 months.  A copy of the amended abstract is to be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, we affirm the judgment.

_____
McCONNELL, P. J.

WE CONCUR:

_____
O'ROURKE, J.

_____
AARON, J.

E X

"F"

Court of Appeal, Fourth Appellate District, Div. 1 - No. D046881
**S150458**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

JOSEPH HILTON MCDONALD, Defendant and Appellant.

The petition for review is DENIED.

SUPREME COURT
F I L E D

MAR 2 8 2007

Frederick K. Unlrich Clerk

DEPUTY

GEORGE

Chief Justice

Test Report for MCDONALD J

ID Number: T 01657
Test Date: 10/23/07
Run Date: 12/06/07
Page No: 3

Rutherford1023
TABE 9/10 Basic Ed
Rutherford,M ABE
10
Entire group

| Subtests | L/F | NC | NA | SS | GE | NP | NRS | NS | OM | Predicted GED |
|---|---|---|---|---|---|---|---|---|---|---|
| Reading | E9 | 16 | 50 | 337 | 1.7 | 6 | 1 | 1 | 0 | |
| Math Compu | E9 | 33 | 40 | 451 | 4.5 | 25 | | 1 | 60 | |
| Applied Math | E9 | 8 | 50 | 200 | 0.0 | 1 | | 1 | 0 | |
| Language | E9 | 10 | 55 | 235 | 0.0 | 1 | 1 | 1 | 0 | |
| Vocabulary | E9 | 5 | 20 | 289 | 0.8 | 3 | | 1 | 0 | |
| Lang Mech | E9 | 6 | 20 | 360 | 1.6 | 10 | | 1 | 0 | |
| Spelling | E9 | 6 | 20 | 337 | 1.8 | 9 | | 1 | 0 | |
| | | | | | | | | | | |
| Total Math | | 41 | 90 | 325 | 2.1 | 2 | 2 | 1 | | |
| Total Battery | | 67 | 195 | 299 | 1.3 | 1 | | 1 | | |

L/F=Test Lev & Frm    NC=No. Correct       NA=No. Attempted
SS=Scale Score         GE=Grade Equiv       NP=National %ile
NRS=Literary Level     NS=National Stan     OM=% Obj. Mastered

| Objectives | Score | MST | Percent | Objectives | Score | MST | Percent |
|---|---|---|---|---|---|---|---|
| **Reading** | | | | **Language** | | | |
| E01 INTRP GRAPH | 1/ 8 | – | 12 | E30 USAGE | 1/13 | – | 7 |
| E02 WDS CONTEXT | 1/ 4 | – | 25 | E31 SENT FORMA | 2/ 9 | – | 22 |
| E03 RECALL INFO | 8/15 | P | 53 | E32 PARA DEVEL | 3/ 8 | – | 37 |
| E04 CONST MEAN | 4/16 | – | 25 | E33 CAPITALIZ | 1/ 8 | – | 12 |
| E05 EVAL/EX MNG | 2/ 7 | – | 28 | E34 PUNCTUATION | 1/10 | – | 10 |
| Subtest Avg | | | 32 | E35 WRITG CONV | 2/ 7 | – | 28 |
| | | | | Subtest Avg | | | 18 |
| **Math Compu** | | | | | | | |
| E11 ADD WHL NUM | 8/ 9 | + | 88 | **Vocabulary** | | | |
| E12 SUB WHL NUM | 8/ 8 | + | 100 | E40 WD MEANING | 3/ 9 | – | 33 |
| E13 MUL WHL NUM | 8/ 8 | + | 100 | E41 MULTIMNG WD | 1/ 4 | – | 25 |
| E14 DIV WHL NUM | 4/ 8 | P | 50 | E42 WD IN CONTX | 1/ 7 | – | 14 |
| E15 DECIMALS | 5/ 7 | P | 71 | Subtest Avg | | | 25 |
| Subtest Avg | | | 83 | | | | |
| | | | | **Lang Mech** | | | |
| **Applied Math** | | | | E43 SENT PHRASE | 3/ 7 | – | 42 |
| E21 NUM OPERATN | 0/10 | r | 0 | E44 WRITG CONV | 3/13 | – | 23 |
| E22 COMP CONTXT | 1/ 6 | – | 16 | Subtest Avg | | | 30 |
| E23 ESTIMATION | 0/ 5 | – | 0 | | | | |
| E24 MEASUREMENT | 0/ 5 | – | 0 | **Spelling** | | | |
| E25 GEOMETRY | 1/ 5 | – | 20 | E45 VOWEL | 4/ 7 | P | 57 |
| E26 DATA ANALY | 1/ 7 | – | 14 | E46 CONSONANT | 1/ 6 | – | 16 |
| E27 STAT/PROB | 2/ 4 | P | 50 | E47 STRUCT UNIT | 1/ 7 | – | 14 |
| E28 PRE-ALG/ALG | 1/ 4 | – | 25 | Subtest Avg | | | 30 |
| E29 PROB SOLVG | 2/ 4 | P | 50 | | | | |
| Subtest Avg | | | 16 | Total Average | | | 33 |

Copyright ® by CTB\McGraw-Hill, Inc. All Rights Reserved.    Page 3

**PROOF OF SERVICE BY MAIL**

**(CCP §§1013(a), 2015.5; 28 U.S.C. §1746)**

I, _JOSEPH McDONALD_, hereby declare that I am over the age of 18, I am the petitioner in the above-entitled cause of action, and my legal mailing address CSP/LAC – A2-_141_, P.O. BOX 8457, Lancaster, CA 93539-8457.

On _6·30·08_, I delegated to prison officials the task of mailing, via the institution's internal mail system (***Houston v. Lack***, 487 US 266 [101 L.Ed.2d 245; 108 S.Ct. 2379] (1988)), the below entitled legal document(s): _Further Argument re 5/30/08 U.S.D.C_

by placing said documents in a properly addressed and sealed envelope, with postage fully pre-paid, in the United States Mail, deposited in the manner provided by CSP/LAC, and addressed as follows: _United States District Court Southern District of California office of the Clerk 880 Front Street, Suite 4290 San Diego, California 92101-8900_

I further declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this _30_ day of _June_ 200_8_ at California State Prison – Los Angeles County.

_____