1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

JOSEPH McDONALD,

Civil No.        08-0652 L (PCL)

11

Petitioner,

**REPORT AND RECOMMENDATION RE:**

12

vs.

13

E.B. HAWS,

**(1)DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS; and**

14

Respondent.

**(2) DENIAL OF EVIDENTIARY HEARING**

15
16

17    **I.      INTRODUCTION**

18            Petitioner Joseph Hilton McDonald, a state prisoner proceeding pro se, has filed a Second

19    Amended Petition for Writ of Habeas Corpus and a Memorandum of Points and Authorities in Support

20    of the Petition[1] pursuant to 28 U.S.C. § 2254, challenging his conviction in case number SCE234930

21    for three counts of burglary, one count of attempted burglary, one count of petty theft with a prior

22    conviction, one count of possession of stolen property and one count of possession of a firearm by a

23    felon. (Lodgment No. 15, vol. 2 at 388-94.)  The jury also found true various enhancements and

24    allegations. (*Id.* at 388-97.)

25    / / /

26

27            [1]  The Memorandum of Points and Authorities in Support of the Second Amended Petition is docketed

28    as "Renewed Motion to Appoint Guardian Ad Litem." (*See* Doc. No. 16, 16-1, 16-2, 16-3, 16-4.)  For ease of
      reference, the Court will cite to the Memorandum of Points and Authorities in Support of the Petition using the
      docket numbers and page numbers assigned to the document by the Court's electronic filing system.

1    The petition presents twelve claims. (*See* Pet.; Doc. Nos. 16, 16-1, 16-2, 16-3, 16-4 .) Petitioner

2    also makes a formal request for an evidentiary hearing. (Traverse at 11.)

3    This case is before the undersigned Magistrate Judge pursuant to S.D. Cal. Civ. R. 72.1(c)(1)(c)

4    for Proposed Findings of Fact and Recommendation for Disposition.  For the reasons set forth below,

5    the Court respectfully recommends the request for an evidentiary be **DENIED** and that the Petition be

6    **DENIED**.

7    ## II.    FACTUAL BACKGROUND

8    This Court gives deference to state court findings of fact and presumes them to be correct;

9    Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

10   U.S.C.A. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding

11   findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory

12   presumption of correctness).  The following facts are taken from the California Court of Appeal's

13   opinion denying McDonald's direct appeal of his conviction.

14                          *McDonald's Living Situation*

15   In late August 2003, McDonald, a California Youth Authority parolee, was given

16   approval to live at a sober living home, One Day At A Time, on 36th Street in San Diego. As a condition of parole, McDonald was required to keep his parole officer informed about where he was living.

17

18   On October 16, 2003, McDonald told a San Diego police officer he was living at 4120 Polk Street in the City Heights area of San Diego.  At the time he spoke to the officer, he was with Tony Washington, who was arrested for petty theft and being drunk

19   in public.

20   On October 17, McDonald's parole officer made a random home visit to One Day At A Time.  The parole officer saw only two pairs of pants in the closet in McDonald's

21   room, no linens on the bed, and no toiletries and came to the conclusion McDonald was not staying there on a regular basis.

22

23   Beginning in middle to late October, a clerk who worked in a produce store saw McDonald and Washington entering and leaving Regina Burton's apartment on Troy Street in Spring Valley.  Burton's apartment was directly across from the market.  The

24   clerk saw McDonald and Washington every day; when he was not busy he would look out the window, and it appeared to him that McDonald and Washington were living in

25   the apartment.  Sometimes they came to the store.

26   On the evening of November 4, 2003, McDonald went to the parole office with Burton, whom he identified as his cousin, [footnote omitted] and requested and was

27   given permission to move to her Troy Street apartment.

28   / / /

2

08cv0652

On November 5, the police conducted surveillance on the Troy Street apartment. McDonald and Washington came in and out of the front door several times before getting into a car and leaving. Their observations were inconsistent with Burton's claim that on November 5 she had picked up McDonald from the One Day At A Time residence.

On November 6, the police executed a search warrant on the Troy Street apartment, arrested McDonald, and searched his car. As detailed below, property from the burglaries was found in the apartment and car.

Washington, McDonald, and Burton testified that while McDonald spent a significant amount of time at the Burton apartment in October and November 2003, he never, or only once, spent the night there and he continued to reside at One Day At A Time. Washington began living in Burton's apartment on October 23. McDonald was not living at Burton's apartment on November 5 or 6.

*October 9, 2003 – Burglary of Havern Residence*

On October 9, 2003, at about 1:00 p.m., Jolene Havern (Jolene) arrived home at her parents' house on Vista Arroyo and found it had been burglarized. Her mother, Janet Havern (Janet), arrived home a short time later. Jewelry boxes in Jolene's room had been disturbed but nothing had been taken. Her parents' room had been ransacked. Among the items taken from the residence were a JVC camcorder, owner's manual and cables, a tripod, a soft-sided cooler used as a carrying case for the camcorder, jewelry, and a London Fog suitcase.

On November 6, the JVC camcorder, cables and soft-sided cooler were found in the Troy Street residence. The owner's manual for the camcorder was found in the glove compartment of McDonald's car. The videotape in the camcorder included photographs from a wedding taken by Jolene as well as scenes taken at the Troy Street apartment that included McDonald, Washington and Burton. The London Fog suitcase and tripod were found inside McDonald's car trunk.

Jolene had dated Washington a year or two earlier. Over a four month period, he had visited her home several nights a week. After they stopped dating, he continued to call her occasionally.

*October 15, 2003 – Borrego Burglary*

On October 15, 2003, at about 11:00 a.m., Adrian Borrego's next door neighbor in Spring Valley was working in his backyard. He made eye contact with a young black man with beaded hair he saw walking alongside Borrego's house. Borrego was not at home. The neighbor saw the man meet another man, whom the neighbor could not see well because he was in the shadows. The two men then went to a car and drove away. The neighbor wrote down the license plate number of the car. When Borrego returned home, the neighbor told Borrego about the incident, described the man he had seen and asked Borrego if the man was a friend. Borrego said no. A window screen had been removed from Borrego's residence and a window had fallen inward towards his daughter's bed but nothing was missing from the house.

The license plate number was traced to McDonald's car.

*October 23, 2003 – Meza Burglary*

On October 23, 2003, about 1:00 p.m., McDonald and Washington went to Central Avenue in Spring Valley where Peter and Michele Meza reside. McDonald asked the Mezas' next door neighbor, Terina Noa (Terina), who was sitting on her front

porch, for a glass of water.  Washington remained on the street. Terina turned and yelled to her husband Elias Noa (Elias) inside the house that there was a man outside who wanted some water.  When she turned around, McDonald was standing on the porch within four or five feet.  She again yelled for Elias to bring some water.  She felt suspicious of McDonald because he was peering into her house as if he was "casing" it. Eventually, Elias gave McDonald some water in a plastic cup and told McDonald to keep the cup and leave.  He watched McDonald walk up to Washington and then saw both start walking toward the Meza house.  Elias went back inside.  Terina, who had gone inside when Elias gave the water to McDonald, returned to the porch 20 to 30 minutes later.  She noticed McDonald and Washington coming out of the Meza driveway.  Both had bicycles, McDonald was carrying a camera bag and Washington was carrying a black bag.  They had not earlier had the bicycles or bags.  As soon as they left, Terina went to the Meza house, knocked on the door, and after finding no one was home, called the Mezas' business number to tell them what she had seen.

When the Mezas returned home, they found their bedroom had been ransacked.  Among the items taken from the home were a palm pilot, jewelry, a digital video camera and bag, the children's bicycles, and two guns, one of which had been recently issued to Peter Meza who is a deputy sheriff.

Around this time McDonald and a man went to the produce market across from the Troy Street apartment.  McDonald pulled jewelry out of his pocket and offered to sell it to the store clerk and a customer, neither of whom was interested in purchasing.

Both Terina and Elias positively identified McDonald in a photo array as the man who had asked for water.  They also identified him at trial.

The Mezas' guns, palm pilot, and digital video camera were found in the Troy Street apartment.

*October 23, 2003 – Morgan Attempted Burglary*

The Meza residence had a rental unit on the ground floor occupied by Dennis Morgan and his wife.  When Morgan arrived home about 3:00 p.m., on October 23, 2003, he found a window screen near the kitchen door was bent and partially removed, the door to the living room was open, and a window sash was pulled away from the wall.  From the damage to the window sash and a plant as well as scuff marks and finger marks on the exterior wall, it was apparent someone had used the window sash and planter to climb up to the balcony and gain entry to the Meza residence.  It did not appear anyone had entered the Morgan residence and nothing was found missing.

*November 3, 2003 – Petty Theft at E & L Therapy*

On November 3, 2003, Michelle Porras discovered her wallet had been taken out of her purse, which had been placed in a desk drawer in a back office at E & L Therapy where Porras worked. E & L Therapy was located in an office building with other businesses in Chula Vista.

About 30 minutes before Porras discovered the theft, at about 1:00 p.m., she was in the break room with a coworker eating lunch.  The break room had a door to the parking lot, which was not the general public entrance to the building or to E & L Therapy.  McDonald opened this back door and asked Porras and the coworker where the front entrance was located.  Not knowing who he was or what business he was looking for, Porras directed him to the building's front entrance. McDonald left.

Another E & L Therapy employee, Nicholas Brecht, saw McDonald in the back

4

office rummaging through the cabinets under the sink.  He thought McDonald might be a plumber.  When Brecht walked into the front area of E & L Therapy where most of the people worked, he asked if anybody knew about the man who was working on the sink Nobody knew anything.  Brecht waited for McDonald to come out of the back area.  When McDonald emerged, he asked Brecht, "Do you know where the bathroom is?"  McDonald was about a foot away.  Brecht pointed to some glass doors and directed McDonald to go out the doors and to his right.  After McDonald left, Brecht suggested his coworkers go to the back office to check if anything was missing.  Porras discovered her wallet was missing.

Other people in the building also saw McDonald.  An administrative assistant for Remedy Staffing, Annayette Esquer, worked on the first floor of the building.  Remedy Staffing had a door from its lobby to the restrooms.  These restrooms also had an entrance from the building's lobby.  Around lunchtime, McDonald came out of the restroom door into Remedy Staffing and asked Esquer if any jobs were available.  When she said no, McDonald started to go out Remedy Staffing's main entrance but then asked if he could use the bathroom .  She said yes.  He was in the bathroom for a short period of time and then left by the business's main entrance.

Elena Martinez was working as a receptionist at Capital Funding on the second floor of the building.  Between noon and 1:00 p.m., she saw McDonald on the stairs and then walking down a hallway that was not generally open to the public; the hallway had a "restricted access" sign.  McDonald was out of her view for about 30 seconds.  He later came up to her desk and asked about the restrooms.  She told him they were downstairs.  She watched as he walked downstairs.  She saw the door to the bathroom shut.

At trial, Porras, Brecht, Esquer and Martinez identified McDonald as the man they had seen on November 3. Porras and Brecht had been earlier shown a photographic lineup.  Porras had identified McDonald and Brecht had selected two photos, one of which was of McDonald.  Brecht and Martinez had attended a live line-up where they both selected two persons, one of whom was McDonald.

On November 6, Porras's Nordstrom credit card, gym membership card and Movie Watcher's card were found under the front passenger seat of McDonald's car.

*Defense*

Washington testified McDonald did not participate in any of the burglaries.  Washington had pleaded guilty to the Havern and Meza burglaries and during trial testified about committing the Borrego burglary.

Washington often borrowed McDonald's car; McDonald was unable to drive because he had broken his glasses.  Washington committed the crimes with a "homie" named "C.K." who he would meet at a trolley station.  Washington did not know where C.K. lived and did not have his phone or pager number.  When he was arrested, he told the police detective that McDonald was not involved.  He denied there was any conversation between himself and McDonald where McDonald suggested Washington should take the blame for the crimes because Washington was likely to get probation while McDonald was likely to go to prison.

Burton testified McDonald was not living with her, but at One Day At A Time.  McDonald let her use his car when her car was not working.  She would often pick him up at One Day At A Time and he would always return to the facility in the evening to sleep because it had a curfew.

Burton specifically remembered what occurred on October 23, 2003, the day of

5

the Meza/Morgan crimes, because it was her son's birthday.  She picked up McDonald at One Day At A Time, brought him with her to her 11:00 a.m. kick boxing class at San Diego City College, ate lunch with him in Chula Vista, dropped him off at One Day At A Time and then, driving McDonald's car, returned to the Troy Street apartment.

She also specifically recalled November 3, the day of the E & L Therapy petty theft.  She went with McDonald to One Day At A Time to pick up his food voucher between noon and 1:00 p.m.  He was with her when she went grocery shopping, she dropped McDonald and Washington at her apartment, and then left her apartment about 2:00 p.m..  The records for One Day At A Time, however, indicated that McDonald did not receive a food voucher on November 3; the last voucher he received was on October 20.

In 2003, Burton and McDonald had been just friends.  However, they had since fallen in love.  She visited him twice a week in jail.  She had deposited money in his jail account.

McDonald denied being involved in any of the burglaries.  He testified he was not living in Burton's apartment.  He let Burton and Washington regularly borrow his car.  He never saw the guns in the apartment.  He first learned of the video camera in the trunk of his car when he read the police report.  He did not know Porras's cards were under the front passenger seat and had not seen them prior to trial.  He never tried to sell jewelry to anybody in the market across from the Troy Street apartment.  He had no conversation with Washington while in the holding cell because the deputies would not let them talk.

*Rebuttal*

When Washington was arrested, he initially denied any involvement in the burglaries.  He later admitted he committed the Borrego and Meza burglaries with McDonald and gave details about the burglaries, including that McDonald climbed up to the rear balcony of the Meza residence.  He said the burglaries were McDonald's idea and he went along only because he was McDonald's friend and was going to "watch his back."  Washington claimed the camcorder was from his aunt's house.

McDonald, when he was interviewed by the police, denied any involvement in the crimes, but after being asked if his fingerprints would be on the guns taken in the Meza burglary, admitted he had handled them at one point.

McDonald and Washington were placed in the holding cells.  Each was alone in a cell.  McDonald yelled to Washington that they were in a lot of trouble and that Washington would probably get probation but McDonald was looking at prison time because he was on parole.  About 15 minutes later, McDonald told a detective that Washington wanted to talk to the detective and would tell him McDonald had nothing to do with the burglaries.

The detective then went to Washington's holding cell and asked if Washington wanted to talk about something.  Washington said yes.  He said McDonald was not involved with the burglaries; he did them with someone else whom he knew but could not describe.  The detective looked at Washington and essentially told him that he knew what was going on, could appreciate that he wanted to take care of McDonald, but that both he and Washington knew that McDonald was the other person who did the

///

6

1    burglaries.  Washington bowed his head, nodded, and said, "Yeah," acknowledging that
2    what the detective said was correct.

3    (Lodgment 3, at 1-12.)

4    **III.     PROCEDURAL BACKGROUND**

5          On September 27, 2004, the San Diego County District Attorney filed an amended information

6    charging McDonald with three counts of residential burglary, one count of attempted residential

7    burglary, one count of petty theft with a prior conviction, one count of receiving stolen property, and

8    one count of being a felon in possession of a firearm.  (Lodgment No. 15 , vol. 2 at 299-301.)  The

9    amended information also included several enhancements and allegations, and alleged that McDonald

10   had suffered a prior conviction for which he served a prison sentence, a prior serious felony conviction

11   and prior strike conviction.  (*Id.* at 301-03.)  Following a jury trial, McDonald was convicted of all

12   counts.  (*Id.* at 388-97.)  The jury also found true all enhancements and allegations, including that he

13   suffered the prior convictions.  (*Id.*)  On July 7, 2005, the trial court sentenced McDonald to prison for

14   twenty-two years and four months.  (*Id.* at 0416-18.)

15         McDonald then filed a habeas corpus petition in the California Supreme Court on May 1, 2006.

16   The Court denied the petition without citation of authority on November 29, 2006.  (*See* Lodgment No.

17   5,  http://appellatecases.courtinog.ca.gov.[2])

18         McDonald filed a direct appeal with the California Court of Appeal, arguing that reversal was

19   required because: (1) the photographic lineup used to identify him was impermissibly suggestive; (2)

20   the court erred in admitting impeachment evidence in the form of love letters and violated his

21   constitutional right to due process and a fair trial; (3) he received ineffective assistance of counsel in

22   failing to object to the impeachment evidence; (4) a sentencing enhancement pursuant to California

23   Penal Code section 667.5(b) should have been stricken; and (5) the abstract of judgment needed to be

24   corrected. (Lodgment Nos. 10, 11.)  On January 10, 2007, the state appellate court affirmed McDonald's

25   convictions, but agreed that the section 667.5(b) enhancement should have been stricken and the abstract

26   of judgment should be corrected.  (Lodgment 3.)  McDonald's sentence was not altered.  McDonald

27   _____

28         [2]  Respondent cites to Lodgment No. 5 as the California Supreme Court's denial of McDonald's May
     2006 habeas corpus petition.  (Mem. of P. & A. Supp. Answer at 2.)  Lodgment No. 5a, however, is the Petition
     for Review McDonald filed in the California Supreme Court on February 26, 2007.  (*See* Lodgment No. 5a.)
     Accordingly, the Court has cited to the California Appellate Courts Case Information Website as its reference.

08cv0652

1    filed a Petition for Review in the California Supreme Court, which summarily denied it on March 28,

2    2007. (Lodgment No. 5a, http://appellatecases.courtinfo.ca.gov[3].)

3         On April 1, 2008, McDonald filed a habeas corpus petition pursuant to 28 U.S.C. § 2254 in the

4    United States District Court for the Central District of California. (Doc. No. 1.)  On that same day, he

5    filed a habeas corpus petition in the California Supreme Court.  (*See* Lodgment No. 6.)  On April 9,

6    2008, McDonald's federal habeas case was transferred to this Court. (Doc. No. 1 at 2-3.)  On May 19,

7    2008, McDonald filed a Motion to Stay and Abey in this Court. (Doc. No. 6.)  McDonald's state habeas

8    corpus petition was denied without citation of authority on October 16, 2008.  (Lodgment No. 8.)  This

9    Court granted Petitioner's Motion to Stay on December 1, 2008.  (Doc. No. 13.)

10        On January 12, 2009, Petitioner filed a Second Amended Petition and Points and Authorities in

11   Support of his Petition. (Doc. Nos. 15, 16, 16-1, 16-2, 16-3, 16-4.)  Respondent filed a motion to dismiss

12   the Petition, which was denied.  (*See* Doc. Nos. 24, 28.)  On May 6, 2010, Respondent filed an Answer

13   and Points and Authorities in Support of the Answer.  (Doc. 37, 37-1.)  Petitioner replied with his

14   Traverse on June 4, 2010.  (Doc. 40.)

15   **IV.    DISCUSSION**

16        A.    *Standard of Review*

17        This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act

18   of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will

19   not be granted with respect to any claim adjudicated on the merits by the state court unless that

20   adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of

21   clearly established federal law; or (2) resulted in a decision that was based on an unreasonable

22   determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C.

23   § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal

24   court is not called upon to decide whether it agrees with the state court's determination; rather, the court

25   applies an extraordinarily deferential review, inquiring only whether the state court's decision was

26   objectively unreasonable.  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d

27

28        [3] Respondent cites to Lodgment No. 6 as the California Supreme Court's denial of McDonald's Petition
     for Review.  (Mem. of P. & A. Supp. Answer at 2.)  Lodgment No. 6, however, is the Petition for Writ of Habeas
     Corpus McDonald filed on April 1, 2008.  (*See* Lodgment No. 6.)  Accordingly, the Court cites to the California
     Appellate Courts Case Information Website as its reference.

872, 877 (9th Cir. 2004). Additionally, the state court's factual determinations are presumed correct, and McDonald carries the burden of rebutting this presumption with "clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West 2006).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

McDonald alleges twelve claims in his petition. First, he claims the trial court erred in permitting the prosecution to impeach a defense witness with love letters, in violation of his Fourteenth Amendment due process rights. Second, he argues there was insufficient evidence to convict him of the burglary of

9

08cv0652

the Havern residence (count one), and that the state trial court erred in denying his motion for acquittal. Third, he contends there was insufficient evidence to convict him of the burglary of the Meza residence (count two). Fourth, he argues the consecutive sentence imposed for his ex-felon in possession of a firearm conviction violated the Double Jeopardy Clause of the United States Constitution. Fifth, he claims the admission of inflammatory gang evidence violated his federal due process rights. Sixth, he alleges his right to due process was violated by the introduction of a videotape found during the execution of the search warrant which was played for the jury. Seventh, he claims the admission of evidence of his incarceration violated his due process rights. Eighth, he contends the prosecutor committed misconduct at various points in the trial. Ninth, he argues his counsel was ineffective because she failed to make proper objections and allowed prejudicial testimony to be admitted. Tenth, he alleges the cumulative effect of errors made by the prosecutor and his counsel violated his right to a fair trial. Eleventh, he claims the jury was improperly instructed. Finally, he contends the trial court made several errors related to the removal of counsel, appointment of substitute counsel, and failure to hold a *Marsden*[4] hearing. (Pet. at 6-11; Mem. of P. & A. Supp. Pet. (Doc. No. 16-1 - 16-4).) McDonald also makes a formal request for an evidentiary hearing. (Traverse at 11.)

    1. *Request for an Evidentiary Hearing*

        Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>     (A) the claim relies on –
>
>         (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>         (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

---

    [4] Under *People v. Marsden*, 2 Cal. 3d 118 (1970), criminal defendants in California may ask the court to discharge their appointed attorney and appoint a new attorney when their right to effective representation is jeopardized.

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e) (2)(West 2006).

The Ninth Circuit has outlined the procedure for deciding whether to grant a request for an evidentiary hearing. First, the court must "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70. A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. If the petitioner has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)." *Insyxiengmay*, 403 F.3d at 669-70.

If, however, the petitioner "has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend [v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]." *Id.* at 670. In *Townsend*, the Court identified six situations in which a habeas petitioner would be entitled to an evidentiary hearing:

(1) [T]he merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

Thus, if a petitioner has not failed to develop the factual basis for his claim, he is entitled to an evidentiary hearing in federal court if he meets one of the *Townsend* factors and makes allegations which, if true, would entitle him to relief. *See Insyxiengmay*, 403 F.3d at 670; *see also Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).

11

In the present case, a sufficient factual basis exists in the record.  The trial transcripts and other records provide enough information for the Court to resolve the merits of McDonald's claims.  *See Insyxiengmay*, 403 F.3d at 669-70.  Even if this were not so, Petitioner would not be entitled to an evidentiary hearing because he failed to develop his claims in state court.  There is no indication in the record that he requested an evidentiary hearing on his claims in the habeas corpus petitions he filed in the California Supreme Court.  (*See* Lodgment No. 6.)  Accordingly, McDonald's request for an evidentiary hearing is **DENIED**.

2.    *Admission of Love Letters*

In his first claim, McDonald argues that the prosecutor's use of love letters to impeach a defense witness violated his Fourteenth Amendment right to due process and rendered his trial fundamentally unfair. (Second Amended Pet. [Doc. 15] at 6.)  In his Traverse, McDonald states that "Ground I is no longer being claimed.  Petitioner therefore removes said claim (love letters)." (Traverse at 9.)  It appears McDonald has formally abandoned this claim.  In any event, as discussed below, the claim is without merit.  Accordingly, the Court recommends that this claim be **DENIED**.

This claim surrounds the testimony of defense witness Regina Burton and the letters she wrote to McDonald while he was incarcerated.  The state court's factual summary, to which this Court must defer under 28 U.S.C. § 2254 (e)(1) and which is supported by the record, reads as follows:

> During direct examination, Burton testified she spent much time with McDonald from August 2003 until he was arrested on November 5, 2003.  Beginning on October 29, they were together almost every day, but he did not sleep at her apartment.  During cross-examination, she admitted she visited McDonald twice a week in the jail, had put money into McDonald's jail account, had hired a lawyer for him at one point, and was in love with him.  She testified she had told McDonald their relationship would not continue if he were released and she testified she would not lie for McDonald.  When the prosecutor asked if she currently thought of her relationship with McDonald as being "sexual in nature at all," Burton answered, "How can it be sexual when he is incarcerated?"  The prosecutor then asked if Burton had written to McDonald about sexual fantasies she had about him.  Defense counsel objected because she had received copies of the letters just prior to Burton's direct examination, and expressed concern some of the letters might involve the attorney/client privilege or defense strategies when Burton may have been "working for" McDonald when he was self-represented.  The prosecutor responded that the letters had been obtained by the previous prosecutor, involved correspondence after defense counsel "came on the case," and argued Burton's expressed sexual fantasies were relevant to showing "bias, interest or other motive."  The court noted McDonald had received the letters, found no attorney/client issues were present or defense strategy issues were involved, and they were relevant to showing Burton's possible bias.  The court stated it would not excuse Burton after cross-

/ / /

12

1  examination and defense counsel could have that evening to examine the letters and to
   try to rehabilitate her the following day.

2

3      The prosecutor then proceeded to cross-examine Burton on some details of her
   sexual thoughts and fantasies contained in the letters, and how she had written that she
   would love him forever.  He also asked her if they had ever engaged in oral sex or sexual

4  intercourse, which she denied.  Defense counsel did not object to any specific question
   nor did she raise any further general objections to the evidence.

5

6  (Lodgment No. 3 at 15-16.)

7      To the extent McDonald is claiming a violation of state evidentiary or discovery law, he is not

8  entitled to relief.  Federal habeas relief is not available for alleged violations of state law.  *Estelle v.*

9  *McGuire*, 502 U.S. 62, 67-68 (1991); *see also* 28 U.S.C. § 2254(a).

10     The federal basis for McDonald's claim is not entirely clear.  In his direct appeal, he alleged the

11 admission of the letters violated his right to a fair trial.  (*See* Lodgment No. 11 at 18-21.)  He also argued

12 the prosecution failed to disclose the letters in a timely manner under California law.  (*Id.* at 12-14.)

13 Respondent argues in the Memorandum of Points and Authorities in Support of the Answer that the

14 prosecutor properly disclosed the letters and did not violate the tenets of *Brady v. Maryland*, 373 U.S.

15 83 (1963) (holding that due process requires a prosecutor to disclose all material, exculpatory evidence

16 to the defendant) and *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) (holding that *Brady*

17 includes impeachment evidence).  Accordingly, the Court will analyze both claims.

18     In order to establish a violation of his federal right to a fair trial, McDonald must show "the

19 admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair.

20 *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (citing *Kealohapauole v. Shimoda*, 800 F.2d

21 1463, 1465 (9th Cir. 1986)).  McDonald has not done so.  The prosecutor was entitled to show Burton's

22 testimony was possibly biased in favor of McDonald because she had romantic feelings for him.  *See*

23 Cal. Evid. Code §§ 780(f), 785.  Burton had already testified that she loved McDonald.  Lodgment No.

24 17, vol. 6 at 959-60.)  The letters simply revealed a more explicit aspect of Burton and McDonald's

25 relationship.  Accordingly, the state court's denial of this claim was neither contrary to, nor an

26 unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  He

27 is not entitled to relief as to this claim.

28 / / /

13

Nor has McDonald shown a *Brady* violation.  In order to establish the prosecutor withheld exculpatory evidence, McDonald must show:  (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the withheld evidence was exculpatory or impeachment material; and (3) he was prejudiced by the failure to disclose.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678 and *United States v. Agurs*, 427 U.S. 97, 110 (1976)).  "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial."  *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676, *Agurs*, 427 U.S. at 111-12).  "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases."  *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986)).

McDonald does not meet these three criteria. First, the evidence was not suppressed.  The letters were written by Burton to McDonald and therefore McDonald was in possession of them.  *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (stating that "'where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense'") (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).  Second, the letters were not exculpatory nor did they impeach the testimony of a prosecution witness.  The letters undermined Burton's credibility and Burton was a defense witness.  Finally, McDonald has not established he was prejudiced by the admission of the letters.  Burton's credibility was put at issue because of other testimony that she spent a large amount of time with McDonald between the date he was paroled and the date he was arrested on the instant charges.  Further, she admitted she was in love with McDonald, had visited him twice a week while he was incarcerated, had put money into his jail account and had hired a lawyer for him.  (Lodgment No. 17, vol. 6 at 958-60.)  For all the foregoing reasons, McDonald has not established a *Brady* violation with regard to the letters.

/ / /

/ / /

/ / /

08cv0652

1       3.      *Sufficiency of the Evidence for the Havern Burglary*[5]

2           In his second claim, McDonald argues there was insufficient evidence presented to support his

3   conviction on Count 1, the Havern burglary. (Pet. at 7; Doc. 16-1 at 26-35.)  Central to McDonald's

4   argument is that there was conflicting testimony regarding his involvement in the incident.  In particular,

5   McDonald argues that while Washington alleged McDonald had participated in burglaries with him

6   initially, he changed his story at trial which thus casts reasonable doubt on the guilty verdict.  (Traverse

7   at 20-33.)  In addition, McDonald argues that because there was "no evidence at the theft site . . .

8   suggesting petitioner's presence there," the jury could not infer that he had committed the burglary.  (*Id.*

9   at 16.)  In sum, Petitioner contends that "[g]uilt was found on no other basis than the inference that could

10  be drawn from evidence that a theft was followed by discovery about a month later of a suitcase in the

11  possession of Petitioner who offered an exculpating explanation for his possession that was neither

12  facially implausible nor directly refused by the evidence."  (Traverse at 27.)  Respondent contends the

13  state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

14  established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 13-15.)

15          McDonald raised this claim in the habeas corpus petition he filed in the California Supreme

16  Court on April 1, 2008.  (*See* Lodgment No. 6.)  That court denied the petition without citation of

17  authority.  (*See* Lodgment No. 8.)  Accordingly, this Court must conduct an independent review of the

18  record to determine whether the state court's denial of the claim was contrary to, or an unreasonable

19  application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

20          In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant

21  question is whether, after viewing the evidence in the light most favorable to the prosecution, any

22  rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

23  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

24  (1979)).  In determining whether sufficient evidence has been presented, the Court must accept the

25  elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n.16; *Aponte v. Gomez*, 993

---

27      [5]  As part of this claim, McDonald also appears to argue that the trial court erred in denying the defense's
28  California Penal Code section 1118.1 motion for an acquittal based on insufficient evidence at the end of the
    State's case-in-chief. (Doc. 40, at 13, 17-18.)  As similarly discussed above, to the extent McDonald is claiming
    a violation of state law, he is not entitled to relief.  Federal habeas relief is not available for alleged violations of
    state law.  *Estelle*, 502 U.S. at 67-68; see also 28 U.S.C. § 2254(a).

08cv0652

1   F.2d 705, 707 (9th Cir. 1993) (stating that federal courts are "bound by a state court's construction of

2   its own penal statutes").

3       In California, burglary requires proof of entry into a residence with the intent to commit larceny

4   or any felony. Cal. Penal Code § 459 (West 2010). Jolene Havern testified that when she returned from

5   school on October 9, 2003 the garage door was open. (Lodgment No. 17, vol. 5 at 554.) She entered

6   the house where she found jewelry boxes in her room opened. (*Id.* at 557.) Janet Havern, Jolene's

7   mother, then arrived home. When Jolene asked who had been in her room, Janet ran upstairs and

8   discovered her bedroom had been ransacked. Several items, including some jewelry, a black "London

9   Fog" bag and a J.V.C. video camera, were stolen. (*Id.* at 558-93.)

10      Detective Jerry Hartman was assigned to the case. His investigation led him to stake out Regina

11  Burton's apartment on Troy Street where he believed McDonald was living and to obtain search

12  warrants for the apartment and McDonald's car. (Lodgment No. 17, vol. 4 at 436-452.) During the

13  search of the apartment, police found the Havern's camcorder, two guns and a video camera stolen from

14  the Meza's, and Michelle Meza's palm pilot. (*Id.* at 460-67.) Videos depicting Washington, McDonald

15  and Burton were later discovered on the memory stick from the Havern's camera. (*Id.* at 468-72.) In

16  McDonald's car, police found items stolen from Michelle Porras' purse, an owner's manual for the

17  Havern's stolen video camera, and two earrings, one of which Janet Havern later identified as hers. The

18  Havern's London Fog suitcase was found in the trunk of McDonald's car. (*Id.* at 484.) Washington's

19  fingerprints were found in the Havern residence after the burglary. (Lodgment No. 17, vol. 4 at 498.)

20  A clerk who worked at the convenience store near the Troy Street residence testified that about two

21  weeks after the Havern burglary, McDonald tried to sell her jewelry from a plastic zip lock bag.

22  (Lodgment No. 17, vol. 3 at 363-65.)

23      It is true, as McDonald contends, that there was conflicting evidence about McDonald's

24  participation in the burglaries presented at trial. Washington testified that he committed all of the

25  charged burglaries, including the Havern burglary, with an individual named "C.K" and that McDonald

26  was not involved in the burglary. (Lodgment No. 17, vol. 5 at 724-37.) Detective Hartman testified on

27  rebuttal, however, that after Washington was arrested, Washington told him he and McDonald

28  committed the Borrego and Meza burglaries together; Washington did not mention the Havern burglary.

1   (Lodgment No. 17, vol. 8 at 1605-10.)  Hartman also heard McDonald tell Washington, who was in a

2   holding cell next to McDonald, that they were both in lot of trouble, but that Washington would

3   probably get probation if convicted while McDonald would go to prison.  (*Id.* at 1615.)  Shortly after,

4   McDonald told Hartman that Washington wanted to "clear things up" and that Washington would tell

5   Hartman that McDonald was not involved in the burglaries.  (*Id.* at 1616-17.)  Washington did tell

6   Hartman that he and another person had committed the burglaries and that McDonald was not involved,

7   but Hartman told Washington that he knew Washington was trying to help McDonald by trying to take

8   full responsibility for the burglaries.  When Hartman told Washington that he knew McDonald was the

9   person he had committed the burglaries with, Washington bowed his head, nodded and said "Yeah."

10  (*Id.* at 1617.)

11        The evidence against McDonald was circumstantial and not overwhelming.  As the Supreme

12  Court has noted, however, "the prosecution need not affirmatively 'rule out every hypothesis except that

13  of guilt,'" and the reviewing court "faced with a record of historical facts that support conflicting

14  inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact

15  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Wright v.*

16  *West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).  Here, there was sufficient

17  circumstantial evidence to support a rational jury's conclusion that McDonald entered the Havern

18  residence with Washington and stole the video camera, London Fog bag and Janet Havern's jewelry.

19

20  The evidence presented at McDonald's trial was sufficient under the *Juan H.* standard to support his

21  conviction for the Havern burglary.  The presence of items stolen from the Havern's in McDonald's car,

22  along with items stolen in other burglaries, together with the discovery of Washington's fingerprints at

23  the Havern residence, could lead a rational jury could to conclude that McDonald and Washington were

24  engaged in committing a series of burglaries, including the one at the Havern residence.  Accordingly,

25  the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

26  established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  McDonald is not entitled to relief as to

27  this claim.

28        4.      *Sufficiency of the Evidence for the Borrego Burglary*

            McDonald also claims there was insufficient evidence presented to support his conviction for

1   the burglary of the Borrego residence.  (Pet. at 8; Doc. 16 at 4; Doc. 16-1 at 36-42; Traverse at 28.)

2

3   Specifically, McDonald contends that there was "insufficient evidence to establish [Petitioner] entered,

4   or abetted the burglary of the Borrego residence within the meaning of Penal Code section 459 . . . ."

5   (Doc. 16-1 at 36-37.)  McDonald points to the fact that Washington's statements implicating him in the

6   Borrego burglary were not recorded by police and that he does not fit the description of the burglar

7   given by eyewitnesses. (*Id.* at 39-40; Traverse at 28-29.)  Respondent counters that the state court's

8   denial of this claim was neither contrary to, nor an unreasonable application of, clearly established

9   Supreme Court law.  (Mem. of P. & A. Supp. Answer at 15-17.)

10       McDonald raised this claim in the habeas corpus petition he filed in the California Supreme

11   Court on April 1, 2008.  (*See* Lodgment No. 6.)  The California Supreme Court denied the petition

12   without citation of authority.  (*See* Lodgment No. 8.)  Accordingly, this Court must conduct an

13   independent review of the record to determine whether the state court's denial of the claim was contrary

14   to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

15       As noted above, "'the relevant question is whether, after viewing the evidence in the light most

16   favorable to the prosecution, any rational trier of fact could have found the essential elements of the

17   crime beyond a reasonable doubt.'"  *Juan*, 408 F.3d at 1275 (quoting *Jackson*, 443 U.S. at 319).  The

18   Court must accept the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n.16.

19   Under California law, "any kind of entry, partial or complete, direct or indirect, will satisfy the element

20   of entry.  The entry may be made by any part of the body or by the use of an instrument or tool."  Cal.

21   Penal Code § 459; CALJIC No. 14.50.  Although nothing was taken in the Borrego burglary, all that is

22   required is for the defendant to have entered the residence with the specific intent to permanently

23   deprive the owners of their property.  Cal. Penal Code § 459; CALJIC No. 14.50.

24       Adrian Borrego testified that when he returned to his home on October 15, 2003 his neighbor,

25   Jeffrey Hannigan, told him two people had been on this his property but had left when they noticed

26   people looking at them.  (Lodgment No. 17, vol. 3 at 322.)  Hannigan had taken down the license plate

27   number of the car in which he saw the individuals drive away.  (*Id.*)  Borrego went inside and noticed

28   a window had been knocked down into his daughter's bedroom.  (*Id.* at 325.)  Borrego also noticed pry

marks on the outside of the window.  (*Id*. at 327.)  Nothing was missing inside the house.  Borrego

1  called police and gave them the license plate number his neighbor had given him.  (*Id.* at 329.)

2

3  Detective Hartman, who was investigating the case, found the car identified from the Borrego

4  residence at the Troy Street apartment.  Hartman saw Washington and McDonald get into the car and

5  drive away.  (Lodgment No. 17, vol. 4 at 452-54.)  Hartman obtained and executed a search warrant for

6  the car.  (*Id.* at 454, 480.)  Police found credit cards belonging to Michelle Porras under the front

7  passenger seat where McDonald had been sitting.  (*Id.* at 453, 48.)  In the glove box, police found

8  documents identifying McDonald as the owner of the car, a manual for the video camera stolen from

9  the Havern's, a set of earrings, the London Fog suitcase stolen from the Havern's and vehicle

10  registration documents indicating McDonald was the owner of the car.  (*Id.* at 481-83.)  McDonald

11  admitted he owned the car.  (*Id.* at 483.)  At trial, Washington testified he committed the Borrego

12  burglary, but claimed he did so with"C.K.," not McDonald.  (Lodgment No. 17, vol. 5 at 726-27, vol.

13  6 at 831-43.)  On rebuttal, Hartman testified that Washington had admitted to him after his arrest that

14  he and McDonald had knocked the window out of the Borrego residence but did not enter.  (Lodgment

15  No. 17, vol. 8 at 1605.)

16  As with the Havern burglary, the evidence connecting McDonald to the Borrego burglary is not

17  overwhelming.  Taken together, however, there is sufficient evidence to lead a rational jury to conclude

18  that Washington and McDonald burglarized Borrego's residence together.  *See Juan H.*, 408 F.3d at

19  1275.  Washington's statements to Detective Hartman, the fact that the car seen leaving the Borrego

20  burglary was registered to McDonald, the discovery of items stolen during the Havern and Porras

21  burglaries in McDonald's car and alleged residence, and the discovery of Washington's fingerprints at

22  the Havern residence is sufficient for a rational jury to conclude that McDonald was engaged in a series

23  of entries into people's homes with the intent to steal, and that he harbored this same intent when he

24  pried the screen and window off of Borrego's residence.  For all the foregoing reasons, the state court's

25  denial of this claim is neither contrary to, nor an unreasonable application of, clearly established

26  Supreme Court law.  *Williams*, 529 U.S. at 412-13.  McDonald is not entitled to relief as to this claim.

27  5.  *Consecutive Sentencing and California Penal Code Section 654*

28  In his fourth claim, McDonald argues that the consecutive sentences imposed by the trial court

for the Meza burglary (where the guns were stolen) and for being a felon in possession of a firearm

1   should have been stayed pursuant to California Penal Code section 654.  (Doc. 16-1 at 43-47.)

2

3   Respondent contends the claim does not present a federal question and, in any event, lacks merit.  (Mem.

4   of P. & A. Supp. Answer at 17-18.)

5       California Penal Code section 654 states that where an act "is punishable in different ways by

6   different provisions of law," an individual shall not "be punished under more than one provision."  In

7   particular, McDonald argues that because the firearm was stolen during the Meza burglary for which

8   he was also convicted, the trial court erred in assigning a separate sentence for the firearm possession

9   count.

10      To the extent McDonald is attacking the state court's application of Penal Code section 654, he

11   is not entitled to relief because, as previously stated, federal habeas relief is not available for alleged

12   violations of state law.  *Estelle*, 502 U.S. at 67-68; *see also* 28 U.S.C. § 2254(a).  In his Traverse,

13   however, McDonald argues the consecutive sentences imposed for these crimes violated his rights under

14   the Double Jeopardy Clause of the Federal Constitution.  (Traverse at 24-25.)  It does not appear

15   McDonald raised a double jeopardy claim in the habeas corpus petition he filed in the California

16   Supreme Court.  (*See* Lodgment No. 6.)  Thus, the claim appears to be unexhausted.  *See Granberry v.*

17   *Greer*, 481 U.S. 129, 133-34 (1987); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citing *Picard*

18   *v. Connor*, 404 U.S. 270, 275 (1971)).  Nevertheless, the Court may deny a habeas petition containing

19   an unexhausted claim if it is "perfectly clear that the applicant does not raise even a colorable claim."

20   *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

21      The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject

22   for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  Essentially,

23   the Clause guards against (1) a second prosecution for the same offense after acquittal or conviction;

24   and (2) multiple punishments for the same offense.  *See Witte v. United States*, 515 U.S. 389, 395-96

25   (1995) (citing *United States v. Dixon*, 509 U.S. 688, 704 (1993)).  To determine if two criminal acts

26   constitute the "same offense," federal courts apply the test established by the Supreme Court in

27   *Blockburger v. United States*, 284 U.S. 299, 304 (1932): "where the same act or transaction constitutes

28   a violation of two distinct statutory provisions," the Clause is not violated if "each [offense] requires

proof of a fact which the other does not."  *Blockburger*, 284 U.S. at 304.  If a court determines that the

1  crimes are indeed separate under this analysis, cumulative punishments may be imposed without

2  treading on Constitutional restrictions. *Id*.

3

4  "Because the substantive power to prescribe crimes and determine punishments is vested with

5  the legislature [citation omitted], the question under the Double Jeopardy Clause whether punishments

6  are 'multiple' is essentially one of legislative intent . . . ." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984).

7  In California, burglary is committed when a person "enters any house . . . with intent to commit grand

8  or petit larceny or any felony . . . ." Cal. Penal Code § 459.  Possession of a firearm by a felon is

9  committed when "[a]ny person who has been convicted of a felony under the laws of the United States,

10  the State of California, or any other state, government . . . and who . . .has in his or her possession . . .

11  any firearm is guilty of a felony." Cal. Penal Code § 12021(a)(1).  These two offenses "require[ ] proof

12  of a fact which the other does not." *Blockburger*, 284 U.S. at 304.  To be convicted of burglary, one

13  must enter a residence with the intent to commit a felony.  To be convicted of being a felon in

14  possession of a firearm, no proof of entry or felonious intent is necessary.  One need only have been

15  convicted of a felony and knowingly be in possession of a firearm.  *See* Cal. Penal Code § 12021(a)(1);

16  CALJIC No. 12.43.  Accordingly, separate sentences for a violation of each of these offenses does not

17  offend the Double Jeopardy Clause. *Blockburger*, 284 U.S. at 304.

18  McDonald also claims counsel was ineffective for failing to challenge the consecutive sentences

19  he received for his burglary and felon in possession of a firearm convictions because they violated

20  California Penal Code section 654.  (Doc. No. 16-1 at 47.)  As with his double jeopardy claim, it is not

21  clear this claim is exhausted, but the Court may deny a habeas petition containing an unexhausted claim,

22  if it is "perfectly clear that the applicant does not raise even a colorable claim." *Cassett*, 406 F.3d at

23  624.

24  To establish ineffective assistance of counsel, McDonald must have first established in state

25  court that his trial counsel's performance fell below an objective standard of reasonableness. *Strickland*

26  *v. Washington*, 466 U.S. 668, 687 (1984).  "This requires a showing that counsel made errors so serious

27  that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

28  *Id.*  Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689.  Second, he

must have shown counsel's deficient performance prejudiced the defense, such that the result of the

1 proceeding would have been different absent counsel's errors.. *Id.* at 687.  On federal habeas review,

2 "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable

3 argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, No. 09-587,

4 slip op. at 16 (U.S., Jan. 19, 2011).

5       California courts have stated the following with respect to the applicability of Penal Code section

6 654:

7        "The proscription against double punishment in section 654 is applicable where there is
a course of conduct which . . . comprises an indivisible transaction punishable under

8        more than one statute . . . .  The divisibility of a course of conduct depends upon the
intent and objective of the actor, and if all the offenses are incident to one objective, the

9        defendant may be punished for any one of them but not for more than one." [Citation.]
"The defendant's intent and objective are factual questions for the trial court; [to permit

10       multiple punishments,] there must be evidence to support a finding the defendant formed
a separate intent and objective for each offense for which he was sentenced." ( *People*

11       *v. Coleman*, *supra*, 48 Cal.3d at p. 162, 255 Cal.Rptr. 813, 768 P.2d 32; see *People v.
Latimer* (1993) 5 Cal.4th 1203, 1208, 23 Cal.Rptr.2d 144, 858 P.2d 611.)

12

13 *People v. Assad*, 189 Cal. App. 4th 187, 200 (2010) (internal quotation marks omitted).

14       Here, McDonald's actions of burglarizing the Meza residence, stealing the gun and possessing

15 the gun were not an "indivisible course of conduct" with one objective.  McDonald's objective in

16 committing the burglary — to enter the residence and steal property — was separate and distinct from

17 his objective of possessing a gun having been convicted of a felony.  Any objection by counsel to the

18 consecutive sentence pursuant to section 654, therefore, would have been rejected as meritless.  Thus,

19 counsel's performance was not unreasonable and McDonald has not established prejudice.  *See Smith*

20 *v. Robbins*, 528 U.S. 259, 288 (2000) (stating that counsel's decision not to pursue a meritless claim

21 does not constitute ineffective assistance).

22       For all the foregoing reasons, the state court's denial of this claim was, therefore, neither

23 contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529

24 U.S. at 412-13.  McDonald is not entitled to relief as to this claim.

25       6.    *Trial Court's Admission of Gang Evidence*

26       McDonald argues in his fifth claim that his Fifth and Fourteenth Amendment due process and

27 fair trial rights were violated by the admission of testimony regarding gang membership.  (Doc. 16-1,

28 at 48, 62, 65; Doc. 16-2, at 3; Doc. 40, at 34-36.)  This claim was presented to the California Supreme

Court in McDonald's habeas corpus petition, which that Court denied without citation of authority.

1    (Lodgment No. 8.)  Thus, this Court must conduct and independent review of the record to determine

2    whether the state court's denial of the claim was contrary to, or an unreasonable application of, clearly

3    established Supreme Court law.  *Himes*, 336 F.3d at 853.

4

5        During pre-trial discussions, defense counsel asked the court to prevent the prosecutor from

6    making any reference to McDonald's gang ties during trial. (Lodgment 17, vol. 2 at 23-24.)  The

7    prosecutor agreed to avoid the subject as long as the defense did the same. (*Id.* at 23-24.)  During the

8    defense portion of the case, counsel told the court she expected Washington to testify indirectly

9    regarding gang activity. (*Id.* at 700.) Specifically, Washington told defense counsel in a pre-appearance

10   interview that if asked about the identity of the individual with whom he committed the burglaries, he

11   would tell the jury that it was his "homie." (*Id.*)  Defense counsel was concerned that "homie" would

12   mean "basically [a] gang [member]" to the jury, and that Washington would therefore unwittingly open

13   up the gang issue at trial. (*Id.*)   At this, the prosecutor reiterated his interest in limiting his

14   cross-examination as much as possible, but explained that the gang reference "comes along with the

15   baggage this witness carries." (*Id.* at 700-01.)  The court ultimately agreed with the prosecutor,

16   reminding defense counsel that she had "already really introduced the whole idea of gangs into this

17   case" with her opening statement and that even if the gang issue was briefly discussed, it was not a

18   central element. (*Id.* at 701-02.)  The court concluded that if Washington testified that his accomplice

19   was his "homie," the prosecutor could inquire as to whether McDonald was his "homie." (*Id.* at 702.)

20       Washington testified for the defense and stated that he and a friend named "C.K" committed the

21   charged burglaries and that McDonald was not involved. (Lodgment No. 17, vol. 5 at 727-29.)  He

22   referred to C.K as his "home boy." (*Id.* at 725.)  During cross examination, the prosecutor asked

23   Washington to define "homeboy"; Washington explained that the term meant "a friend." (*Id.* at 786-87.)

24   Outside the presence of the jury, the prosecutor then asked the court for permission to expand his

25   questioning by asking: (1) whether "homie" meant gang member; (2) whether Washington and

26   McDonald belonged to a gang; and (3) the name of the gang. (*Id.*)  Defense counsel objected to the

27   relevancy of this questioning, reasoning that it improperly implied that the crimes were gang-related.

28   (*Id.* at 796-99.)  Ultimately, the court determined that the prosecutor could proceed with the gang

1    questioning because it was relevant to any possible bias Washington might have.  (*Id.* at 798.)  The court

2    was careful to warn the prosecutor, however, about "getting on delicate ground" in going too far with

3    the gang questioning as it was "not a gang case."  (*Id.*)  The prosecutor agreed and assured the court he

4    / / /

5    intended to "inquire primarily about Mr. Washington's involvement in a gang and who his homies

6    [were]."  (*Id.* at 799.)

7         In response to further questioning, Washington testified that "homie" was simply a figure of

8    speech to describe a friend. (Lodgment No. 17, vol. 6 at 801.)  Washington also stated that although he

9    was not a member of a local Bloods gang, he had friends who were members, including "C.K."  (*Id.* at

10   801-04.)  Washington also admitted that Blood gangs and Crips gangs do not like each other, and that

11   "C.K." is a nickname for "Crips killer."  (*Id.* at 801-03.)  Detective Hartman testified on rebuttal and

12   was asked questions about gangs as well.  He testified that while Washington initially denied gang

13   membership, he eventually admitted to being a member of a local Bloods set.  (Lodgment No. 17, vol.

14   8 at 1610.)  In addition, Hartman stated that "homie" or "home boy" generally refers to a fellow gang

15   member.  (*Id.* at 1611.)

16        Much of McDonald's argument on this claim relies on California Evidence Code sections 351,

17   352, 353, and 354.  (*See* Doc. 16-1, at 48, 62-66, 68; 16-2, at 1; Traverse at 36-37.)  To the extent this

18   claim alleges a violation of state law, McDonald is not entitled to relief.  *See Estelle*, 502 U.S. at 67-68.

19        McDonald also argues, however, that his federal due process right to a fair trial was violated by

20   the admission of gang evidence because it encouraged the jury to infer that he was a gang member by

21   association with Washington.  (*See* Doc. 16-1 at 62; 16-2, at 1-3; Traverse at 37-38.)  A state court's

22   evidentiary ruling can violate due process if it deprives a defendant of a fundamentally fair trial.  *See*

23   *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  The bar is set high however.  Due process is violated only if

24   the court's evidentiary error "so fatally infected the proceedings as to render them fundamentally

25   unfair."  *Jammal*, 926 F.2d at 919.  Whether a defendant suffered any prejudice from the error is

26   evaluated under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993): whether the

27   wrongfully admitted evidence had a "substantial and injurious effect or influence in determining the

28   jury's verdict."  *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Applying these factors to the instant case, this Court finds that McDonald was not deprived of a fair trial. Washington had previously told police that he and McDonald had committed the charged crimes and was now claiming that an individual named C.K. had committed the crimes with him. Washington himself was the first person to use the word "homie." (Lodgment No. 17, vol. 5 at 786.) The prosecution sought to prove that C.K. did not exist and that Washington was lying about McDonald's lack of involvement in the crimes. To that end, the prosecutor was properly permitted to ask Washington about what "homie" meant, what "C.K." stood for and what, if any connections he had with gangs. Detective Hartman was also properly questioned about these matters, particularly the fact that Washington admitted to Hartman he was a gang member, a fact he denied at trial. This served to impeach Washington's credibility. *See* Cal. Evid. Code §§ 780, 785. No evidence was presented that McDonald was a gang member.

In any event, any error in the admission of evidence related to gang membership did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 623. Detective Hartman testified Washington admitted he and McDonald committed the Meza and Borrego burglaries. (Lodgment No. 17, vol. 8 at 1605-10.) Although Washington recanted this claim at trial, he was thoroughly impeached. (Lodgment No. 17, vol 5 at 801-873, 885-87, 892-93.) Items stolen during the burglaries were found in McDonald's car and the residence where he was staying. (Lodgment No. 17, vol. 4 at 460-87.) Several victims identified McDonald as the individual they saw just before a number of the burglaries were committed. (Lodgment No. 17, vol. 3 at 154, 214, 249-50, 283, 311, vol. 4 at 421, ). The gang questioning occupied a very small portion of the overall trial testimony, and the evidence supporting the convictions was more than sufficient. Thus. the state court's denial of this claim was neither contrary to nor an unreasonable application of Supreme Court law. *Williams*, 529 U.S. at 412-13. McDonald is not entitled to relief.

7.    *Admission of the Videotape*

McDonald next argues the videotape found in the Havern's stolen video camera was admitted in violation of California Evidence Code section 356 and that the admission violated his federal due

08cv0652

process rights.[6]  (Doc. No. 16-2 at 4-37, 41-44.)  Respondent counters that the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 21-27.)

McDonald raised the claim relating to the admission of the videotape in the habeas corpus petition he filed in the California Supreme Court, which denied the petition without citation of authority.  (*See* Lodgment Nos. 6, 8.)  Accordingly, this Court must conduct an independent review of the record to determine whether the state court's denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.  As to the prosecutorial misconduct and ineffective assistance of counsel claims, it is not entirely clear whether they are exhausted.  Respondent does not dispute they are.  In any event, the Court may deny a habeas petition containing an unexhausted claim if it is "perfectly clear that the applicant does not raise even a colorable claim."  *Cassett*, 406 F.3d at 624.

This claim concerns the videotape of Washington, McDonald, Burton, and several other individuals that was found on the memory stick of the Havern's stolen video camera.  At a pretrial hearing on the admissibility of the videotape, the prosecutor said he wanted to admit a seven minute portion of the video tape which depicted Washington smoking (presumably) marijuana and Washington and McDonald drinking alcohol and "rapping" in the Troy Street apartment.  The prosecutor stated the video tape would help establish that McDonald committed the burglaries because he referred to the two stolen guns during his rap.  According to the prosecutor, it also helped establish that Washington and McDonald "hung out" together and thus likely committed the burglaries together.  (Lodgment No. 17, vol. 2 at 3-5.)  Defense counsel objected, arguing the tape was more prejudicial than probative, lacked context, and the audio was not sufficiently clear to establish what was said.  (*Id.* at 5-7.)  The trial judge ruled that only the portion of the tape depicting the rap song would be admitted because it helped establish that Washington and McDonald stole the guns from the Meza residence.  (*Id.* at 15-16.)  The judge also ruled, however, that if some dispute arose regarding the relationship between Washington

---

[6]  McDonald also argues the prosecutor committed misconduct when he "exploited" the videotape during his closing argument by arguing  that the jacket Porras testified she saw the suspect in the Chula Vista burglary wearing was the same jacket McDonald is seen wearing in the video taken from the Havern's stolen video camera's memory stick .  (Doc. 16-2 at 35-37.)  That claim will be addressed in the "Prosecutorial Misconduct" portion of this R&R, section IV(B)(9)(d).

1   and McDonald, more of the tape would become relevant and would be admitted.  (*Id.*)

2       At trial, Detective Hartman testified the videotape depicted Washington, McDonald, Burton and

3   other individuals smoking marijuana, drinking alcohol, "partying," and rapping in the Troy Street

4   apartment.  Hartman also testified that McDonald's lyrics referred to a "Glock 40" and a "Tre-80."

5   "Tre-80" a slang term for a .380-caliber handgun.  These were the types of guns stolen from the Meza

6   residence.  (Lodgment No. 17, vol. 2 at 2-4; vol. 5 at 550-51.)  Washington testified the videotape

7   depicted him and McDonald drinking; Washington was also smoking.  (Lodgment No. 17, vol. 5 at 779-

8   84.)  Washington also testified that McDonald was a really good friend of his.  (Lodgment No. 17, vol.

9   6 at 827.)

10      McDonald testified that he rapped on the tape about things that were going on around him.

11  (Lodgment No. 17, vol. 7 at 1542-44.)  He admitted to referring to the Glock 40 and the Tre-80, that the

12  references were to guns, but claimed he was not referring to the stolen guns because he did not know

13  about the burglaries.  (*Id.* at 1544-45.)  McDonald claimed he had known Washington for about a year

14  and half, but that he rarely spent time with him.  (*Id.* at 1524-26.)  McDonald also testified he asked

15  Washington not to smoke marijuana in front of him, but that Washington occasionally did.  (*Id.* at 1555.)

16  McDonald admitted Washington rolled a marijuana joint in front of him on the video, that he did not

17  ask Washington to stop rolling the joint, and that he drank alcohol on the video, a violation of his parole.

18  (*Id.* at 1558-59.)

19      Following McDonald's testimony, the prosecutor asked to admit the rest of the seven minute

20  portion of the tape to show Washington rolling the marijuana joint in front of McDonald and McDonald

21  drinking alcohol.  (*Id.* at 1569.)  The prosecutor argued McDonald testified in contradiction to what was

22  depicted on the tape, making the seven minute portion of the tape relevant and admissible as

23  impeachment.  (*Id.*)  Defense counsel objected, arguing there was no contradiction, and that the tape was

24  more prejudicial than probative.  (*Id.* at 1569-72.)  The trial court eventually ruled the seven minute

25  portion of the tape could be admitted; it was relevant and no longer prejudicial because McDonald,

26  Washington and Burton had all testified to essentially what was visible on the tape.  (*Id.* at 1571-72.)

27  The remaining portion of the seven minute excerpt of the tape was played and the jury was told they

28  were viewing only the portion deemed relevant to the proceedings.  (*Id.* at 1573.)

08cv0652

As with several of the preceding claims, to the extent McDonald bases his claim on the state's court application of state evidentiary rules, he is not entitled to relief under 28 U.S.C. § 2254. *Estelle*, 502 U.S. at 67-68; 28 U.S.C. § 2254(a). Moreover, the state court's admission of the seven minute portion of the videotape did not violate McDonald's federal due process rights by "so fatally infec[ting] the proceedings as to render them fundamentally unfair." *Jammal*, 926 F.2d at 919. The tape was relevant because it impeached McDonald's claim that that he had nothing to do with the burglaries and that he rarely spent time with Washington. *See* Cal. Evid. Code §§ 780, 785. McDonald's rapping about the "Glock 40" and the "Tre-80" and the relationship between he and Washington depicted on the tape belied these claims. In addition, the tape was not prejudicial because the matters depicted on the tape had already been discussed at some length in testimony from McDonald himself. (Lodgment No. 17, vol. 7 at 1536-37, 1542-45, 1552-59.) Given the evidence linking McDonald to the burglaries already discussed, the admission of the tape did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.

McDonald also argues the prosecutor improperly exploited the erroneously admitted videotape during closing arguments. (Doc. No. 16-2 at 35-37.) In the context of statements made during closing argument, attorneys are given wide latitude to argue reasonable inferences which can be drawn from the evidence presented at the trial. *See Darden v. Wainwright*, 477 U.S. 168, 181-22 (1986); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993) and stating that "counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom"). Here, the prosecutor's statements fell well within these parameters. Both the video and McDonald's own testimony established McDonald knew and spent time with Washington, that they drank alcohol together and that Washington, at least, smoked marijuana. (Lodgment No. 17, vol. 7 at 1525-26, 1557-60, 1574-75.) Items stolen from the Havern residence were found in McDonald's car and the residence where he was alleged to be living. (Lodgment No. 17, vol 4 at 460-86.) Washington told police he and McDonald committed burglaries together. (*Id.* at 498; Lodgment No. 17, vol. 8 at 1605-10.) The video found on the memory stick of the video camera stolen from the Havern's depicted Washington and McDonald "rapping," drinking and spending time together.

(Lodgment No. 17, vol. 4 at 478-79, vol. 7 at 1574-75.)  It is reasonable to infer from this evidence that McDonald and Washington "hung out" and committed residential burglaries together.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.   McDonald is not entitled to relief as to this claim.

/ / /

### 8.     *Admission of Evidence of McDonald's Incarceration*

McDonald next contends the prosecutor committed misconduct when he revealed to the jury via questioning of various witnesses that he was incarcerated during the trial.  (Doc. No. 16-2 at 80-85.) Specifically, McDonald complains that the prosecutor asked Burton how many times she had visited McDonald in jail since he was arrested.  (*Id.* at 80.)  Defense counsel objected and asked for sidebar, which was refused.  The prosecutor then asked more questions regarding McDonald's incarceration. (*Id.* at 80-81.)  McDonald also argues the prosecutor's actions violated the presumption of innocence to which he is entitled.  (*Id.* at 82.)  In the alternative, McDonald argues trial counsel was ineffective for failing to object to the questioning.  (*Id.* at 82-83.)

The Supreme Court has discussed the right to a fair trial in the context of courtroom procedures that highlight a defendant's incarceration or dangerousness as follows:

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on
> grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).  This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down.  Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. . . .

*Holbrook v. Flynn*, 475 U.S. 560, 567-68 (1986).

In determining whether a defendant has been denied the right to a fair trial, this Court must "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial. . . ." *Id.* at 572.  In McDonald's case, a large part of his defense was the claim that he did not live at the Troy Street apartment where many

of the items stolen in the burglaries were found.  In order to establish this, the defense cross examined McDonald's California Youth Authority (CYA) parole officer, James Burgert, about observations he made of McDonald's living quarters at the sober living facility where he was supposedly living. (Lodgment No. 17, vol. 2 at 103-41.)  Thus, the jury was mostly likely aware that McDonald had been re-incarcerated as a result of the charges he was facing in this case even before Burton testified and as a direct result of the defense strategy.  In any event, considering the trial as a whole, the revelation that McDonald was in custody was a very small portion of the evidence presented at trial, particularly in light of the evidence supporting McDonald's guilt.  Accordingly, informing the jurors that McDonald was in custody was not "so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial." *Id.*  The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and McDonald is therefore not entitled to relief as to this claim. *Williams*, 529 U.S. at 412-13.

### 9.    *Prosecutorial Misconduct*

Next, McDonald alleges the prosecutor committed several acts of misconduct.[7]  (Doc. No. 16-2 at 51-76.)  Respondent counters that the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 29-38.)

McDonald raised these claims in the habeas corpus petition he filed in the California Supreme Court.  (Lodgment No. 6.)  That court denied the petition without citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must conduct and independent review of the record to determine whether the state court's denial was either contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "It is not enough that the prosecutor's remarks were undesirable or even universally condemned."

---

[7] McDonald also repeats his claim that the prosecutor improperly commented on the matters depicted in the videotape.  For the reasons discussed in Section IV(B)(7) of this Report and Recommendation, the Court concludes the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

08cv0652

1   *Darden*, 477 U.S. at 181.  Rather, a prosecutor commits misconduct when his or her comments "'so

2   infect[s]. . . the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.*

3   (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).)  "Moreover, the appropriate standard of

4   review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad

5   exercise of supervisory power.'"  *Id.* (citing *Donnelly*, 416 U.S. at 642.)

6                    a.    *Other Crimes Evidence*[8]

7           McDonald first argues the prosecutor committed misconduct when he elicited testimony from

8   Washington about Washington and McDonald drinking alcohol and Washington smoking marijuana in

9   front of McDonald.  (Doc. No. 16-2 at 51-55.)  It was not the prosecution, however, who put this

10  information before the jury.  The information McDonald complains about was already before the jury

11  as a result of defense questioning, and was clearly part of defense counsel's strategy to have McDonald

12  admit to what was obviously depicted on the videotape, that he drank alcohol with Washington and that

13  Washington smoked marijuana in front of him.  (Lodgment No. 17, vol. 7 at 1520, 1534-36.)  He also

14  testified that drinking alcohol was a violation of his parole and that he was not "supposed to be, you

15  know, smoking like this or anything like that."  (*Id.* at 1520, 1536.)  On cross examination, the

16  prosecutor followed up on McDonald's direct testimony by asking whether Washington smoked

17  marijuana in front of McDonald frequently and whether Washington had rolled a joint in front of

18  McDonald on the video, and McDonald admitted he had.  (*Id.* at 1555-58.)  The prosecutor also asked

19  McDonald what kind of alcohol he was drinking on the video.  (*Id.* at 1559.)  These were legitimate

20  follow-up questions.  Thus, the prosecutor's actions did not "so infect. . . the trial with unfairness as to

21  make [McDonald's] conviction a denial of due process."  *Darden*, 477 U.S. at 181.  The state court's

22  denial of this claim was neither contrary to, nor an unreasonable application of, clearly established

23  Supreme Court law, and McDonald is therefore not entitled to relief as to this claim.  *Williams*, 529 U.S.

24  at 412-13.

25                    b.    *Vouching for Witnesses and Expressing a Personal Opinion on Defendant's Guilt*

26          McDonald next alleges the prosecutor vouched for the credibility of a prosecution witness and

27

28          [8] McDonald argues the admission of "other crimes" evidence violated the California Evidence Code and state law.  (Doc. No. 16-2 at 52-55.)  As with his other claims based on violations of state law, he is not entitled federal habeas relief on those grounds.  *Estelle*, 502 U.S. at 67-08.

improperly expressed his personal opinion about McDonald's guilt to the jury. (Doc. No. 16-2 at 56-60.) He claims that the following remarks made by the prosecutor during closing argument were improper vouching:

> [THE PROSECUTOR, MR. BOWMAN]: What else might be true? That Detective Hartman lied about the statement that he took from Mr. Washington. Mr. Washington admitted his involvement in those burglaries and said it was Mr. McDonald who was with him, and Mr. Hartman must be lying about that. This detective who obviously values his reputation and has been a detective for many years. Would he come in and lie about something like that?
>
> . . . .
>
> [THE PROSECUTOR]: And I talked about the number of people that would have had to have lied, and the number of people, the three people that you must believe in order if he is truly innocent, then naturally Regina would be telling the truth. Naturally Tony Washington would be telling the truth. And it would follow the defendant, when he got on the stand and swore under oath to tell the truth, that we has telling the truth when he testified.
>
> . . . .
>
> [THE PROSECUTOR]: Who do you believe? Who do you believe? Do you believe all these uninterested parties, such as the Noas who are just minding their own business.
>
> Terina Noa is just talking to her mother and she gets dragged down here to testify. She has no interest in this case.
>
> Michelle Porras, Nicholas Brecht, all of these guys are just going to work earning an honest living. They all get called into court here. They have no bias or motive, no interest in this case whatsoever.

(Lodgment No. 17, vol. 9 at 1762, 1769, 1770.)

In addition, McDonald alleges the prosecutor improperly expressed his personal opinion on his guilt when he made following remarks during closing argument:

> [THE PROSECUTOR]: What conclusion can you draw from that? Well, the C.K. guy doesn't exist. Where is he? Who is he? Do we know where he lives? No. Does he have a cell phone? No. Pager? No.
>
> I asked, does he have a post office box? Do we write this guy? No, not that I know of.
>
> Do you hang out with this guy on the corner of Southeast? Tony Washington, he is posted down there, and I go out and hang out with him. That is absolutely unbelievable.
>
> The truth is he does not exist. He is just trying to cover for the defendant.

. . . .

[THE PROSECUTOR]: And he says he never told the defendant about the guns. Well, that is convenient because it is interesting when Mr. McDonald got on the stand, that is how he explained his rap song, that Mr. Washington told him about the guns and he started to rap about them.

/ / /

/ / /

But once again, they are getting their story crossed up.  One person says one thing.  The defendant says another thing.  They can't get the story straight because it is all a big lie.  It's not the truth.

. . . .

[THE PROSECUTOR]: You can't believe him.  And he convinced Washington to change his story when they were back in the holding cell.  Why would he do that if he is truly innocent?  The truth is he is not truly innocent.

. . . .

[THE PROSECUTOR]: . . .[T]here is a tendency of jurors to go back in a jury room to say, you know what?  I heard Mr. McDonald's testimony and I didn't believe a word he said, so I am just going to disregard it.  That would be a huge mistake.

You know what I am asking you to do is disregard the content of his testimony because it is not true, but don't disregard the fact that he lied to you.  Please consider that in your deliberations.  Consider the fact that he lied to you.  Don't disregard his testimony. He lied to you for a reason.  Because if he told you the truth, he would come in here and have to admit to doing all of these burglaries, doing all of these crimes.

(*Id.* at 1776-78, 1782.)

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses."  *United States v. Molina*, 934 F.3d 1440, 1444 (9th Cir. 1991) (citing *United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985)).  A prosecutor commits misconduct ("vouching") when he or she "plac[es] the prestige of the government behind the witnesses through personal assurances of their veracity or [by] suggesting that information not presented to the jury supports the witnesses' testimony . . . ."  *Id.* at 1445 (citing *United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir. 1988)).

The Court will first address the statements McDonald claims are vouching.  The statement regarding the number of people who would have had to have lied does not amount to improper vouching because is does not express the prosecutor's belief in the veracity of a government witness.  Instead, the prosecutor invited the jury to consider the plausibility of the defense assertions and the motivations and

biases of various witnesses who testified in the case.  The statements regarding the believability of

Detective Hartman and other prosecution witnesses, are, however, a little closer to the line.  In *U.S. v.*

///

///

///

*Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005), the Ninth Circuit found the following statements, made

by a prosecutor about various government witnesses, to be impermissible vouching:

> They had no reason to come in there and not tell you the truth.  And they took the stand and they told you the truth.  I guess, if you believe Mr. Valladeres [defense counsel], they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge, they lied to me; they lied to my agent, Agent Baltazar.  I guess they lied to the dispatcher when they called it in.  These are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood.  And, on top of that if they come in here and lie, I guess they're riskin' bein' prosecuted for perjury.  Doesn't make sense because they came in here and told you the truth, ladies and gentlemen.

*Id.* at 1146.

The statements made by the prosecutor in McDonald's case, however, are distinguishable from

those made in *Weatherspoon*.  The prosecutor in McDonald's case never told the jury that the witnesses

were telling the truth, but rather asked the jurors themselves to consider why any of the prosecution

witnesses would lie and whether it made sense for them to lie.  Unlike the prosecutor in *Weatherspoon*,

the prosecutor in McDonald's case never said the witnesses would lose their jobs and be subject to

perjury prosecutions if they lied.  "[P]rosecutors must have reasonable latitude to fashion closing

arguments, and thus can argue reasonable inferences based on the evidence, including that one of the

two sides is lying."  *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (citing *United*

*States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991)).

With regard to the statements which McDonald alleges amount to the prosecutor expressing his

personal opinion, the Court comes to the same conclusion.  McDonald's defense centered around

Washington's claim that he committed the burglaries with someone named "C.K." and that McDonald

was not involved.  The prosecutor's comments simply highlighted the implausibility of Washington and

McDonald's testimony and argued the evidence that supported the prosecution's version of events —

that McDonald and Washington committed the burglaries together and that Washington made up C.K.'s

1   existence as a way to shield McDonald.  *See Ducket v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995)

2   (stating that a prosecutor's assertions regarding the believability of witnesses were not statements of

3   personal opinion because they were inferences drawn from the evidence); *see also Necoechea*, 986 F.2d

4   at 1279.         In any event, even if the remarks McDonald complains about amounted to vouching or

5   the expression of personal opinion, in the context of the trial as a whole they did not "so infect[] the

6   proceedings with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477

7   U.S. at 181.  As previously discussed, the evidence supporting McDonald's guilt was more than

8   sufficient, and the comments were minimal in the context of the trial as a whole.  Accordingly, the state

9   court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

10  established Supreme Court law, and McDonald is not entitled to relief as to this claim.  *Williams*, 529

11  U.S. at 412-13.

12              c.    *Comments About the Jewelry McDonald Tried to Sell to the Store Clerk*

13         McDonald argues that the prosecutor committed misconduct when he told the jury they could

14  find him guilty of receiving stolen property based on the testimony of the store clerk, Morena Damian,

15  who said McDonald tried to sell her jewelry from a zip lock bag.  (Doc. No. 16-2 at 61-63.)  McDonald

16  claims this violated his right to be advised of the charges against him, and that there was insufficient

17  evidence to support such a conviction because there was no evidence the jewelry in the baggie was

18  stolen.  (*Id.* at 96.)  McDonald also claims the prosecutor argued facts that were not admitted as evidence

19  and engaged in improper vouching with regard to Damian.  (*Id.* at 97-98.)

20         The facts surrounding this allegation are as follows.  During closing argument, the prosecutor

21  argued the jewelry McDonald tried to sell Damian from the zip lock baggie was stolen.  The prosecutor

22  said:

23              [THE PROSECUTOR]: Where do you think Mr. McDonald got that jewelry?
            Whose jewelry was that?  Was it his?  Is he running round with a ziplock baggie full of
24          women's jewelry?  Why, why is he doing that?

25              The truth of the matter is he had the jewelry because he is a burglar.  And he stole
            it from somebody.  He didn't know who.  He didn't care.  But he stole it from them.
26
                What motive does Morena Damian have to come in here and lie about something
27          like that?  Zero.

28  (Lodgment No. 12, vol. 9 at 1762.)

The trial court judge then called the attorneys for a side bar and the following discussion occurred between counsel and the court:

THE COURT: As things crop up during arguments, it suddenly occurred to me I probably needed to give [California Jury Instruction] 17.01 in this case.  Because we are dealing with now the jewelry that was shown to Ms. Damian was — your argument that it was stolen property.  And it's not the property.  It's not even the same date, so far as I know, as the charge receiving, so there could be more than one act that they have to agree unanimously on.

MR. BOWMAN: Oh.

THE COURT: Unless you want to tell them that you are not proceeding on that as a receiving stolen property.

MR. BOWMAN: I don't want to do that.  Yeah, I hadn't thought about that. Yeah, I don't want to limit them to the times in the car and the house because, obviously, that is part of their defense.

I agree it should probably be given.  So, how do you want to handle that?

THE COURT: Well, I will handle it by instructing them.  I am going to have to give you an opportunity to argue that.

MS. LACHER: Yeah.

THE COURT: I mean, if you want.  I don't know how anything changes except now will be the opportunity for you to address that specifically.

MS. LACHER: I guess I hadn't —

MR. BOWMAN: No.

MS. LACHER: I was thinking about that last night, whether or not we should have been giving 17.01.  Until he started to say that, I wasn't sure that was the theory of the prosecution.  He is saying he doesn't want to give it up now, but that really wasn't the theory.  I am not even sure the court should be giving it.

THE COURT: I need to give it because he is entitled to — he is entitled to argue, based upon the evidence, that he was in possession of stolen property, whether it be the jewelry or whether it be the — well, what stolen property.

MR. BOWMAN: Well, in the car, in the house, all that stuff.

THE COURT: So, they have to agree on what stolen property he possessed.

MR. BOWMAN: I agree.

THE COURT: Which means I probably should have given it without even thinking about the jewelry because we are talking about property in Troy Street.

MR. BOWMAN: And in the car.

MS. LACHER: That is true then.

1   THE COURT: Okay.

2   MR. BOWMAN: Well, do you feel you need to argue that point?

3   MS. LACHER: Can I table that, so I can think this through?

4   THE COURT: Yeah.

5   / / /

6
7   MR. BOWMAN: It's not — it's not inconsistent with what you already argued. You already argued he didn't have any knowledge.  He denied even showing her the jewelry.

8   MS. LACHER: Right.  I don't think there is anything I would like to argue, so when he finishes, I would like the opportunity.
9

10   THE COURT: You can think about it.  And when he finishes, I will give you an opportunity to rebut any evidence you want to present.

11   (Lodgment No. 17, vol. 9 at 1762-64.)

12          i.   *Notice of Charges*

13       McDonald first contends the prosecutor committed misconduct when he argued the jewelry

14   Damian testified he tried to sell her could form the basis for his guilt on the possession of stolen property

15   charge.  (Doc. No. 16-2 at 61-63.)  This, he claims, violated his Sixth Amendment right to adequate

16   notice of the charges against him.  Respondent counters that the state court's denial of this claim was

17   not contrary to, nor was an unreasonable application of, clearly established Supreme Court law because

18   McDonald had adequate notice of the charges.  (Mem. of P. & A. Supp. Answer at 33-37.)

19       "The Sixth Amendment guarantees a criminal defendant the fundamental right to be clearly

20   informed of the nature and course of the charges in order to permit adequate preparation of a defense."

21   *Stephens v. Borg*, 59 F.3d 932, 934 (9th Cir. 1995) (citing *Sheppard v. Rees*, 909 F.2d 1234, 1236 (9th

22   Cir.1990)).  While a reviewing court first looks to the information or indictment to determine whether

23   a defendant was given adequate notice of the charges against him, other sources, such as the evidence

24   presented at trial, can also provide sufficient notice.  *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir.

25   1995).  The amended information charged McDonald with possession of stolen property on or about

26   November 6, 2003, the date of his arrest and the search of his car.  (Lodgment No. 15, vol. 2 at 299.)

27   Janet Havern testified that some of her jewelry was taken during the October 9, 2003 burglary, including

28   a pair of cubic zirconium stud earrings.  (Lodgment No 17, vol. 5 at 590-91.)  Damian testified

McDonald  came in to her store around October 23, 2003 and tried to sell her jewelry from a ziplock baggie he pulled out of his pants pocket. (Lodgment No. 17, vol. 3 at 360-64.) The jewelry was "nice," and not "costume jewelry." (*Id.* at 361.) Damian did not purchase any of the jewelry. (*Id.*)  Havern identified as hers one of the earrings found during the November 6, 2003 search of McDonald's car. (Lodgment No. 17, vol. 4 at 483, vol. 9 at 591.)  Taken together, Havern's and Damian's testimony was sufficient to put McDonald on notice that the prosecution could argue the jewelry stolen from the Havern residence was the stolen property McDonald possessed for purposes of count six.

ii.    *Arguing Facts Not in Evidence*

McDonald argues the prosecutor committed misconduct by arguing that the jewelry Damian testified he tried to sell her was stolen because there was no evidence presented that the jewelry in the bag was stolen.  (Doc. 16.2 at 62-63.)  As noted above, Havern testified a pair of cubic zirconium earrings was stolen from her home on October 9, 2003.  A pair of earrings was found in the glove box of McDonald's car during the November 6, 2003 search. (*Id.* at 483.)  Havern identified the earrings as hers. (Lodgment No. 17, vol. 9 at 591.)  Damian testified McDonald  came in to her store around October 23, 2003 and tried to sell her jewelry from a ziplock baggie he pulled out of his pants pocket. (Lodgment No. 17, vol. 3 at 360-64.)  The jewelry was "nice," and not "costume jewelry." (*Id.* at 361.) A reasonable inference could be drawn from this testimony that the jewelry McDonald tried to sell Damian from the ziplock baggie was the jewelry McDonald stole from Havern.   No misconduct occurred. *See Darden*, 477 U.S. at 181-82; *Ceja*, 97 F.3d at 1253-54.

iii.    *Vouching*

McDonald alleges the prosecutor vouched for the credibility of Damian when he said, "What motive does Morena Damian have to come in here and lie about something like that? Zero." (Doc. No. 16-2 at 63; Lodgment No. 17, vol. 9 at 1762.)  As discussed above, a prosecutor commits improper vouching when he "express[es]  his opinion of the defendant's guilt or his belief in the credibility of government witnesses . . . plac[es] the prestige of the government behind the witnesses through personal assurances of their veracity or suggest[s] that information not presented to the jury supports the witnesses' testimony . . . ." *Molina*, 934 F.3d at 1444-45.  Here, the prosecutor did none of these things. He simply argued a rational inference from the evidence, that a disinterested witness would have no

1    motive to lie.  *See Necoechea*, 986 F.2d at 1276 (stating that "prosecutors . . . can argue reasonable

2    inferences based on the evidence, including that one of the two sides is lying").  No vouching occurred.

3           d.      *Comments About the Jacket Seen in the Videotape*

4           McDonald also argues the prosecutor committed misconduct during his closing argument by

5    arguing  that the jacket Porras testified she saw the suspect in the Chula Vista burglary wearing was the

6    same jacket McDonald is seen wearing in the video taken from the Havern's stolen video camera's

7    memory stick .  (Doc. No. 16-2 at 69-71.)  McDonald points to three arguments the prosecutor made:

8           [THE PROSECUTOR]: These two acted together.  These two, as you saw on the
       video, hang out together.  They smoke together.  They drink together. They hang out
9       together.  And they commit residential burglaries together.  That is what they do.

10                                                    . . . .

11
            [THE PROSECUTOR]: . . .He had the video camera that was taken from the
12      Havern residence, which we have seen the videotape that he was taking of himself,
       rapping, Tony Washington smoking and drinking and doing all this kind of stuff.
13
                                                      . . . .
14
            [THE PROSECUTOR]: What else is important? Well, we know in the video that
15      was found at the Havern property that he is wearing a black denim jacket.  I am not
       going
16      to play the whole thing for you, but right here at the beginning, you can see he is wearing
       an oversized loose fitting black denim jacket, just like it was described by the witnesses
17      in the Chula Vista crime.  See that.  Black denim jacket oversized.

18          And then a little bit further down, you will see he takes the jacket off and puts it
       on that black chair next to him.  There is the black denim jacket again.  Right next to Mr.
19      McDonald, the same jacket presumably that he was wearing when he did the burglary.

20   (Lodgment No. 17, vol. 9 at 1703, 1713, 1781.)

21          It was permissible for the prosecutor to argue the evidence supported a conclusion that

22   McDonald was the individual who committed the Chula Vista burglary because the jacket worn by the

23   individual Michelle Porras saw just before she discovered her wallet was stolen was the same jacket

24   worn by McDonald in the videotape from the Havern's camera.  The jury was free to accept or reject

25   the prosecutor's assertion that it was the same jacket based on their own evaluation of the evidence and

26   were so instructed.  (*See* Lodgment No. 15, vol. 2 at 338 (CALJIC No. 1.02 ("Statements made by the

27

28

                                                     39

attorneys during the trial are not evidence").))  No prosecutorial misconduct occurred.[9]

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13. McDonald is not entitled to relief as to this claim.

/ / /

> e. *Questioning of Officer Carroll Regarding His Encounter with McDonald and Washington*

McDonald next argues the prosecutor committed misconduct by questioning Officer Carroll about an encounter he had with McDonald and Washington about three weeks before McDonald's arrest on the charges in this case.  (Doc. No. 16-2 at 72-76.)  Carroll testified that on October 16, 2003, he spoke to McDonald and Washington in a 7/11 parking lot at about 1:00 in the morning.  (Lodgment No. 17, vol. 3 at 377-78.)  Washington was accused of taking a cell phone from a female friend, hiding it, and refusing to tell her where it was; he was eventually arrested for petty theft and being drunk in public. (*Id.* at 382-85.)  McDonald gave his address as 4120 Polk Street, the sober living facility, and told Carroll he was on parole.  (*Id.* at 379, 381.)  McDonald's complaint centers on the following exchange between Carroll and the prosecutor:

> Q.  And did you leave that 7/ll for some period of time during the contact with Mr. McDonald and Mr. Washington?
>
> A.  Yes, I did.
>
> . . . .
>
> Q.  So, I guess it is safe to say you are not completely familiar with all the details on the arrest because you left to assist another peace officer who needed your assistance, correct?
>
> A.  Yes.
>
> Q.  And then by the time you returned, your partner Officer Caropreso?
>
> A.  Yes.
>
> Q.  Was finishing up the arrest report and so forth?

---

[9]  Because no prosecutorial misconduct occurred, McDonald's claim that counsel was ineffective for failing to object to the prosecutor's conduct is also without merit.  *See Strickland*, 466 U.S. at 687-89; Doc. No. 16-2 at 64, 69.

08cv0652

1        A.  We actually, we did the arrest report after we arrested Washington.  So, later on that night, yeah.

2

3        Q.  But for the most part, your partner was involved and knows more of the details on the arrest than you would, of course?

4        A.  Yes.

5

(*Id.* at 386-87.)

6

7        McDonald argues that this questioning was improper because it suggested to the jury that there were details about the arrest that were being withheld and that McDonald was involved in the incident leading to Washington's arrest.  As Respondent points out, however, it was defense counsel who questioned Carroll about the details of Washington's arrest in order to make sure the jury knew McDonald had not been arrested during the incident.  (*Id.* at 382-84.)  In addition, it was clear from the questioning that McDonald was not involved in the incident that led to Washington's arrest.  (*Id.* at 383.)  In any event, the exchange was extremely brief in the context of the trial, and thus did not "so infect[] the proceedings with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and McDonald is not entitled to relief as to this claim.  *Williams*, 529 U.S. at 412-13.

        10.    *Ineffective Assistance of Counsel*

        McDonald argues counsel was ineffective for three reasons.  First, he contends counsel should not have allowed his parole officer to testify that he had been on parole previously, was on parole with two agencies at the time of the crimes, had committed criminal acts, such as drug use, had violated parole on several occasions and had been convicted of misdemeanors and felonies while on parole.  (Doc. No. 16-2 at 77-85, Doc. No. 16-3 at 1-3.)  Second, he claims counsel should have prevented the jury from learning the identity of the parole agent.  (Doc. No. 16-2 at 77-83, 84-85, Doc. No. 16-3 at 1-3.)  Third, McDonald argues counsel should have brought a suppression motion alleging his Fifth Amendment right to remain silent had been violated because he was forced, as a condition of his parole, to reveal his residence.  (Doc. No. 16-2 at 83-84.)  Respondent counters that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 38-44.)

McDonald raised these claims in the habeas corpus petition he filed in the California Supreme Court, which denied the petition without citation of authority. (Lodgment Nos. 6, 8.) This Court must therefore conduct and independent review of the record to determine whether the state court's denial was either contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

As previously discussed, to establish ineffective assistance of counsel, McDonald must have first established in state court that his trial counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. On federal habeas review, "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, No. 09-587, slip op. at 16. Second, he must have shown counsel's deficient performance prejudiced the defense, such that the result of the proceeding would have been different absent counsel's errors. *Id.* at 687.

        i.     *Testimony by the Parole Officer/Identity of the Parole Officer*

McDonald claims his trial counsel was ineffective when she allowed his CYA parole officer, James Burgert, to testify he had been on parole previously, was on parole with two agencies at the time of the crimes, had committed criminal acts, such as drug use, had violated parole on several occasions and had been convicted of misdemeanors and felonies while on parole. (Doc. No. 16-2 at 77-83, 84-85, Doc. No. 16-3 at 1-3.) He also complains that counsel should have prevented the jury from learning the identity of Burgert as McDonald's parole officer. (*Id.*) The portion of Burgert's testimony McDonald complains about relates to questions defense counsel asked regarding Burgert's supervision of McDonald:

Q. Officer Burgert, prior to — strike that. Was August 20, '03 the first time you and Mr. McDonald had contact, or was he your parolee prior to that date?

A. He had been my parolee on a few other occasions prior to that date.

Q. How many times had he been your parolee?

A. Well he had been on parole at least two times, and he had also had some

1    minor incidents that — where he was in custody.

2          You have to define whether he was active on parole.  Try to be more specific.

3          THE COURT: The question really is when did you supervise him, not what he was there for.

4

5          MS. LACHER: Thank you, your Honor.

6                                        . . . .

7          MS. LACHER: Given the fact that there was a record then that he wasn't attending [a drug group] regularly, that would mean he would not be in compliance of the terms and conditions of his parole, is that correct?

8

9          A.  Correct.

10         Q.  And that you didn't violate him, did you?

11         A.  No.  We use escalating sanctions.

12         Q.  Well, did you impose any sanctions upon him?

13         A.  Yeah, we restructured him.  He is a juvenile ward.  We restructured him.  We talk to them.  We try to encourage them to change their behavior.  I mean, there is other incidences that there was violation of behavior, but you didn't ask me about those.

14                                       . . . .

15         BY MS. LACHER: Do you remember a discussion between you and Mr. McDonald concerning him having to ask his adult parole officer after asking you to live [at the Troy Street apartment]?

16

17         A.  I believe during our conversation on November 4th I instructed him to contact his [California Department of Corrections] C.D.C. parole agent.

18

19                                       . . . .

20         BY MR. BOWMAN: Sir, you mentioned at one point — or actually, you were questioned by Ms. Lacher regarding a C.D.C. parole agent.  Do you recall that?

21

22         A.  Yes.

23         Q.  Are you his C.D.C. parole agent?

24         A.  No.  I am California Youth Authority.

25         Q.  Okay, so when we talk about C.D.C. parole agent, we are talking about a different parole agent?

26         A.  California Department of Corrections

27         Q.  Okay, so he had a C.D.C. parole agent and you, correct?

28         A.  Correct.

1    Q.  Both you you were supervising him simultaneously?

2    A.  Correct.

3                                    . . . .

4    Q.[Mr. Bowman]: Okay.  And it was based on [McDonald's and Burton's]
     representation [that they were cousins] that you initially approved the placement [at the
5    Troy Street apartment], correct?

6    A. Based on the length of the conversation and the description of the residence,
     my previous knowledge of that community, it seemed reasonable.
7
     Q. And you could have arrested Mr. McDonald right then and there on the 4th,
8    correct?

9    A. Yes.

10   Q. And did you do that?

11   A. No.

12   Q. Why not?

13   A.  It seemed like there was — because they are youthful offenders, they
     committed the crime prior to the age of 18, we treat them somewhat differently than if
14   they were an adult. Even though they are of the adult age, we have to assume sometimes
     they may not have the necessary skills to recognize that they have to maintain consistent
15   and regular communication.

16                                   . . . .

17   Q. [Ms. Lacher] And you indicated when I was doing my cross-examination that
     Mr. McDonald had many violations in your mind, correct?
18
     A. Yes.
19
     Q. Can you tell us what those were?
20
     A.  He last had violations for — they have been anywheres from minimal to
21   serious.  They have been infractions, they have been misdemeanors, they have been
     felonies, they have been drug-related.  They have been so serious that he got sent to
22   prison as an adult.

23   (Lodgment No. 17, vol. 2 at 108-09, 120-21, 124, 126-27, 132, 134-35.)

24   Much of McDonald's defense hinged on his claim that he did not live at the Troy Street

25   apartment, and thus had no knowledge of or connection to the stolen items found there.  To that end,

26   counsel presented evidence, via Burgert and others, that McDonald was living at the Polk Street sober

27   living facility.  Counsel's questioning of Burgert was an attempt to bolster this defense by suggesting

28   that had McDonald been in violation of his parole by living in a non-approved residence, Burgert would

                                    44                              08cv0652

have violated his parole.  Thus, an inherent and unavoidable part of the defense was Burgert's identity as McDonald's parole officer and McDonald's status as a parolee.  Counsel's performance in this realm, however, was not particularly strong.  Many of the questions were inartfully constructed and allowed Burgert to introduce extraneous information about McDonald's past, convictions, performance on parole, and other information not relevant to the charges or the defense.  Nevertheless, although counsel's questioning was at times weak and unfocused, the state court's determination that counsel did not "[make] errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" was not unreasonable.  *Strickland*, 466 U.S. at 689; *Harrington*, slip op. at 16.

Moreover, McDonald has not established he was prejudiced by the introduction of this testimony.  *Id.* at 694.  As the trial court pointed out when it denied the defense request for a mistrial, much of what Burgert testified to was either already before the jury, an integral part of the defense strategy or would have to be proven by the prosecution anyway.  McDonald's defense focused on establishing that he was living at the Polk Street sober living facility and not at the Troy Street apartment where the stolen property was found.  To that end, counsel sought to establish that the sober living facility had strict rules for residence, that both of McDonald's parole officers and the director of the sober living facility were monitoring McDonald to ensure that he was living at the sober living facility and that he would have suffered consequences had he not been living there.  McDonald's residence at a sober living facility informed the jury that McDonald had been involved with drugs at some point.  And, because McDonald refused to admit to the validity of his prior felony convictions, the prosecution had to establish that McDonald had been convicted of a felony in order to prove he was a felon in possession of a weapon for purposes of count seven.  Thus, the information regarding McDonald's prior convictions and drug use was before the jury independently of Burgert's testimony.

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  He is not entitled to relief as to this claim.

    ii.    *Suppression of Statements*

McDonald also argues counsel was ineffective for failing to research and bring a motion to

suppress statements he made to Burgert which were related by Detective Hartman at trial.  (Doc. No. 16-2 at 118-20, 121-23.) McDonald alleges the statement were not made voluntarily.  (*Id.*)  Respondent does not address this argument.

At trial, Detective Hartman testified that he spoke to Burgert in the course of his investigation. (Lodgment No. 17, vol. 4 at 511-116.)  On cross examination, Hartman testified he asked Burgert sometime early in the day on November 4, 2003, where McDonald was living; Burgert told Hartman that McDonald's "whereabouts were unknown."  (*Id.* at 513.)  Later that day, Burgert called Hartman back and told him McDonald had contacted him with a new address of 8614 ½ Polk Street.  (*Id.* at 515-16.)  McDonald claims counsel should not have asked these questions but rather should have sought to suppress these statements by arguing they violated McDonald's Fifth Amendment right to remain silent. (Doc. No. 16-2 at 119-20.)

The state court's conclusion that counsel was not ineffective was not objectively unreasonable because there was no basis for a Fifth Amendment challenge.  "[T]he Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *Hibel v. Sixth Jud. Dist. Ct. of Nev., Humbolt County*, 542 U.S. 177, 190 (2004) (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)).  However, "[t]he Fifth Amendment privilege is only properly invoked in the face of 'a real and appreciable danger of self-incrimination.'" *U.S. v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005) (citing *McCoy v. Comm'r*, 696 F.2d 1234, 1236 (9th Cir.1983) (internal quotation marks omitted).))  "'If the threat is remote, unlikely, or speculative, the privilege does not apply . . . .'" *Id.*

The United States Supreme Court addressed the Fifth Amendment's application in a case similar to McDonald's in *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).  In *Murphy*, a probationer admitted to a counselor to a prior rape and murder.  *Id.* at 422-23.  Upon learning of this, Murphy's probation officer directed Murphy to schedule a meeting with her.  At the meeting, the probation officer confronted Murphy about the information and turned it over to police.  Murphy sought to suppress the statements about the rape and murder on Fifth and Fourteenth Amendment grounds.  *Id.* at 423-25.  The Court first stated that "[a] defendant does not lose [his Fifth Amendment protection against self

1    incrimination] by reason of his conviction of a crime." *Id.* (citing *Baxter v. Palmigiano*, 425 U.S. 308,

2    316 (1976)).  The Court went on to note, however, that "the general obligation to appear and answer

3    questions truthfully did not itself convert Murphy's otherwise voluntary statements into compelled

4    ones." *Id.* at 427.  Rather, the Court stated:

5        In that respect, Murphy was in no better position than the ordinary witness at a trial or
         before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer
6        on the pain of contempt, unless he invokes the privilege and shows he faces a realistic
         threat of self incrimination.  The answers of such a witness to questions put to him are
7        not compelled within the meaning of the Fifth Amendment unless the witness is required
         to answer over his valid claim of the privilege.

8

9    *Id.* at 427.

10       Indeed, the Court specifically rejected the notion that the mere fact that Murphy's probation

11   officer could compel his attendance at the meeting and truthful answers transformed the meeting into

12   a setting sufficiently coercive as to meet the "compulsion" requirement of the Fifth Amendment.  *Id.*

13   at 431.

14       McDonald was in much the same position as the defendant in *Murphy*.  His disclosure of his

15   address was not "compelled" simply by the requirement that he inform his parole officer of his current

16   address.  *See id.* at 427.  Moreover, the threat of prosecution with regard to McDonald's disclosure of

17   his address to his parole officer was speculative because at the time he made it, McDonald was not

18   aware of any criminal investigation into McDonald's activities.  (*See* Lodgment No. 17, vol. 4 at 510-13,

19   vol. 5 at 743-45.)

20       For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor

21   an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

22       11.    *Cumulative Effect of Errors/Cumulative Ineffective Assistance of Counsel*

23       McDonald claims the cumulative effect of the evidentiary errors and ineffective assistance of

24   counsel which occurred at his trial rendered it unfair.  (Doc. No. 16-3 at 4-7.)  "Cumulative error applies

25   where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

26   the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d

27   1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)).

28   Because the Court has determined there is no merit to the evidentiary error claims McDonald has

alleged, it follows there was no cumulative error.  Likewise, since there were no instances of counsel's

conduct which rose to the level of ineffective assistance, there is no basis for the Court to conclude the

cumulative effect of counsel's errors amounted to ineffective assistance or that McDonald did not

receive a fair trial.  Accordingly, the state court's denial of the claim was neither contrary to, nor an

unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

McDonald is not entitled to relief as to this claim.

     12.    *Instructional Error*

     McDonald claims his federal due process rights were violated by the state court's failure to *sua*

*sponte* instruct the jury on the need for corroboration of an accomplice's testimony in order to convict

him. (Doc. No. 16-3 at 8-11.)  He also argues the jury was improperly instructed with CALJIC No. 2.15.

(*Id.* at 11-16.)  Respondent counters that this claim does not present a federal question, and, in the

alternative, McDonald's due process rights were not violated.  (Mem. of P. & A. Supp. Answer at 47-

50.)  McDonald raised these claims in the habeas corpus petition he filed in the California Supreme

Court, which denied the petition without citation of authority.  (Lodgment No. 6.)  That court denied

the petition without citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must conduct and

independent review of the record to determine whether the state court's denial was either contrary to,

or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

     To the extent McDonald is arguing the state trial court violated California law when it failed to

give the accomplice instruction or by instructing with CALJIC No. 2.15, Respondent is correct that

McDonald is not entitled to federal habeas relief.  *Estelle*, 502 U.S. at 67-68; *see also* 28 U.S.C.

§ 2254(a).  This Court must determine, however, whether any instructional error so infected the trial as

to render it fundamentally unfair.  *Estelle*, 502 U.S. at 67-68.

     i.    *Accomplice Instructions*

     Penal Code section 1111 states that "[a] conviction can not be had upon the testimony of an

accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with

the commission of the offense . . . ."  (Cal. Penal Code § 1111.)  To that end, when the prosecution's

case rests on the testimony of an accomplice, a jury in California is normally instructed with CALJIC

Nos. 3.11 and 3.12, which state, in pertinent part, as follows:

You cannot find a defendant guilty based upon the testimony of an accomplice or the testimony by a codefendant that incriminates the defendant unless that testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense.

Testimony of an accomplice or by a codefendant includes any out-of-court statement purportedly made by an accomplice or a codefendant received for the purpose of proving that what the accomplice or the codefendant stated out-of-court was true.

. . .

To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged.

However, it is not necessary that the evidence of corroboration be sufficient in and of itself to establish every element of the crime charged, or that is corroborates every fact to which the accomplice testifies.

In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.

If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated.

If there is independent evidence which you believe, then the testimony of the accomplice is corroborated.

(CALJIC Nos. 3.11, 3.12.)

As Respondent correctly contends, California law does not require a court to *sua sponte* instruct on accomplice testimony when, as in the present case, an accomplice is called as a witness by the defense. *People v. Provencio*, 210 Cal. App. 3d 290, 308 (1989). Thus, the failure to give the instructions *sua sponte* was not inconsistent with California law. The California appellate court in *Provencio* noted as follows:

[T]he mere presence of potentially incriminating out-of-court statements of a defense witness who denies accomplice status, does not give rise to a sua sponte duty to instruct the jury concerning accomplice testimony when the witness is called to testify for the defense. Rather, a question of credibility for the jury to determine arises concerning the weight to be given to such statements.

*Id.* at 309.

Respondent is also correct that there is no clearly established Supreme Court law requiring the

type of instruction McDonald claims should have been given in this case. Rather, an instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instruction cannot be judged in isolation, however. *Estelle*, 502 U.S. at 72. Rather, it must be considered in the context of the entire trial record and the instructions as a whole. *Id.*

Because Washington was a defense witness and testified that McDonald did not commit the burglaries with him, the accomplice instructions were not applicable or helpful to his defense. The jury was called upon to determine whether they believed Washington's statements to Detective Hartman or his trial testimony. Obviously, the defense wanted the jury to credit Washington's trial testimony, and the accomplice instructions would have undermined Washington. Accordingly, the failure to give accomplice instructions did not "so infect the entire trial that [McDonald's] conviction violates due process." *Murtishaw*, 255 F.3d at 971. The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. McDonald is not entitled to relief as to this claim.

### ii.    *CALJIC No. 2.15*

Next, McDonald argues CALJIC No. 2.15 lowered the burden of proof on the prosecutor and violated his right to a fair trial. (Doc. No. 16-3 at 131-36.) McDonald focuses specifically on the language in CALJIC No. 2.15 which states that only slight corroborating evidence must be presented in order to infer guilt. CALJIC No. 2.15 states as follows:

> If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.
>
> As corroboration, you may consider:
>
> (1) The attributes of possession — time, place and manner,
>
> (2) That the defendant had an opportunity to commit the crime charged,
>
> (3) The defendant's conduct,

(4) His false or contradictory statements, if any, and or other statements he may have made with reference to the property,

(5) A false account of how he acquired possession of the stolen property,

(6) Any other evidence which tends to connect the defendant with the crime charged.

(CALJIC No. 2.15; Lodgment No. 15, vol. 2 at 0345.)

An instruction that requires the jury to infer a finding, shifting the burden of proof from the prosecutor to defendant, violates a defendant's due process rights. *See Carella v. California*, 491 U.S. 263, 265 (1989). However, where that inference is permissive, the instruction may be constitutionally sound. *Ulster County Court v. Allen*, 442 U.S. 140, 157 (1979). The inference that a jury can draw from CALJIC No. 2.15 is a permissive one, neither required by the mere possession of stolen property nor mandated by the existence of other corroborating factors such as proximity to the crime scene, opportunity to commit the crime, or subsequent conduct. *Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir.1992).

When the inference is permissive, allowing the jury to infer an essential fact from proof of another fact is lawful so long as "the inferred fact is more likely than not to flow from the proved fact on which it is made to depend." *Id.*, (citations and internal quotations omitted). Here, it is clearly "more likely than not" that McDonald had committed the burglaries if he was in possession of the items stolen during the burglaries. Indeed, the instruction itself states that "possession [of stolen property] is not by itself sufficient to permit an inference that the defendant is guilty of the crime of burglary" and that "corroborating evidence tending to prove defendant's guilt" was necessary. (Lodgment No. 15, vol. 2 at 0345 (CALJIC No. 2.15).) Further, considering the jury instructions as a whole, as the Court is required to do under *Estelle*, 502 U.S. at 72, the instruction did not impermissibly shift the burden of proof or permit the jury to infer and improper fact. In addition to the substantive elements of burglary (CALJIC No. 14.50), the jury was told to consider the instructions as a whole (CALJIC No. 1.01) and that the prosecution had the burden of proving all elements of the crimes with which McDonald was charged beyond a reasonable doubt (CALJIC No. 2.90). (Lodgment No. 15, vol. 2 at 0337, 0354, 0361.)

McDonald also complains that the instruction is infirm because it does not inform the jury that "guilt cannot be based on the presumption (or inference) alone unless it has been proved beyond a

reasonable doubt that the defendant's explanation for possession of the recently stolen property is unsatisfactory." (Doc. No. 16-3 at 14.)  As Respondent correctly argues, however, this is not required. (Mem. of P. & A. Supp. Answer at 49-50.)  The jury's role is that of fact finder, and, so long as a permissive inference in an instruction makes the "inferred fact more likely than not to flow from the proved fact on which it is made to depend," no error has occurred. *Schwendeman*, 971 F.2d at 316.  The jury is free to accept either the prosecution's version of events or the defense version.

/ / /

/ / /

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. McDonald is not entitled to relief as to this claim.

13.   *Substitution of Counsel*

Finally, McDonald argues the trial court impermissibly denied his right to substitute counsel when it relieved his retained counsel, then reappointed her without holding a *Marsden* hearing.  The facts surrounding this claim are as follows.  Deputy Public Defender Stacy Gulley began representing McDonald on November 20, 2003.  (Lodgment No. 15, vol. 2 at 0421.)  For reasons that are not in the record, Gulley was taken off the case and Deputy Public Defender Michael Ruiz began representing McDonald on December 8, 2003.  (*Id.* at 0424.)

On May 4, 2004, McDonald told the Court he wanted to "discharge the Public Defender as his attorney of record." (Doc. No. 16-3 at 43.)  When asked why, McDonald told the judge his attorney had not subpoenaed "an important witness," who McDonald identified as Clarence Burton. (*Id.* at 2.)  When questioned by the judge, Ruiz said that despite his efforts, he had been unable to locate Burton in order to subpoena him.  (*Id.* at 3.)  McDonald told the judge he wanted Ruiz to file a "motion to produce" Burton, to which the judge responded that no such motion existed.  Because McDonald knew the name of the witness and the witness was not in custody, it was the obligation of the defense to locate Mr. Burton. (*Id.* at 3-4.)  McDonald also complained that the defense investigator had not visited him in jail or visited the crime sites to "gather information crucial to [his] defense in this case."  (*Id.* at 5.) Specifically, McDonald wanted the investigator to determine how far away the witnesses who identified

1    him were as a means to challenge their identification because, he alleged, the lineup was not fair.  (*Id.*

2    at 5-6.)  According to McDonald, Ruiz was also encouraging him to settle the case even though he was

3    innocent and that Ruiz asked him to sign a document which stated that McDonald was taking the case

4    to trial against the advice and wishes of Ruiz's coworkers and superiors.  (*Id.* at 6-7.)

5         Ruiz told the judge that, contrary to what McDonald alleged, he and his investigator had visited

6    the crime scenes and had taken measurements to determine how far away the witnesses were from

7    McDonald when they claimed they saw him in order to challenge their identification.  (*Id.* at 8-9.)  Ruiz

8    also noted that Gulley had filed a motion for a live lineup which had been denied and that, as a result,

9    Ruiz had hired an identification expert to testify about the inaccuracies of the photo lineup at trial.  (*Id.*

10   at 9.)  Finally, Ruiz told the judge that he had tried to find Burton but that he had also explained to

11   McDonald that "unless the prosecution is going to use his testimony in trial, there is no confrontation

12   issue and without a confrontation issue, they don't have to bring him to us."  (*Id.* at 9.)  McDonald also

13   wanted to testify, which was contrary to Ruiz's advice due to impeachment problems.  (*Id.*)  At this

14   point, Ruiz believed there had been a "breakdown in communication" between him and McDonald.  (*Id.*

15   at 10.)  Ruiz had given McDonald an evaluation of the strengths and weaknesses of the case and his

16   consultations with other attorneys in his office, he should accept the prosecution's offer.  He also told

17   McDonald that in order to get a better sentence than the prosecution was offering, Ruiz would have to

18   secure a not guilty verdict on all four burglaries.  (*Id.* at 10-11.)

19        At the conclusion of the hearing, McDonald told the judge that if he did not grant his request to

20   relieve the public defender, he wanted to go pro per.  The judge told McDonald they were two separate

21   issues.  (*Id.* at 16.)  The judge then denied McDonald's *Marsden* motion, noting that Ruiz had

22   investigated the case, was prepared and was "one of the most competent attorneys in the Public

23   Defenders' Office."  (*Id.* at 17.)  The court then heard McDonald's motion to represent himself.  Over

24   the prosecution's objections, the court granted the request and gave McDonald a six week continuance.

25   (*Id.* at 22-29.)[10]

26        On August 12, 2004, McDonald appeared with retained counsel Pam Lacher.  (Lodgment No.

27

28   _____

[10] The original trial date of July 12 was eventually vacated and reset for September 27, 2004.  (Lodgment
No. 15, vol. 2 at 0439-41.)

15, vol. 2 at 0442.)  Lacher told the court she would be ready to proceed to trial on the September 27, 2004 trial date and that date was confirmed.  (Doc. No. 16-4 at 13-14; Lodgment No. 15, vol. 2 at 0442.) On September 21, 2004, Lacher told the court she had received a phone call from  McDonald's girlfriend the preceding day telling her that McDonald no longer wanted her as his attorney.  (Doc. No. 16-4 at 1.)  McDonald had told Lacher that he wanted an attorney appointed for him.  (*Id.*)  The prosecutor objected to McDonald's request to relieve Lacher, detailing the lengthy course of the case and the numerous delays in the trial date due to McDonald's *Marsden* motions and requests to represent himself.  The prosecutor also noted that a prosecution witness would be unavailable after October 5th because he was being deployed to the Middle East, a fact that had been well known to all the parties for some time.  (*Id.* at 2-5.)  When the court indicated it would not grant his request to discharge Lacher, McDonald told the court that he had been "perfectly happy" with the original public defender who had been appointed to represent him, Stacey Gulley, and objected to Gulley being taken off his case.  (*Id.* at 5-10.)  He complained about Ruiz's representation and Lacher's representation, claiming that neither one had competently represented him.  (*Id.* at 16-20.)  Ultimately, the court granted McDonald's request to discharge Lacher, but appointed her to represent him and kept the original trial date of September 27, 2004.  (Lodgment No. 15, vo. 2 at 0445.)

McDonald has several complaints related to this series of events.  First, he contends the trial court improperly conducted the *Marsden* hearing on attorney Ruiz.  (Doc. No. 16-3 at 137-38). Specifically, McDonald argues the judge did not conduct an inquiry into his claim that Ruiz was demanding McDonald sign a waiver before proceeding to trial.  Contrary to McDonald's claim, however, the trial judge did inquire into McDonald's contention that Ruiz was pressuring him to settle the case and "sign a paper stating that against his [Ruiz's] wishes and the against the wishes of his superiors and/or coworkers — basically that I should take this deal and I shouldn't take it to trial, your Honor."  (Doc. No. 16-3 at 49.)  The trial judge asked Ruiz to respond to these allegations.  (*Id.* at 8.) Ruiz stated as follows:

> MR. RUIZ: What I did this morning, I provided Mr. McDonald with a letter outlining, basically, the state of the case, outlining the charges, the quote unquote nickel prior, the problem with some of the facts that we know to be facts based upon the preliminary examination.  In fact, I have consulted with numerous attorneys, Miss Coyne, from my office, as well, advising him that after consulting with these other attorneys as well, we believe it is in his best interest to accept the people's offer.

THE COURT: You have to communicate that to him.

MR. RUIZ: I do.  And I have provided a letter to him.

THE COURT: Based on your evaluation of the witnesses and the fact that you may prevail on some of the counts but, perhaps, not all counts.

MR. RUIZ: I explained I need to prevail on all four burglaries in order to beat the offer.

(*Id.* at 10-11.)

/ / /

The trial court's inquiry was appropriate and revealed that Ruiz's actions were simply what is required of a competent attorney — a thorough, unbiased evaluation of the strengths and weaknesses of the case and a professional opinion on whether or not taking the offer made by the prosecution was in McDonald's interest.  The state court's denial of this claim, therefore, was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

McDonald next argues his decision to represent himself was not voluntary because the trial court's *Marsden* proceedings were insufficient and because the trial court's refusal to remove Ruiz created a situation where McDonald was forced to proceed with an attorney he did not believe would properly represent him.  (Doc. No. 16-3 at 138-39.)  First, as discussed above, there was no error in the *Marsden* proceedings.  The trial court properly conducted the hearing, inquired into McDonald's complaints and Ruiz's preparation and determined that Ruiz was both competent and prepared to represent McDonald.  McDonald simply disagrees with the outcome of the *Marsden* hearing, and that does not, by itself, render it insufficient.

Second, the record reflects McDonald's request to waive representation and to represent himself was knowing and intelligent.  Under the Sixth and Fourteenth Amendments, a defendant has the right to represent himself.  *See Faretta v. California*, 422 U.S. at 422 U.S. 806, 819-20 (1975).  If a defendant waives counsel and chooses to represent himself, the waiver must be "knowing, voluntary and intelligent," and he "must be warned specifically of the hazards ahead."  *Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004) (citing *Faretta*, 422 U.S. at 806).  A waiver is intelligent if "the defendant 'knows what he is doing and his choice is made with eyes open.'"  *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).  No formal script is required, but courts should consider "a range

of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* at 88-89 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

In McDonald's case, McDonald filled out the waiver form given to him by the trial judge which detailed the charges and the maximum punishment he faced. (Doc. No. 16-3 at 60-61.) The judge assured himself that McDonald understood the content of the form and that he had an adequate educational background and knew how to read and write. (*Id.* at 19.) He told McDonald what access he would have to legal research as well as the restrictions he would face by representing himself. (*Id.*) He also gave McDonald a continuance of six weeks for him to prepare. (*Id.*) Under these circumstances, McDonald's request to represent himself was knowing, voluntary and intelligent. The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

To the extent McDonald is arguing he was forced to represent himself because Ruiz was incompetent, his claim is also without merit. The trial judge's inquiry at the *Marsden* hearing revealed that Ruiz had thoroughly investigated the case, including visiting the sites of the burglaries and the vantage points from which the identification witnesses claimed they had seen McDonald. (Doc. No. 16-3 at 50-51.) Ruiz had also secured the services of an expert witness to counter the identification evidence. (*Id.* at 9.) Ruiz explained that through his own evaluation of the evidence and discussions with colleagues, he believed McDonald should accept the offer made by the prosecution. (*Id.* at 9-10.) Ruiz also indicated he was prepared to file some in limine motions before trial and would be interviewing Washington as part of his defense. (*Id.* at 10-13.) The trial judge said that Ruiz was "one of the most competent attorneys in the Public Defender's Office." (*Id.* at 17.) There is simply no evidence in the record that Ruiz was not competently representing McDonald when McDonald decided to represent himself. *See Miller v. Blackletter*, 525 F.3d 890, 897 (9th Cir. 2008) (stating that the Ninth Circuit is "unaware of any [Supreme Court precedent] that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of conflicts of interests, but with whom the defendant refuses to cooperate because of dislike or distrust") (quoting *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008)).

McDonald also contends the trial court improperly denied his request to discharge his attorney, Pamela Lacher, on the day of trial and appoint another attorney. (Doc. No. 16-3 at 138.) Although the record reflects the trial judge granted McDonald's request to relieve Lacher, the judge's subsequent decision to appoint her to represent McDonald is the functional equivalent of denying McDonald's request.

/ / /

/ / /

The Sixth Amendment guarantees a defendant the right to counsel of choice under certain circumstances. The Ninth Circuit has discussed the clearly established Supreme Court law on this issue as follows:

> The Supreme Court has emphasized . . . that the right to counsel of choice is "circumscribed by several important respects." *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100, L.Ed.2d 140 (1988). Indeed there are four specific situations in which the Sixth Amendment does not entitle a defendant to preferred counsel: A defendant does not have the right to be represented by (1) an attorney he cannot afford; (2) an attorney who is not willing to represent the defendant; (3) an attorney with a conflict of interest; or (4) an advocate (other than himself) who is not a member of the bar. *Id.* In addition, the Court has established that a trial court requires "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *[United States v.] Gonzalez-Lopez*, 126 S.Ct. at 2565-66 (citation omitted). As such, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id.* at 2566.

*Miller*, 525 F.3d at 895.

Because Lacher was retained counsel, McDonald had the right to counsel of his choice. *Id.* at 895. The Ninth Circuit has identified three factors a court should consider when deciding whether to permit a substitution of retained counsel: (1) whether the defendant had retained new counsel; (2) whether current counsel was prepared and competent to proceed forward; and (3) the timing of defendant's request. *Id.* at 896-98. In addition, the trial court had an obligation, under Ninth Circuit authority, to inquire into the problems McDonald alleged he was having with Lacher. *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (citing *Schell v. Witek*, 218 Fl.3d 1017, 1025-26 (9th Cir. 2000)).

The Ninth Circuit in *Miller* denied habeas corpus relief under similar circumstances to those in the present case. First, in *Miller*, as in McDonald's case, the defendant had not retained new counsel at the time of the request. *See Miller*, 525 F.3d at 896; Doc. No. 16-4 at 10-22. Second, as in *Miller*,

08cv0652

1   the trial judge assured himself that Lacher was prepared for trial and was competent to proceed to trial.

2   When McDonald made his request to relieve Lacher, the judge permitted McDonald to explain the

3   reasons why.  *See id* at 896-97.  McDonald began by expressing his dissatisfaction with Gulley being

4   taken off of his case early on, and complaining about Ruiz being unprepared.  (Doc. No. 16-4 at 15-16.)

5   Focusing on the fact that he was facing twenty-six years to life, McDonald contended that Lacher was

6   "not prepared to present my side of the story" and that "all I'm asking is to have a person on the side

7   of me to represent me competently."  (*Id.* at 18.)  Specifically, McDonald complained that Lacher had

8   stated McDonald was living at the Troy Street residence at a prior hearing, had not subpoenaed

9   Washington and he had "a couple witnesses" he was trying to locate for her.  (*Id.* at 19.)  He wanted to

10  be "on the same playing field as the D.A."  (*Id.*)  The judge noted that Lacher had stated she would be

11  ready to try the case by the trial date when she was initially retained and that "from what I've heard so

12  far today, she will be ready to try this case on Monday."  (*Id.* at 13.)

13      Third, although McDonald's request to substitute counsel was not as late as the request made

14  by the defendant in *Miller*, who made it on the eve of trial, the trial judge reasonably concluded that

15  McDonald's request was not timely.  McDonald made his request to discharge Lacher one week before

16  trial.  (Lodgment No. 17, vol. 2 at 0445; Doc. No. 16-4 at 5.)  Lacher was McDonald's third attorney,

17  not including the time period during which he had proceeded *pro per*.  (Doc. No. 16-4 at 7-10, 11-15.)

18  McDonald's case was nearly a year old and had been delayed numerous times for a variety of reasons,

19  including McDonald's previous *Marsden* motion and request to proceed *pro per*.  (*Id.*)  In addition, the

20  prosecutor also reminded the judge earlier that one of their witnesses was going to be deployed to the

21  Middle East shortly and would become unavailable, a fact that had been known by all parties for a long

22  time. (*Id.* at 7-10.)  As in *Miller*, the trial court's refusal to continue the case in order for McDonald to

23  secure substitute counsel was not the kind of "unreasoning and arbitrary insistence on expeditiousness

24  that clearly established federal law prohibits."  *Id.* at 898 (quoting *Daniels v. Woodford*, 428 F.3d 1181,

25  1200 (9th Cir. 2005) and *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)).

26      For the foregoing reasons, the Court concludes the state court's denial of McDonald's request

27  for substitute counsel was not contrary to, nor an  unreasonable application of, clearly established

28  Supreme Court law.  *Williams*, 529 U.S. at 412-13.  The trial court properly and reasonably applied the

08cv0652

1   factors set forth in *Miller*.  *Miller*, 525 F.3d at 895.  In addition, the trial court made an adequate inquiry

2   into McDonald's alleged conflict with and complaints about Lacher.  *See Plumlee*, 512 F.3d at 1211.

3         McDonald also seems to argue that the trial court should have held a *Marsden* hearing after it

4   appointed Lacher to represent him.  (Doc. No. 16-3 at 139-40.)  But there is no evidence in the record

5   that McDonald asked for a *Marsden* hearing after the Court appointed Lacher.  (Lodgment No. 15

6   [Clerk's Transcript]; Doc. No. 16-4 at 5-23 [transcript of hearing on request for substitute counsel].)

7   The Court has been unable to locate any Supreme Court authority which requires a state court to conduct

8   such a hearing *sua sponte*.  In any event, the trial court conducted an adequate inquiry into McDonald's

9   complaints about Lacher and concluded that she was competent and prepared to proceed to trial on the

10  date set.  (Doc. No. 16-4 at 13-14.)  Accordingly, the state court's denial of this claim was neither

11  contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529

12  U.S. at 412-13.

13        Finally, McDonald argues the state court should have appointed public defender Gulley instead

14  of Lacher.  (Doc. No. 16-3 at 141-142.)  As Respondent correctly points out, the Sixth Amendment does

15  not afford a defendant who is represented by an attorney at the state's expense counsel of his or her

16  choice.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).  Once Lacher was relieved and

17  McDonald did not either have another attorney retained or choose to represent himself, the court was

18  required to appoint an attorney for McDonald.  But under *Gonzalez-Lopez*, McDonald did not have a

19  Sixth Amendment right to choose who that attorney was.   (*Id.*)  Accordingly, the state court's denial

20  of this claim, therefore, was neither contrary to, nor an unreasonable application of, clearly established

21  Supreme Court law.  *Williams*, 528 U.S. at 412013.  McDonald is not entitled to relief as to this claim.

22  **IV.    CONCLUSION**

23        The Court submits this Report and Recommendation to United States District Judge Lorenz,

24  under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for

25  the Southern District of California. For the reasons outlined above, IT IS HEREBY RECOMMENDED

26  \that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2)

27  directing that Judgment be entered **DENYING** Petitioner's request for an evidentiary hearing and

28  **DENYING** the Second Amended Petition for Writ of Habeas Corpus.

1     IT IS ORDERED that no later than February 25, 2011 any party to this action may file written

2  objections with the Court and serve a copy on all parties. The document should be captioned "Objections

3  to Report and Recommendation."

4     IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and

5  served on all parties no later than March 9, 2011. The parties are advised that failure to file objections

6  within the specified time may waive the right to raise those objections on appeal of the Court's order.

7  / / /

8  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th

9  Cir. 1991).

10     **IT IS SO ORDERED.**

11

12  DATED: <u>February 8, 2011</u>

13                                                      Peter C. Lewis
                                                         U.S. Magistrate Judge
14                                                      United States District Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cv0652